**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  09-23411-CIV-UNGARO/SIMONTON**

**SEVEN SEAS CRUISES S. DE R. L.,**
**f/k/a CLASSIC CRUISE HOLDINGS, S. DE**
**R.L., LLC, d/b/a REGENT SEVEN SEAS**
**CRUISES, INC.** *et al.*,

> **Plaintiffs,**

**v.**

**V.SHIPS LEISURE SAM,** *et al.*,

> **Defendants.**

_____

## SECOND AMENDED COMPLAINT

Plaintiffs SEVEN SEAS CRUISES S. DE R. L., f/k/a CLASSIC CRUISE HOLDINGS, S. DE R.L., LLC, d/b/a REGENT SEVEN SEAS CRUISES, INC., PRESTIGE CRUISE HOLDINGS, LTD., CELTIC PACIFIC (UK) LTD., CELTIC PACIFIC TWO (UK), LTD., SUPPLYSTILL LIMITED, and RADISSON SEVEN SEAS FRANCE SNC, by and through their undersigned counsel, sue Defendants RINA S.P.A., MARTIN OTTAWAY, VAN HEMMEN & DOLAN, INC., V.SHIPS LEISURE SAM, V.SHIPS LEISURE UK, LTD., and MARINE CONTRACTING ASSOCIATION LIMITED, and state the following:

### INTRODUCTION

1.      In January 2008, Prestige Cruise Holdings acquired Regent Seven Seas, a luxury cruise line offering cruise experiences on three premier cruise liners, the Navigator, the Mariner and the Voyager.  In deciding to purchase Regent, Prestige relied, in material part, upon class certifications and a survey concerning the condition of the ships owned by Regent.  Following the purchase, Prestige initially kept in place the previous ship management company, but after

one year, switched to another company to operate the ships.  Shortly after switching operating companies, however, Prestige and its affiliates discovered the following deeply disturbing facts:

a.      that the certifications and survey upon which Prestige relied in purchasing Regent had badly misstated the condition of the Navigator;

b.      that all three ships had been managed and maintained in a grossly inferior condition prior to the purchase and in the year following the purchase, and

c.      that the management company in the year following the purchase, in conjunction with a purchasing group of which it was a member, had secretly overcharged Prestige and its affiliates for supplies and services for the ships.

Prestige and its affiliated entities bring this action to recover the significant damages they have suffered from the wrongful actions of the Defendants.

## JURISDICTION, VENUE AND PARTIES

2.      This Court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1332 because this is a civil action in which the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest, attorneys' fees and costs, and is between citizens of different states.

3.      This Court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1333 because this action arises under the admiralty and maritime laws of the United States.  This action alleges, *inter alia*, breach of maritime contract subject to this Court's admiralty contract jurisdiction, as well as negligent, reckless, willful, and/or fraudulent tortious acts that occurred and/or had effects on a vessel in navigable waters.

4.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions that give rise to the alleged claims occurred in the Southern District of Florida.

5.      Pursuant to Florida Statute § 48.193, each of the named Defendants has subjected itself to the jurisdiction of the courts of Florida by engaging in, and/or carrying on a business or business venture in the state; having an office or agency in this state; committing a tortious act within the state; and/or by committing one or more of the acts enumerated in Florida Statute § 48.193.  Defendants' conduct, as described more fully herein, was specifically directed to, relied upon by, and caused significant damage to Plaintiffs in Florida and was performed in the State of Florida.

6.      Defendants each have established sufficient minimum contacts with the State of Florida such that constitutional due process requirements are neither raised nor infringed upon.

7.      Plaintiff, Seven Seas Cruises S. DE R. L., f/k/a Classic Cruise Holdings, S. DE R.L., L.L.C., d/b/a Regent Seven Seas Cruises, Inc. ("Regent"), is a Panamanian business entity authorized to do business in Florida, and maintains its principal place of business in Fort Lauderdale, Broward County, Florida, and otherwise is *sui juris*.

8.      Plaintiff, Prestige Cruise Holdings, Ltd. (hereinafter "Prestige" or "Purchaser"), is a Panamanian business entity authorized to do business in Florida.  As more fully described herein, Prestige is currently the ultimate Owners of the M/V Seven Seas Navigator (the "Navigator"), the M/V Seven Seas Mariner (the "Mariner"), and the M/V Seven Seas Voyager (the "Voyager"), and otherwise is *sui juris*.

9.     Plaintiff, Celtic Pacific (UK) Ltd. ("Celtic Pacific"), is a British business entity that maintains its principal place of business in Southampton, United Kingdom.  Celtic Pacific is a subsidiary of Prestige, and otherwise is *sui juris*.

10.     Plaintiff, Celtic Pacific Two (UK) Ltd. ("Celtic Two"), is a British business entity that maintains its principal place of business in Southampton, United Kingdom.  Celtic Two is a subsidiary of Prestige, and otherwise is *sui juris*.

11.     Plaintiff, Supplystill Limited ("Supplystill") is a British business entity that maintains its principal place of business in Southampton, United Kingdom.  Supplystill is a subsidiary of Prestige, and otherwise is *sui juris*.

12.     Plaintiff, Radisson Seven Seas France SNC ("Radisson Seven Seas") is a French business entity that maintains its principal place of business in Southampton, United Kingdom.  Radisson Seven Seas is a subsidiary of Prestige, and otherwise is *sui juris*.

13.     Defendant, Marine Contracting Association Limited ("MARCAS"), is a Bermudian business entity with offices in Cyprus and the Isle of Man.  MARCAS conducts business in the State of Florida, and has caused harm to several of the Plaintiffs here in Florida, as set forth more fully herein, and otherwise is *sui juris*.

14.     Defendant, Martin Ottaway, van Hemmen & Dolan, Inc. ("Martin Ottaway"), is a New Jersey business entity that maintains its principal place of business in Red Bank, New Jersey.  Martin Ottaway conducts business in the State of Florida, and has caused harm to several of the Plaintiffs here in Florida, as set forth more fully herein, and otherwise is *sui juris*.

15.     Defendant RINA S.p.A. ("RINA"), is an Italian business entity that maintains its principal place of business in Genoa, Italy.  RINA conducts business in, and has an office in, the

State of Florida, has caused harm to several of the Plaintiffs here in Florida, as set forth more fully herein, and otherwise is *sui juris*.

16.     Defendant V.Ships Leisure SAM ("VSLS"), is a Monegasque business entity that maintains its principal place of business in Monte Carlo, Monaco.  At all times, VSLS also acted through its related business entities of V.Group Limited ("V.Group") and V.Ships.  VSLS conducts business in the State of Florida, maintains an office in Miami, Florida, and has caused harm to several of the Plaintiffs here in Florida, as set forth more fully herein, and otherwise is *sui juris*.

17.     Defendant V.Ships Leisure UK, Ltd. ("VSLUK"), is a British business entity that maintains its principal place of business in Southampton, United Kingdom.  VLSUK conducts business in the State of Florida, and has caused harm to several of the Plaintiffs here in Florida, as set forth more fully herein, and otherwise is *sui juris*.

18.     At all relevant times, VSLS and VSLUK acted through their related entities of V.Group and V.Ships.  V.Ships is divided into three (3) operating divisions:  V.Ships Ship Management, Manpower Services, and V.Ships Leisure.  These divisions are all supported by a single corporate executive team.  VSLS, VSLUK, V.Group and V.Ships act as an integrated business unit with executives and employees providing services across the corporate structure.

## GENERAL ALLEGATIONS

**The Seven Seas Navigator, the Seven Seas Mariner and the Seven Seas Voyager.**

19.     Constructed in or around January 1998, the Navigator is one of the world's premier luxury cruise ships.  Its overall length is 565 feet and has eight (8) passenger decks, and it carries approximately 500 passengers and a crew of approximately 350.

20.     The Mariner also is one of the world's premier luxury cruise ships.  Its overall length is 709 feet and has nine (9) passenger decks, and it carries approximately 700 passengers and a crew of approximately 450.

21.     The Voyager is another of the world's premier luxury cruise ships.  Its overall length is 670 feet and has nine (9) passenger decks, and it carries approximately 700 passengers and a crew of approximately 450.

22.     Regent, one of the world's leading cruise lines, owns the Navigator, the Mariner and the Voyager.  Prestige acquired all three (3) ships when it became the Owners of Regent in 2008.

**Classification of the Navigator.**

23.     RINA is the operational company of Registro Italiano Navale, which was founded in Genoa in 1861.  RINA is a ship classification society.

24.     Ship classification societies are organizations that set the standards for the quality, integrity, and seaworthiness of vessels, and after inspecting a particular vessel, certify  the vessel as conforming to those standards.

25.     In the course of its duties as a classification society, and purportedly based on its extensive research and experience in the maritime industry and experience with the international regulations in force, RINA establishes and maintains standards for the classification of ships and offshore structures.  The standards established and administered by RINA are known as Rules and Regulations (the "Rules"), and their purpose is to address the design, construction, continued classification, and ongoing maintenance of ships.  RINA certifies that construction of vessels is performed according to these standards, and it carries out regular surveys of ships in service to ensure ongoing compliance with these standards, and with the requirements of international

maritime conventions, environmental and safety laws and regulations, and the requirements of the flag state of the vessel.  RINA also inspects and audits ship management practices under the International Safety Management Code (the "ISM Code") to certify compliance with both the ISM Code and with the ship and/or its manager's Safety Management System ("SMS").

26.     Classification of a vessel by RINA is a representation to the world that the vessel is in conformity with the Rules, laws and international standards.  Continued classification of a vessel by RINA after periodic inspections and surveys is a representation that the vessel remains sound in its design, and as presently constituted, fit for its intended use, and conforms to the certain standards of seaworthiness set by RINA by way of the Rules, environmental laws and regulations and safety standards for the class in which the vessel operates, the ISM Code—in effect since July 1, 1998, and the ship's SMS and, subject to any conditions of class or other recommendations in the class record that are imposed on the ship.

27.     In or around 1998, RINA contracted with VSLS and VSLUK to serve as the classification society for the Navigator during its construction in 1998, and RINA remained the vessel's classification society until approximately May 2009.[1]  In performing its duties as the classification society for the Navigator during its construction, RINA was responsible for, *inter alia*, certifying that the ship was constructed in accordance with the applicable flag state—the Bahamas—and international standards.

28.     In performing its duties as the classification society for the Navigator after its construction and during the vessel's operation, RINA continued to act on behalf of the flag state[2]

---

[1] In May 2009, RINA withdrew its class certificate for the Navigator upon the ship's transition to another classification society, Det Norske Veritas.

[2] The Bahamas was the flag state of the Navigator from its construction for a period of years until the vessel's flag was changed to Bermuda.

to inspect the Navigator and certify that the Navigator was meeting the requisite environmental and safety standards for the class in which it operated.  By certifying that the Navigator was in class, RINA certified that the requisite physical systems and processes were in place as required by the ISM Code, and RINA approved the Celtic Pacific SMS as managed by VSLS and VSLUK to operate Navigator.  RINA also certified that VSLS and VSLUK—the companies that were responsible for managing, manning and maintaining the ships—were following the SMS.

29.     RINA would issue class certificates for the vessels on its registry on a periodic basis.  Additionally, RINA would issue off-cycle class certificates in connection with the purchase and/or sale of a vessel.

30.     From the date of construction of the Navigator, RINA maintained the Navigator in class.  RINA continued to issue clean class certificates for the Navigator and the Celtic Pacific SMS as managed by VSLS and VSLUK to operate Navigator—from approximately January through approximately May 2009.

31.     Despite its clear duties as the Navigator's classification society, throughout the time period during which RINA acted as in this capacity, RINA failed to use the correct standards with regard to the vessel certification process and/or applied those standards incorrectly.  RINA also erroneously issued clean class certificates for the Navigator when the condition of the vessel did not comport with the requisite maintenance and environmental standards, the Rules, and environmental regulations.  RINA also neglected to report deficiencies and the vessel's non-compliance with the applicable standards and regulations.

**Prestige engages in due diligence to acquire Regent.**

32.     In or around the later part of 2007 and into January 2008, Prestige engaged in discussions about purchasing all of Regent's issued and outstanding stock (the "Regent Purchase

Transaction").  As a consequence of this contemplated transaction, Prestige would acquire the Navigator , a cruise liner owned by Regent.

33.    As part of the due diligence involved in the transaction, Prestige needed to determine the condition of the ships in the Regent fleet, and asked for a new classification certificate and retained a surveying company to conduct a survey of the ships.

### RINA certifies the Navigator for purchase.

34.    In or around the later part of January 2008, Prestige requested clean class certificates for the Navigator, the Mariner and the Voyager as a condition precedent to the Regent Purchase Transaction.  A clean class certificate of the ships is standard industry practice in connection with transactions of this type.

35.    On approximately January 29, 2008, RINA issued a clean class certificate for the Navigator (the "January 2008 Navigator Certificate").  A true and correct copy of the January 2008 Navigator Certificate is attached hereto as Exhibit "A."

36.    RINA knew that Prestige, as Purchaser, had requested the January 2008 Navigator Certificate and would be relying upon the January 2008 Navigator Certificate, and all prior clean class certificates issued by RINA for the Navigator, in connection with the Regent Purchase Transaction.

### Martin Ottaway prepares a survey of the Navigator.

37.    In or around October 2007, Martin Ottaway, in its capacity as a professional surveyor, conducted a survey of the Navigator in connection with the Regent Purchase Transaction (the "Martin Ottaway Survey").  As a professional surveyor, Martin Ottaway was responsible for surveying the vessel and thereafter determining whether the condition of the ship

was satisfactory.  Upon surveying Navigator, Martin Ottaway represented that the condition of the vessel was satisfactory.

38.    The Martin Ottaway Survey, however, did not accurately state the condition of the Navigator as there were many maintenance and other defects that rendered the vessel's condition below satisfactory.

39.    Through its physical survey of the vessel, Martin Ottaway should have known that the ship's true condition was not as represented.

40.    Based on the circumstances of its engagement, upon information and belief, Martin Ottaway was aware that an entity such as Prestige, as a potential purchaser, would be relying on its survey and the representations made by Martin Ottaway in connection with a purchase transaction.

41.    Based, in part, on Martin Ottaway's representation that the Navigator was in a satisfactory condition, Prestige ultimately entered into the Regent Purchase Transaction.

**Prestige enters into the Regent Purchase Transaction.**

42.    On January 31, 2008, Prestige acquired Ownership of Regent via the Regent Purchase Transaction, whereby Regent became a wholly-owned subsidiary of Prestige, and Prestige became the ultimate Owners of the Navigator, the Voyager and the Mariner.  Prestige attained Ownership of Regent by purchasing all of Regent's issued and outstanding shares and acquired the Navigator through its subsidiary Celtic Two, the Voyager through its subsidiary Standstill, and the Mariner through its subsidiary Radisson Seven Seas. (these subsidiaries hereinafter are collectively referred to as the "Owners").

43.    Prestige relied upon the January 2008 Navigator Certificate and the Martin Ottaway Survey in deciding to acquire Regent on the terms agreed.

44.     Prestige eventually discovered that the condition of the Navigator was far worse than that described in the January 2008 Navigator Certificate and in the Martin Ottaway Survey, and needed significant repairs to its equipment and to its structure, including issues with its stability.   As a result of this discovery, Prestige was forced to drydock the Navigator in November 2009—prior to its regularly scheduled drydock and for a longer period of time—to perform the repairs, causing Prestige to incur a substantial repair expense and to incur significant lost revenues from cancelled cruises.

**Management of the Vessels.**

45.     VSLS and VSLUK are part of V.Group, a group of companies that, together, constitute one of the world's largest providers of ship-management and marine-outsourcing services, with approximately 70 offices in 35 countries, including an office in Miami, Florida. As VSLS and VSLUK provide ship-management services to the cruise, ferry and mega-yacht industries, their services include, *inter alia*, deck and engine management, hotel operations management, marine planning, technical management, catering, manning, crew travel, new building supervision, shore excursions, port agency, consultancy and ship sale, purchase and chartering.

### *Management and maintenance of the ships before the purchase*

46.     VSLS provided management and maintenance services for the Navigator, the Mariner and the Voyager from approximately early 2000 through January 2008 pursuant to an oral management and maintenance agreement with Celtic Pacific.

*Management and Maintenance of the ships after the purchase.*

47.     After the Regent Purchase Transaction, Celtic Pacific was engaged to oversee certain aspects of the operations of the Navigator, the Mariner and the Voyager on behalf of the Owners.

48.     On or about May 27, 2008, Celtic Pacific, on behalf of Celtic Pacific Two, entered into separate ship management agreements with VSLS and VSLUK for the management of the Navigator (the "VSLS Navigator Management Agreement" and the "VSLUK Navigator Management Agreement," and collectively the "Navigator Management Agreements").   True and correct copies of the Navigator Management Agreements are attached hereto as Exhibits "B" and "C."   Pursuant to the Navigator Management Agreements, VSLS and VSLUK provided, *inter alia*, crew management, accounting services and technical management.   The Navigator Management Agreements lasted for one year—expiring on June 30, 2009—and included an annual management fee in the amount of $566,600.00 US.   *See* Exs. B and C, Boxes 4, 15 and 17, ¶ 8.

49.     On or about May 27, 2008, Celtic Pacific, on behalf of Radisson Seven Seas, also entered into separate ship management agreements with VSLS and VSLUK for the management of the Mariner (the "Mariner Management Agreements").   True and correct copies of the Mariner Management Agreements are attached hereto as Exhibits "D" and "E."   Pursuant to the Mariner Management Agreements, VSLS and VSLUK provided, *inter alia*, crew management, accounting services and technical management.   These management agreements lasted for one year—expiring on June 30, 2009—and included an annual management fee in the amount of $566,600.00 US.   *See* Exs. D-E, Boxes 4, 15 and 17, ¶ 8.

50.     On or about May 27, 2008, Celtic Pacific, on behalf of Supplystill, also entered into separate ship management agreements with VSLS and VSLUK for the management of the Voyager (the "Voyager Management Agreements").   True and correct copies of the Voyager Management Agreements are attached hereto as Exhibits "F," and "G."  Pursuant to the Voyager Management Agreements, VSLS and VSLUK provided, *inter alia*, crew management, accounting services and technical management.   These management agreements lasted for one year—expiring on June 30, 2009—and included an annual management fee in the amount of $566,600.00 US.  *See* Exs. F-G, Boxes 4, 15 and 17, ¶ 8.

51.     Pursuant to the Navigator Management Agreements, the Mariner Management Agreements, and the Voyager Management Agreements (referred to collectively as the "Ship Management Agreements"), and as Managers (defined therein), VSLS and VSLUK agreed:

a.      to "undertake to use their best endeavors to provide the agreed Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services."  *See* Exs. B-G ¶ 4.1;

b.      to ensure "that the requirements of the law of the flag of the Vessel are satisfied and they shall in particular be deemed to be the 'Company' as defined by the ISM Code, assuming the responsibility for the operation of the vessel and taking over the duties and responsibilities imposed by the [International Safety Management] Code when applicable."  *See* Exs. B-G ¶ 4.2; and

c.      that "the Managers will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Vessel's flag, or of the places where she trades."  *See* Exs. B-G ¶ 16.

52.     Despite these clear contractual agreements, VSLS and VSLUK did not use their "best endeavors" with regard to fulfilling their duties under the Ship Management Agreements. *See* Exs. B-G ¶ 4.1.  VSLS and VSLUK also failed to ensure that the requirements of the law or regulations of the flags of the Navigator, Mariner and Voyager and the places where they sailed were satisfied and that the ship management comported with the ISM code.  *See* Exs. B-G ¶ 4.2.

***Prestige changes  management of the Navigator, the Mariner and the Voyager.***

53.     As the Ship Management Agreements were set to expire on June 1, 2009, in or around late May 2009, Prestige assumed the technical operation of the Navigator, Mariner and Voyager.

54.     In or around early March 2009, in anticipation for assuming management of the Navigator, Prestige instructed VSLS and VSLUK to place Tonci Masle ("Masle"), a chief engineer, on the Navigator, in anticipation of having Mr. Masle appointed as chief engineer of the Navigator upon the expiration of the Navigator Management Agreements.

55.     Upon becoming the Navigator's chief engineer, Mr. Masle discovered the poor condition of the ship and reported his findings with regard to the Navigator's maintenance to the Owners, Prestige, VSLS and VSLUK.  Specifically, Mr. Masle described numerous mechanical and maintenance deficiencies, identified potential environmental violations aboard the vessel, and several structural and safety concerns.

56.     As a direct and proximate cause of the poor maintenance of the Navigator, since assuming technical management and operations of the vessel, Celtic Pacific and Celtic Pacific Two have been required to make various repairs, replace equipment, and were required to drydock the Navigator earlier than its scheduled drydock dates, beginning on or around

November 14, 2009, in order to perform additional extensive repairs to the vessel, resulting in additional costs and lost revenues from cancelled cruises.

57.     As a direct and proximate cause of the poor maintenance of the Mariner, Celtic Pacific and Radisson Seven Seas were required to make various repairs and to replace certain equipment, resulting in additional, unnecessary costs.

58.     As a direct and proximate cause of the poor maintenance of the Voyager, Celtic Pacific and Supplystill were required to make various repairs and to replace certain equipment, resulting in additional, unnecessary costs.

59.     VSLS and VSLUK consistently failed to comply with their own SMS regarding the maintenance of the Navigator, Mariner and Voyager and the ships' equipment, the purchasing of spare parts, and compliance with applicable environmental laws with regard to the Navigator.  And VSLS and VSLUK failed to adequately maintain the Navigator, Mariner and Voyager, causing Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill to be required to make and to make extraordinary repairs that should not have been necessary and that caused various breakdowns.

60.     As a result of VSLS and VSLUK's actions and failure to act, the Navigator was unable to meet the applicable stability requirements and required a drydock, in November 2009, to address the stability concerns.

**Purchasing improprieties.**

61.     Pursuant to the Ship Management Agreements, VSLS and VSLUK also agreed to procure supplies for the ships, and agreed to:

> arrange for the supply of necessary victualling, stores, spares, provision, lubricating oils and services for the Vessel.  **To enable the Managers to arrange such supplies at the most advantageous terms, the Managers shall be entitled to join with**

> **other parties in making arrangements for bulk purchase.**  The Managers are presently members of Marine Contracting Association Limited ("MARCAS") a company established to negotiate on behalf of its members prices, terms, and conditions regulating the bulk purchasing of goods and services for the marine industry.

*See* Exs. B-G ¶ 21.1 (emphasis added).  In this provision, VSLS and VSLUK agreed to work with MARCAS, an independent contracting agency formed as an association of ship Owners and managers for the shipping business, "to enable [VSLS and VSLUK] to arrange such supplies at the most advantageous terms."  Marcus purported to enable VSLS and VSLUK to benefit from bulk purchasing and other economies of scale and to keep operating costs for Regent's ships at a minimum.

62.     VSLS and VSLUK engaged MARCAS to procure supplies for the Navigator, the Mariner and the Voyager.  *See* Exs. B-G ¶ 21.1.  As an independent contracting agency, MARCAS signs supply contracts with suppliers "as agent on behalf of members," and generates income through broker fees.  Its objective is to pool its resources and negotiate globally on behalf of its members in order to obtain the most competitive market prices without compromising quality or safety.  The agency represents that business between MARCAS, its members, and suppliers, is conducted in a fair, open, and business-like manner in order to ensure fair competition.

63.     However, rather than arranging supplies and services at the most advantageous terms to the Owners, VSLS, VSLUK and MARCAS intentionally overstated, inflated and exaggerated invoices for amounts due to third-party contractors that provided services and/or products to the Navigator, the Mariner and the Voyager, and failed to pass on to Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill the promised volume discounts they received. VSLS, VSLUK and MARCAS represented to Celtic Pacific Celtic Two, Radisson Seven Seas

and Supplystill that the amounts contained in their supply and service invoices were legitimate and intended and expected Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill to rely on the bills presented.  Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill made payments of the amounts due thereunder, in the inflated amounts, and VSLS, VSLUK and MARCAS accepted those inflated payments.

64.    All conditions precedent to bringing this action have occurred, have been performed or have been waived.

### COUNT I:  NEGLIGENT MISREPRESENTATION
### (Prestige v. RINA)

65.    Prestige re-alleges and incorporates the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

66.    Sometime before January 31, 2008, VSLS and VSLUK contracted with RINA to serve as the classification society for the Navigator.

67.    In performing its duties as the classification society for the Navigator, RINA periodically issued class certificates for the vessel.

68.    As part of the Regent Purchase Transaction and in the course of its business as a classification society, RINA issued an additional clean class certificate for the Navigator.

69.    Via this certification, RINA certified that the Navigator was in class and met the requisite standards, however this representation was false.

70.    RINA failed to exercise reasonable care in its representation that the Navigator was in class and met the requisite standard and rules.

71.    RINA was negligent in its representation that the Navigator was in class and met the requisite standard and rules because it should have known the statement was false.

72.     In fact, RINA failed to apply the correct standards and applied those standards incorrectly when certifying that the Navigator complied with the applicable regulations and in issuing class certificates for the vessel.

73.     RINA also failed to report deficiencies and non-compliance with maintenance standards and environmental regulations with regard to the Navigator.

74.     RINA knew that Prestige, as Purchaser of the Navigator, would be relying upon RINA to certify that the Navigator was in class and met the requisite standards and rules.

75.     RINA intended and expected that the class certificates it issued—namely the certificate issued in connection with the Regent Purchase Transaction—influence and benefit Prestige, as Purchaser of the Navigator.

76.     As such, Prestige, as Purchaser of the Navigator, was reasonable and justified in relying upon RINA's certification that the Navigator was in class and met the requisite standards and rules as a condition to closing the Regent Purchase Transaction.

77.     As a proximate cause of RINA's negligent misrepresentations, Prestige, as Purchaser of the Navigator, suffered damages.

**WHEREFORE**, Plaintiff Prestige, as Purchaser of the Navigator, respectfully requests this Court enter a final judgment in its favor and against RINA for damages for its negligent misrepresentation, and any such other relief as may be proper.


## COUNT II:  NEGLIGENCE
### (Prestige v. RINA)

78.     Prestige re-alleges and incorporates the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

79.     Sometime before January 31, 2008, VSLS and VSLUK contracted with RINA to serve as the classification society for the Navigator.

80.     RINA served as the classification society for the Navigator.

81.     In performing its duties as the classification society for the Navigator, RINA owed a duty to use due care to determine whether the Navigator conformed to its standards and rules.

82.     RINA periodically issued class certificates for the Navigator.

83.     As part of the Regent Purchase Transaction, and in the course of its business as a classification society, RINA issued an additional clean class certificate for the Navigator.

84.     Via this certification, RINA certified that the Navigator was in class and met the requisite standards, however this representation was false.

85.     RINA failed to exercise the standard of care applicable to classification societies in its representation that the Navigator was in class and met the requisite standard and rules.

86.     RINA also failed to exercise the standard of care applicable to classification societies in its inspection of the Navigator to determine whether it initially met the class and environmental standards; continued to meet the class and environmental standards; and what acts were required to be undertaken to bring the Navigator back up to RINA's class and environmental standards.

87.     As a proximate cause of RINA's failure to exercise the standard of care applicable to classification societies in performing its duties in connection with the Navigator, Prestige, as Purchaser of the Navigator, suffered damages.

**WHEREFORE**, Plaintiff Prestige, as Purchaser of the Navigator, respectfully requests this Court enter a final judgment in its favor and against RINA for damages for its negligence, and any such other relief as may be proper.

### COUNT III:  NEGLIGENT MISREPRESENTATION
### (Prestige v. Martin Ottaway)

88.     Prestige re-alleges and incorporates the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

89.     As a condition precedent to the Regent Purchase Transaction, Prestige requested that the Navigator be reviewed by a professional surveyor.

90.     At the request of Prestige, Martin Ottaway was retained to perform the survey on the Navigator, and in that capacity, Martin Ottaway conducted the Martin Ottaway Survey of the Navigator.

91.     In the Martin Ottaway Survey, Martin Ottaway made the representation that the condition of the Navigator was satisfactory.

92.     Martin Ottaway's representation that the condition of the Navigator was satisfactory was materially inaccurate.

93.     Martin Ottaway was negligent in its representation that the condition of the Navigator was satisfactory.

94.     Martin Ottaway should have known its representation that the condition of the Navigator was false.

95.     Martin Ottaway knew that a prospective purchaser of the Navigator would be relying upon the Martin Ottaway Survey to determine whether the condition of the Navigator was satisfactory.

96.     Martin Ottaway intended for and expected that a potential purchaser such as Prestige would rely upon the representation that the condition of the Navigator was satisfactory.

97.     Prestige, as the Purchaser of the Navigator, was reasonable and justified in relying upon Martin Ottaway's representation that the condition of the Navigator was satisfactory.

98.     As a proximate cause of Martin Ottaway's negligent misrepresentations, Prestige, as the Purchaser of the Navigator, suffered damages.

**WHEREFORE**, Plaintiff Prestige, as the Purchaser of the Navigator, respectfully requests this Court enter a final judgment in its favor and against Martin Ottaway for damages for its negligent misrepresentation, and any such other relief as may be proper.

### COUNT IV:  NEGLIGENCE
### (Prestige v. Martin Ottaway)

99.     Prestige re-alleges and incorporates the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

100.    Martin Ottaway served as the professional surveyor for the Navigator.

101.    In performing its duties as the professional surveyor for the Navigator, Martin Ottaway owed a duty to use due care in its examination and survey of the Navigator to determine whether the condition of the Navigator was satisfactory.

102.    Ottaway failed to exercise the standard of care applicable to professional surveyors in examining and surveying the Navigator and in its representation that the condition of the Navigator was satisfactory.

103.    As a proximate cause of Martin Ottaway's failure to exercise the standard of care applicable to professional surveyors in performing its duties in connection with the Navigator, Prestige, as the purchaser of the Navigator, suffered damages.

CASE NO.: 09-23411-CIV-UNGARO/SIMONTON

**WHEREFORE**, Plaintiff Prestige, as the Purchaser of the Navigator respectfully requests this Court enter a final judgment in its favor and against Martin Ottaway for damages for its negligence, and any such other relief as may be proper

### COUNT V:  BREACH OF CONTRACT (Maintenance Before the Purchase)
### (Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill v. V.Ships Leisure SAM)

104.    Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

105.    Beginning in December of 2000, Celtic Pacific, on behalf of the Owners, entered into an oral ship management and maintenance arrangement with VSLS, pursuant to which VSLS agreed to be responsible for the proper maintenance of the Navigator, the Voyager and the Mariner.  This arrangement lasted through January 2008, when Prestige acquired Regent in the Regent Purchase Transaction.

106.    VSLS breached this management and maintenance arrangement with Celtic Pacific and the Owners by failing properly to maintain the Navigator, the Voyager and the Mariner during the term of the arrangement.

107.    As a proximate cause of the breach of the management and maintenance arrangement, Celtic Pacific and the Owners suffered damages.

**WHEREFORE,** Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in their favor for damages against VSLS for its breach of contract and any such other relief as may be proper.

CASE NO.: 09-23411-CIV-UNGARO/SIMONTON

### COUNT VI:  BREACH OF CONTRACT (Maintenance After the Purchase)
(Celtic Pacific, Celtic Two Radisson Seven Seas and Supplystill v. V.Ships Leisure SAM & V.Ships Leisure UK)

108.   Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

109.   On or about May 27, 2008, Celtic Pacific, on behalf of Celtic Two, Radisson Seven Seas and Supplystill, entered into the Ship Management Agreements with both VSLS and VSLUK.  *See* Exs. B-G.  The date of expiration of the Ship Management Agreements was June 1, 2009.  *See id.*

110.   VSLS and VSLUK breached the Ship Management Agreements, as described in paragraphs 47 through 63, above.

111.   As a proximate cause of the breach of the Ship Management Agreements by VSLS and VSLUK, Celtic Pacific, Celtic Two, Radisson Seven Seas and Supplystill suffered damages.

**WHEREFORE,** Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in their favor for damages against VSLS and VSLUK for their breach of contract and any such other relief as may be proper.

### COUNT VII:  BREACH OF WARRANTY OF WORKMANLIKE PERFORMANCE
(Celtic Pacific, Celtic Two Radisson Seven Seas and Supplystill v. V.Ships Leisure SAM & V.Ships Leisure UK)

112.   Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

113.   On or about May 27, 2008, Celtic Pacific, on behalf of Celtic Two Celtic Two, Radisson Seven Seas and Supplystill, entered into the Ship Management Agreements with both VSLS and VSLUK.  *See* Exs. B-G.  The date of expiration of the Ship Management Agreements was June 1, 2009.  *See id.*

114.    In connection with the Ship Management Agreements, VSLS and VSLUK impliedly warranted to Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill that they would perform in a workmanlike manner with regard to their management and maintenance of the Mariner, Navigator and Voyager.

115.    VSLS and VSLUK breached their warranty of workmanlike performance with regard to their management of the Mariner, Navigator and Voyager.

116.    VSLS and VSLUK failed to exercise the diligence, attention and skill adequate to successfully complete the tasks required of a ship management company with regard to their management of the Mariner, Navigator and Voyager.

117.    As a proximate cause of the breach of the implied warranty of workmanlike performance by VSLS and VSLUK, Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill suffered damages.

**WHEREFORE,** Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in its favor for damages against VSLS and VSLUK for their breach of implied duty of workmanlike performance, and any such other relief as may be proper.

### COUNT VIII:  BREACH OF CONTRACT (Purchase of Supplies and Services)
*(Celtic Pacific & Celtic Two v. V.Ships Leisure SAM & V.Ships Leisure UK)*

118.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

119.    On or about May 27, 2008, Celtic Pacific, on behalf of Celtic Two Celtic Two, Radisson Seven Seas and Supplystill, entered into the Ship Management Agreements with both VSLS and VSLUK.  *See* Exs. B-G.  The date of expiration of the Ship Management Agreements was June 1, 2009.  *See id.*

120.    VSLS and VSLUK breached the Ship Management Agreements as set forth in paragraphs 61 through 63, above.

121.    As a proximate cause of the breach of the Ship Management Agreements by VSLS and VSLUK, Celtic Pacific and Celtic Two suffered damages.

**WHEREFORE,** Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in its favor for damages against VSLS and VSLUK for their breach of contract and any such other relief as may be proper.

### COUNT IX:  FRAUD
### (Celtic Pacific & Celtic Two v. MARCAS)

122.    Celtic Pacific and Celtic Two re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

123.    MARCAS presented bills for payment to VSLS and VSLUK (on behalf of Celtic Pacific and Celtic Two) and to Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill for charges from third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

124.    These bills presented by MARCAS were knowingly overstated and inflated, exaggerating the amounts due thereunder and misrepresenting material facts contained therein concerning the amount paid for goods and services that were purchased.

125.    MARCAS represented to Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill that its bills were for legitimate charges that were paid in full to third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

126.    MARCAS knowingly misrepresented the material facts about each payment and knowingly overstated and inflated the amounts due under the bills presented for payment to Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill.

127.    MARCAS intended Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill to rely upon MARCAS to present legitimate charges paid in full to third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

128.    MARCAS intended Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill to rely on the bills actually presented for payment by Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill for charges from third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

129.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill acted in reliance upon the false representations by MARCAS regarding amounts paid to third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.  In reliance on those representations, Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill paid all amounts billed by MARCAS.

130.    MARCAS profited from misrepresenting, overstating and inflating the bills presented for payment by Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill for charges from third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

131.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill reliance upon the false representations by MARCAS proximately caused Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill to suffer damages.

132.    The conduct of MARCAS was intentional, willful and malicious, thereby entitling Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill to punitive damages.

**WHEREFORE,** Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in its favor for damages against MARCAS for fraud, including punitive damages, and any such other relief as may be proper.

### COUNT X:  UNJUST ENRICHMENT
### <u>(Celtic Pacific & Celtic Two v. MARCAS)</u>

133.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill re-allege and incorporate the allegations contained in paragraphs 1 through 64 above as if stated fully herein.

134.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill conferred a benefit upon MARCAS by paying in full the overstated, inflated, and exaggerated amounts represented in the bills MARCAS for payment for charges from third-party contractors that provided services and/or products to the Mariner, Navigator and Voyager.

135.    MARCAS has knowledge of such benefit.  By knowingly overstating and inflating the amounts due to third-party contractors contained in the bills, presenting them to Celtic Pacific and Celtic Two, and accepting payment in full of said bills from Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill, MARCAS voluntarily accepted and retained the benefit conferred.

136.    When MARCAS accepted payment in full of the third-party contractor bills from Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill, MARCAS knew it was not entitled to any funds that overstated or inflated the actual amount due to the third-party contractors.

137.    Under these circumstances, the acceptance of these overstated funds by MARCAS makes it inequitable for MARCAS to retain such benefit without paying Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill the value thereof.

CASE NO.: 09-23411-CIV-UNGARO/SIMONTON

138.    MARCAS has been unjustly and wrongly enriched by its receipt and acceptance, and negotiation of the overstated funds.

139.    Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill have been injured as a result of the foregoing acts of MARCAS.

**WHEREFORE**, Celtic Pacific Celtic Two, Radisson Seven Seas and Supplystill respectfully request this Court enter a final judgment in its favor and against MARCAS for damages for unjust enrichment, and such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiffs demand a jury trial on all claims so triable.


March 30, 2010.                                       Respectfully submitted,


                                              _/s/_ Daniel A. Casey
                                              Daniel A. Casey, Esq.
                                              Florida Bar No. 327972
                                              daniel.casey@klgates.com
                                              Robert M. Kritzman, Esq.
                                              Florida Bar No. 0475830
                                              robert.kritzman@klgates.com
                                              Steven R. Weinstein, Esq.
                                              Florida Bar No. 985848
                                              steven.weinstein@klgates.com
                                              **K&L GATES LLP**
                                              Wachovia Financial Center
                                              200 S. Biscayne Boulevard, Suite 3900
                                              Miami, Florida 33131
                                              Telephone:  305.539.3300
                                              Facsimile:  305.358.7095
                                              *Attorneys for Plaintiffs*