**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.:  09-23411-CIV-UNGARO/SIMONTON**

**SEVEN SEAS CRUISES S. DE R. L.,
f/k/a CLASSIC CRUISE HOLDINGS, S. DE
R.L., LLC, d/b/a REGENT SEVEN SEAS
CRUISES, INC.,** *et al.***,**

      **Plaintiffs,**

**v.**

**V.SHIPS LEISURE SAM,** *et al.***,**

      **Defendants.**

_____

**PLAINTIFFS' AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Plaintiffs Celtic Pacific (UK) Ltd., Celtic Pacific Two (UK), Ltd., Radisson Seven Seas France SNC, and Supplystill Limited (hereinafter "Plaintiffs"), by and through undersigned counsel, and pursuant to this Court's Pre-Trial Scheduling Order [D.E. 57], hereby submit the following Amended Findings of Fact and Conclusions of Law for adoption by this Court in granting relief to the Plaintiffs on the claims alleged in their Second Amended Complaint.

**FINDINGS OF FACT**

***The Parties***

1.     The Plaintiffs are the owners of the three ships, the M/V Seven Seas Navigator (the "Navigator"), the M/V Seven Seas Mariner (the "Mariner") and the M/V Seven Seas Voyager (the "Voyager") and the company established to oversee the ships' operations.

2.    V.Ships Leisure SAM ("VSLSAM") is the company that agreed to provide technical maintenance and support services for the benefit of the Plaintiffs, including providing for the maintenance and repair of the Navigator the Voyager and the Mariner under different agreements from 1998 until June 2008.

3.    V.Ships Leisure UK ("VSLUK") (VSLSAM's close affiliate) continued the technical management duties for the Regent fleet when VSLSAM's repair and maintenance responsibilities ended in June 2008.  [DE 53].

### *The History of the Parties*

4.    Beginning in 1998, two companies with different, but complementary, backgrounds decided to create a joint venture for the operations of their respective cruise operations. (Conroy Trial Tr. 62:5-63:2). CPUK's parent company was a joint venture company owned by Vlasov Shipping and Carlson Companies, Inc.  (Conroy Trial Tr.72:25-73:23).[1]

5.    The Carlson Group (the owner of the Radisson Hotel franchise) brought its expertise in hotel, hospitality, marketing and sales to the joint venture, and the Vlasov Group (one of the world's largest ship management firms) brought to the joint venture its expertise in ship operations and management.  (Conroy Trial Tr. 63:3-19).

6.    From the beginning, the parties agreed that they each would bring their respective expertise to benefit the joint venture – Carlson in marketing and hospitality and Vlasov in ships management and operations.  Vlasov performed its ship management and operations functions through its wholly-owned subsidiary, VSLSAM.  (Conroy Trial Tr.64:2-10).

---

[1] The names of certain individuals who were part of the joint venture were misspelled in the transcript:  John Diracles, Mauro Terrevazzi, Tullio Biggi, and Ettore Bonaventura.

### *The 1998 Management Agreement*

7.     From the beginning of the Vlasov / Carlson joint venture, the parties had agreed that

V.Ships, an affiliate of the Vlasov Group, would provide ship management services for

the ships of the Regent fleet.  (Conroy Trial Tr. 69:23-70:3).

8.     Pursuant to that agreement, in 1998, Regent Seven Seas Cruises entered into a ship

management agreement with VSLSAM for the management of the Navigator that

provided for the full management of the vessel, including Maritime Operations,

including Manning, Technical and Marine Services, Hotel Operations Personnel,

Procurement of Inventories, Vessel maintenance and Repair, Dry docking, Wet

docking and Refurbishment, Insuring the Vessel and Claims, as well as all

environmental compliance.  (Pls.' Ex. 78 at Sec. 3).

9.     The 1998 agreement provided that VSLSAM, as the Manager, "should provide service

to the Vessel in degree and quality to luxury cruise standards as expected in the cruise

ship industry from time to time and, without prejudice to the foregoing, at least the

same degree and quality of services as the other comparable luxury cruise ship vessels

which Owner operated as of the date hereof" and that this measure relates specifically

to the technical expertise, management time, and degree of competence which manager

employs."  (Pls.' Ex. 78 at Sec. 3).

10.    Under the 1998 agreement, VSLSAM was to be paid $450,000 per year for the

services provided thereunder, plus an additional amount, for the hotel crew

recruitment.  (Pls.' Ex. 78 at Attachment A).

### *The Establishment of CPUK*

11.    In late 2000, however, the ship owners decided to take advantage of certain tax

beneficial ship leasehold opportunities under UK law that required, *inter alia*, that

certain aspects of the management of the ships be performed by a UK entity and that many of the management functions occur in the UK.  (Conroy Trial Tr. 72:25-73:17).

12. Since VSLSAM, the existing manager of the ships, was based in Monaco and did not have an existing UK affiliate, the joint venture parties decided to form a new entity, Celtic Pacific (UK) LTD ("CPUK"), to serve as the formal technical manager of the ships.  (Conroy Trial Tr. 72:25-73:17).

13.  CPUK's parent company was a joint venture company owned by Vlasov Shipping and Carlson Companies, Inc.  (Conroy Trial Tr.73:18-23).

14. Consistent with the agreement that CPUK would serve as the formal technical manager of the Regent Fleet, on December 31, 2000, CPUK signed a management agreement with CPUK Two for management of the Navigator, for which CPUK was paid $150,000.00 per annum.  (Conroy Trial Tr. 74:25-75:23) (Sinclair Trial Tr. 265:12-15) (Pls.' Ex. 5).  This management agreement permitted CPUK to engage others to provide services (Conroy Trial Tr. 75:24-1, 76:1, 5, 7-14) (Sinclair Trial Tr. 265:19-266:4).

15. The transfer of formal management of the ships to CPUK, however, presented two problems to the closely-affiliated owners of the Regent joint venture.  First, CPUK did not have any ship management capabilities whatsoever.  (Conroy Trial Tr.76:15-18, 21-25; 76:1-13).  Second, the transfer to CPUK would severely and negatively impact VSLSAM, which would lose its previously agreed-upon contracts to manage the fleet and the revenues those contracts generated. (Conroy Trial Tr. 80:23-24).

16. In order to provide CPUK with the technical management expertise it needed, and to make up for the lost contract and revenue to VSLSAM, the parties agreed that

VSLSAM, through a series of written and oral agreements, would provide CPUK with the management personnel and expertise it needed, including management and advice concerning the repair and maintenance of the ships.  (Conroy Trial Tr.77:6-13, 18-25; 78:1-14; 79:1-18; 80:5-11) (Sinclair Trial Tr. 266:5-100 (Pls.' Exs. 86, 87).

### *The Parties Entered Into a Series of Written and Oral Agreements*

17.    The oral contract sued upon by the Plaintiffs arises from the relationship between the parties, which was relatively casual, collegial and fully cooperative.  (Conroy Trial Tr. 65:23-66:4); Sinclair Trial Tr. 263:10-16).

18.    From the beginning of the Vlasov / Carlson joint venture, the parties had agreed that V.Ships, an affiliate of the Vlasov Group, would provide ship management services for the ships of the Regent fleet.  (Conroy Trial Tr. 69:23-70:3).

19.    Pursuant to that agreement, in 1998, Regent Seven Seas Cruises entered into a ship management agreement with VSLSAM for the management of the Navigator that provided for the full management of the vessel.  (Pls.' Ex. 78 at Sec. 3).  And for tax purposes, the parties established CPUK.  (Conroy Trial Tr. 72:25-73:17).

20.    The establishment of CPUK had presented the parties with a number of issues.  First, CPUK did not have the technical operating expertise to actually manage the operations of the fleet technically.  (Lindsay Trial Tr. 376:13–377:1).  Second, VSLSAM raised issues because it feared losing the benefits of the 1998 ship management agreement. (Conroy Trial Tr. 80:23-24).  In order to allay those concerns, the Owners agreed that CPUK would be named as the formal Manager for the ships, but, that VSLSAM would continue to provide the support for all of the services it had provided under the 1998 agreement, and that it would be paid the same amount or more for those services as had been agreed in the 1998 agreement.  (Conroy Trial Tr. 80:5-11; 81:20-82:2).

21.     In order to effectuate that agreement, the parties entered into a series of written and oral agreements.   Effective December 31, 2000, CPUK entered into a written management agreement with CPUK Two for CPUK to serve as the Manager of the Navigator.  (Pls.' Ex. 5).  That agreement provided that CPUK, as the Manager, "shall use its reasonable endeavors to provide the management services …and the Manager shall have full power and authority, in the name of the Disponent Owner and as its agent, to do all things which may seem expedient or necessary for the provision of the services or otherwise in relation to the management of the Vessel.  (Pls.' Ex. 5 at Sec. 1.2).  That agreement also provided that the Manager "shall be entitled, on behalf of the Disponent Owner, to: … appoint consultants and other experts to supervise or advise in relation to the maintenance, repair, operation and survey of the Vessel." (Pls.' Ex. 5 at Sec. 2.1(ii)).

22.     In order to provide the Claims, Insuring the Vessel, Procurement of Inventories and Marine Manning responsibilities from the 1998 agreement, effective December 12, 2000, VSLSAM entered into a Manning and Ancillary Services Agreement with Radisson Seven Seas Cruises, Inc., to provide Emergency Situation Assistance, Insurance Claims Handling, Procurement and crew Manning.  (Pls.' Ex. 87 at Sec. 3). VSLSAM was to be paid $80,000 a year for its services under the manning and Ancillary Services Agreement.  (Pls.' Ex. 87 at Sec. 6).

23.     In order to provide the Hotel Operations Personnel and Marine Services responsibilities from the 1998 agreement, effective December 14, 2000, VSLSAM entered into a Management Service Agreement with Radisson Seven Seas Cruises, Inc., to provide Hotel Operations Personnel and Marine Services.  (Pls.' Ex. 86 at Sec.

3). VSLSAM was to be paid $450,000 plus $60,000 for hotel crew recruitment services. (Pls.' Ex. 86 at Sec. 6).

### *The Parties Expressly Agreed to the Oral Agreement in December 2000*

24. In addition, due to the UK tax leases, the parties agreed, orally, in mid-December, 2000 that VSLSAM would provide the rest of the technical management services previously supplied under the 1998 agreement (Technical Marine Operations, Vessel Maintenance and Repair and dry docking, wet docking and Refurbishment). (Conroy Trial Tr. 81:16-19).

### *The Parties to the Oral Agreement*

25. The parties to this oral agreement were CPUK, as an agent on behalf of CPUK Two, and VSLSAM. (Conroy Trial Tr. 80:5-11).

### *The Terms of the Oral Agreement*

26. The terms of the oral contract were that VSLSAM was to provide these technical management and support services as they had agreed to do in the past. (Conroy Trial Tr. 80:5-11; 111:8-17).

### *The Standard of the Oral Agreement*

27. The standard was to be consistent with the standard contained in the 1998 agreement, "with comparable luxury cruise vessels … that competed in the same class of service." (Conroy Trial Tr. 111:8-17). In the context of the relationship between the parties, the standard was that "the ship would be maintained in class and structure and the same quality as before." (Conroy Trial Tr. 181:20 – 182:3). Moreover, it was understood that the ship was to be kept in flag, in class "and in good condition." (Conroy Trial Tr. 182:12-15).

### *VSLSAM Has Admitted that an Oral Agreement Was Entered Into and that it Was Providing Technical Management Services Thereunder*

28.     The Defendants had assured Robin Lindsay in 2008 that the Management of the Regent Fleet was sound because "it's V.Ships behind it and everything will be, you know, in good order."  (Lindsay Trial Tr. 377:2-9).

29.     VSLSAM personnel created documents discussing the services given by V.Ships to CPUK and RSSC, describing their role as "Backstage Management and Support" and specifically noting services provided in addition to written contracts.  (Pls.' Ex. 219). In describing these services, Mr. Malvarosa testified that "there were some issue that we thought at the time were on top of, let's say, our duty of the contract.  Were still ancillary services but ancillary services on top of the ancillary service contract." (Malvarosa Dep. Vol. II, 13:1-13).

30.     On September 14, 2006, Lorenzo Malvarosa wrote a letter to Tami Thraum, the Chief Financial Officer at Regent Seven Seas Cruises, stating that "[i]t was our understanding that the strategic establishment of UK lease/CPUK structure, in which we were instrumental, and with lead to significant financial/commercial benefits for the parent company, should not alter our direct or indirect involvement and as consequence the level of fees."  (Pls.' Ex. 29 at 1).  Mr. Malvarosa goes on in that letter to state that "[a]lthough CPUK is a stand alone operating company, our involvement before/after the establishment of CPUK had not changed on the whole, due to the contract in force between us and the parties involved."  (Pls.' Ex. 29 at 1).

31.     On February 21, 2008, Mr. Malvarosa wrote an email soliciting a continuation of the existing management arrangement, and again describing the services provided by

VSLSAM to the Regent Fleet in the preceding years.  (Pls.' Ex. 13).  In that letter, Mr.

Malvarosa acknowledged that:

> V.Ships is providing management and consulting services covered
> by various agreements due to the fact that the management party
> was transferred to Celtic Pacific UK (CPUK) to comply with UK
> Lease requirements.  Furthermore, these agreements were made in
> the spirit that V.Ships would not be penalised by the UK Lease
> requirements which represented a benefit to the Owners and was
> facilitated by us.

(Pls.' Ex. 13 at 1).

### *The Oral Agreement Was Supported by Adequate Consideration*

***Continuing Business Relationship***

32.    After CPUK was established, the parties agreed that VSLSAM would continue to

provide the same level of services that they had been providing for the same amount of

payment.  (Conroy Trial Tr. 177:14–178:5).

33.    Mr. Malvarosa has also admitted to same in numerous contemporaneous

communications.  (Pls.' Ex. 29 at 1).   In Plaintiffs' Exhibit 13, Malvarosa again

acknowledged that:

> V.Ships is providing management and consulting services covered
> by various agreements due to the fact that the management party
> was transferred to Celtic Pacific UK (CPUK) to comply with UK
> Lease requirements.  **Furthermore, these agreements were made
> in the spirit that V.Ships would not be penalised by the UK
> Lease requirements which represented a benefit to the Owners
> and was facilitated by us.**

34.    In Plaintiffs' Exhibit 220, Mr. Malvarosa lists the various services that VSLSAM was

providing to the Navigator and to the Voyager all in the same horizontal column, and

concludes with a column entitled "Total Management Fee" for all of the services,

including those under the "Support Services (Backstage Management Support)"

column.  (Pls.' Ex. 220).

*The amounts of VSLSAM's payments demonstrate sufficient consideration*

35.    Before CPUK was established, VSLSAM contractually agreed to provide all of the ship management for the Navigator, for $450,000 a year, plus a small daily amount for placed personnel.  (Pls.' Ex. 273).  Starting in 2000 when CPUK was set up, however, VSLSAM began being paid more for its allegedly reduced role in the management of the Navigator than the same parties had agreed to pay it under the 1998 full management agreement.  According to Plaintiffs' Exhibit 273, VSLSAM received $521,051 for the services it provided to the Navigator in 2000, $616,364 for the services it provided to the Navigator in 2001, $545,900 for the services it provided to the Navigator in 2002, $557,652 for the services it provided to the Navigator in 2003, $568,834 for the services it provided to the Navigator in 2004, $583,056 for the services it provided to the Navigator in 2005, $600,552 for the services it provided to the Navigator in 2006, and $710,442 for the services it provided to the Navigator in 2007.  (Pls.' Ex. 273).

36.    In comparison, when VSLUK, VSLSAM's affiliate, was awarded the contract for the full management of the Navigator beginning on June 1, 2008, it was paid only $566,600.  (Pls.' Ex. 15).  In additional comparison, during the years 2002 through 2005, VSLSAM was under contract to provide the full management of the Mariner (a 50,000 ton, 700 passenger ship), and in each of those years it was paid less for the Mariner management than it received for the services it was providing to the Navigator (a 30,000 ton, 500 passenger ship).  (Conroy Trial Tr. 89:12-90:2).

37.     Marc Conroy testified that he would never have agreed to pay VSLSAM the same amount of fees for what VSLSAM claims were significantly reduced management services and responsibilities after CPUK was established.  (Conroy Trial Tr. 178:2-5).

***VSLSAM also Received Additional Consideration for its Services***

38.     There also is clear evidence that VSLSAM received payment for the services of its employees providing services to the Regent fleet above the amounts it received as the management fees described above.  In addition to payments under the Manning and Ancillary Services Agreements and the Management Service Agreements, VSLSAM received an additional $48,000 for each ship for "Management Expenses."  (Pls.' Ex. 271).

39.     CPUK also paid numerous other amounts to VSLSAM for VSLSAM personnel performing services for the Regent fleet.   These additional expenses included reimbursing VSLSAM for Vittorio Facco's salary, and paying for Mr. Facco's lodging expenses, his personal and business travel, and for his UK taxes.  (Sinclair Trial Tr. 271:21–272:19).

40.     CPUK also paid for Pantaleo Murolo's lodging, personal and business travel and for his UK taxes.  (Sinclair Trial Tr. 281:7-13).

41.     CPUK also paid for Antonio Favuzzi's lodging and UK taxes.  (Sinclair Trial Tr. 286:1-5).

***Detrimental Reliance as Consideration***

42.     The Managing Director of a ship management company is responsible for everything, the office, the staff and the contracts they manage.  (Evenhand Trial Tr. 1370:4-8). The specific responsibilities of a Managing Director of a ship management company

include giving instructions to and supervising the company's technical staff, evaluating the technical staff, and hiring the technical staff. (Evenhand Trial Tr. 1370:14-24).

43. When CPUK needed to find a new managing Director in 2003, it appointed Susan Sinclair to serve in that position despite her inexperience in the technical aspects of ship management. (Conroy Trial Tr. 103:21–104:7).

44. Throughout the entire time between her appointment as the Managing Director of CPUK until June 1, 2008, when VSLUK became the technical managers, Ms. Sinclair relied exclusively upon the VSLSAM personnel to provide the technical expertise for the Regent fleet. (Sinclair Trial Tr. 266:21-24).

45. During that time, Ms. Sinclair had nothing to do with instructing her technical staff, with supervising her technical staff, with evaluating her technical staff or even with hiring her technical staff. (Sinclair Trial Tr. 279:12-15; 279:25–280:6; 283:12 – 284:9). Instead, Ms. Sinclair relied upon VSLSAM to perform those functions. (Sinclair Trial Tr. 266:21-24).

46. VSLSAM Actually Performed the Services Under the Oral Agreement

47. Throughout the entire period at issue, VSLSAM and its personnel were materially involved in overseeing and implementing the repair and maintenance functions for the Navigator and for the Voyager. Brian Hernaman, the "Technical Coordinator" for the Regent Fleet from 2000 until 2009, came from a V.Ships entity, and, during the entire time from 2000 through mid-2008, remained a V.Ships employee and was paid by V.Ships through he worked in the CPUK office. (Sinclair Trial Tr. 340:3-4; 360:6-8).

48. Kelvin McIldoon, the Purchasing Manager for the Regent Fleet, came from a V.Ships entity, and, during the entire time from 2000 through mid-2008, remained a V.Ships

employee and was paid by V.Ships through he worked in the CPUK office.  (Sinclair Trial Tr. 268:244-269:1).

49.    Ron Ellison, the original Managing Director of CPUK from 2000 until 2003, came from V.Ships, and was a V.Ships employee, paid by V.Ships during his service at CPUK.  (Sinclair Trial Tr. 268:6-8).  Mr. Ellison consulted on an almost daily basis with Lorenzo Malvarosa concerning technical management issues for the Regent Fleet, and reported to Mr. Malvarosa.  (Sinclair Trial Tr. 268:6-8).

50.    At the time that CPUK was established, the original Technical Superintendent for the Regent fleet was Paolo Gavazza, a VSLSAM employee also serving as a Fleet Superintendent for VSLSAM, and one of the two Technical Controllers for the Regent fleet, Claudio Carracciolo, and one of the Safety and Quality Superintendents for the Regent Fleet, were VSLSAM employees also serving in similar functions for VSLSAM.  (Pls.' Ex. 224).  Each of the superintendents for the Regent fleet reported to the managing Director for CPUK and to Lorenzo Malvarosa, and that the Managing Director liaised with Mr. Malvarosa.  (Pls.' Ex. 224).

51.    Superintendent Reports for the Navigator dated February and July, 2001, completed by Paolo Gavazza, a VSLSAM employee serving as the Technical Superintendent for the Regent Fleet, are on a VSLSAM reporting form, with the V.Ships logo prominently displayed on the front.  (Pls.' Exs. 140, 141).

52.    At a July, 2002 meeting held in the VSLSAM office in Monaco, Mr. Malvarosa and other personnel from VSLSAM was actively involved in discussions about the technical expense savings.  (Conroy Trial Tr. 98:23-99:3).

53.    Vittorio Facco, the Technical Director of the Regent Fleet from 2003 until 2006, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time. (Sinclair Trial Tr. 271:14-23).

54.    Mr. Facco took direction from Lorenzo Malvarosa, VSLSAM's CEO.  (Sinclair Trial Tr. 275:15-16).

55.    During his tenure in the offices at CPUK, Mr. Facco was reimbursed for his lodging and personal travel expenses to and from Italy (where his family remained) by CPUK, and CPUK paid his UK taxes and national insurance.  (Sinclair Trial Tr. 272:5-19; 274:14-17).

56.    In February of 2004, various persons from VSLSAM were involved in responding to a critical report of the management and condition of the Navigator by a surveyor working for Seaworthy Systems.  The response to the owners was initially drafted by Lorenzo Malvarosa.  (Pls. Ex. 56 at 36).  Mr. Facco later ran a later draft of the response back to Mr. Malvarosa before sending it.  (Pls.' Ex. 215).

57.    On September 14, 2006, Mr. Malvarosa sent a letter to the CFO for Regent Seven Seas Cruises describing the nature and extent of the relationship between VSLSAM and the Regent Fleet.  (Pls.' Ex. 29).  In the letter, Mr. Malvarosa stated that "The pure cost for V.Ships Leisure of the personnel involved in RSSC and CPUK support and management … amounts to US$1,244,000.  This includes … myself (who I am rated in the model at 5% - but I am effectively now using more than 50% of my time for the RSSC vessels)….our Electrical Superintendent Pantaleo Murolo (who is working 95% on RSSC vessels) has solved problems that would have cost tens of thousands of dollars in assistance from makers …."  (Pls.' Ex. 29 at 2).

58.    Pantaleo Murolo, the Technical Director of the Regent Fleet from mid-2007 until mid-2008, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time.  (Sinclair Trial Tr. 280:12-13, 16-20).  On his UK Customs paperwork, Mr. Murolo acknowledged VSLSAM as his employer during his time in the UK.  (Pls.' Ex. 100).  Mr. Murolo was evaluated in his performance by Andrea Zito, COO of VSLSAM.  (Murolo Dep. 76:6-17).  During his tenure in the offices at CPUK, Mr. Murolo was reimbursed for his lodging and personal travel expenses to and from Monaco by CPUK, and CPUK paid his UK taxes.  (Sinclair Trial Tr. 281:7-13).

59.    Antonio Favuzzi, the Fleet Superintendent of the Regent Fleet from 2006 until mid-2008, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time.  (Sinclair Trial Tr. 284:25-285:5).  On his UK Customs paperwork, Mr. Favuzzi acknowledged VSLSAM as his employer during his time in the UK.  (Pls.' Ex. 34).  He was evaluated in his performance by Mr. Murolo.  (Sinclair Trial Tr. 288:1-5).  During his tenure in the offices at CPUK, Mr. Favuzzi was reimbursed for his lodging and travel expenses to and from the ships by CPUK, and CPUK paid his UK taxes.  (Sinclair Trial Tr. 286:1-5).

60.    Lorenzo Malvarosa, the CEO of VSLSAM, was actively involved in the technical management of the Regent ships.  Whenever any material issue of technical services or management arose, Lorenzo Malvarosa, was involved in the call.  (Sinclair Trial Tr. 379:15-24).  Mr. Conroy referred to Mr. Malvarosa as the "go to guy" for serious technical issues for the Regent fleet.  (Conroy Trial Tr. 96:10-19).

61.    VSLSAM was listed on the Hull and Machinery insurance policies for the Navigator as a Co-Assured with its status listed as joint manager of the ship along with CPUK.

(Pls.' Ex. 11).  A Hull and Machinery policy covers risk because of any problems with the mechanical aspects of the ship or its operations, risks that VSLSAM would not face in relation to any of the obligations it undertook under the any of the other written agreements it had in connection with the management of the ships.  (Sinclair Trial Tr. 301:10-17).  These insurance policies were procured for the Navigator by a V.Ships affiliate of VSLSAM.  (Sinclair Trial Tr. 303:2-5).

**Course of Conduct**

62.    In the same time period, 2000 to 2008 various V. Ships entities, including V. Ships U.K. Group HR, Marine Services MD and SEACOM, occupied desks in the CPUK offices pursuant to an oral sub-lease agreement based roughly on a per body basis. (Sinclair Trial Tr. 263:24-264:4; 265:6-8; Evenhand Trial Tr. 1378:2-10).

63.    The relationship between the parties was relatively casual, collegial and fully cooperative.  (Conroy Trial Tr. 65:23-66:4); Sinclair Trial Tr. 263:10-16).

64.    VSLSAM listed Regent Fleet Personnel as Part of the VSLSAM Operations Department

65.    In July 2005, VSLSAM created a presentation to Radisson Seven Seas Cruises that described the history and the "technical operations" of the Regent Fleet.  (Pls.' Ex. 10).

66.    That presentation includes a chart entitled "Operation Department – RSSC Fleet" that listed Mr. Malvarosa as the Chief Executive Officer of the Operation Department of the RSSC Fleet, it listed Richard Evenhand, the COO of VSLSAM, as the Operations Director, and it listed Vittorio Facco, the Technical Director of the Regent Fleet, as "RSSC Fleet Functional Organization," with a dotted line reporting relationship to Mr. Malvarosa.  (Pls.' Ex. 10 at. 17).

67.     That chart also listed the responsibility of giving "support to Celtic Pacific UK" as part of the Technical Operation department of VSLSAM. (Pls.' Ex. 10 at. 17). The chart omitted Susan Sinclair, the Managing Director of CPUK, and did not list her with any responsibility for the "Operation Department of the RSSC Fleet"). (Pls.' Ex. 10 at. 17).

68.     Mr. Malvarosa vetted Plaintiffs' Exhibit 10 extensively before it was presented, sending it to a variety of the senior personnel at VSLSAM for their comments at least six (6) times in seven (7) days. (Pls.' Ex. 223).

**When Formal Management Changed, the Actual Management Personnel and Processes Did Not**

69.     When formal management changed from VSLSAM under the 1998 agreement to CPUK under the December 31, 2000 agreement, little about the actual management changed. (Conroy Trial Tr. 94:14-21). The personnel remained the same and the Regent used the same SMS and other operating policies and procedures after the change as were employed before the change. (Conroy Trial Tr. 95:3-6).

70.     Similarly, when VSLUK came into management on June 1, 2008, nothing changed about how the ships were managed or by whom. (Sinclair Trial Tr. 296:13-23; Evenhand Trial Tr. 1395:16-1396:4). The same personnel remained performing the same functions under VSLUK. (Sinclair Trial Tr. 296:13-23; Evenhand Trial Tr. 1396:9-11). VSLUK continued to use the same SMS and operating procedures. (Conroy Trial Tr. 95:3-6; Evenhand Tr. 1395:25- 1396:4).

71.     When VSLUK took over management responsibilities for the condition of the Regent fleet on June 1, 2008, it did not conduct a survey of the condition of the ships. (Evenhand Trial Tr. 1400:7-13). When VSLUK assumed management of the Regent

fleet, it did not even fill out the V.Ships "Vessel Takeover Data Sheet".  (Pls.' Ex,
272).

72.    VSLSAM Promoted the Technical Support and Deck and Engine Management
Services it was Providing to the Regent Fleet in Promotional Presentations to Potential
Customers

73.    Throughout the period between 2001 and 2008, VSLSAM sent out numerous
promotional presentations describing its ship management experience to potential
customers.  Those presentations frequently included a slide presentation that included a
description of the services it was providing to its "Current Cruise Clients" in which it
described its services to the Regent fleet in the following way – "In 1998, the Group
signed a joint venture agreement with Radisson for the construction of one 500-
passenger and one 720-passenger ultra luxury cruise vessels, which will be managed
technically by the Group and operated by Radisson Seven Seas Cruises.  Radisson
Seven Seas Cruises is today one of the world's largest luxury cruise lines.  (Pls.' Exs.
229 to 244). That slide goes on to list the ships in the Regent fleet and to describe the
"Services Provided" as including either "deck and engine management" or as
"Technical Support Services."  Id.  Several of these presentations include a chart of the
"Marine Business Unit: V.Ships Leisure" that showed "Technical Director Vittorio
Facco, CPUK Southampton" in a direct line reporting relationship with Andrea Zito,
then the COO of VSLSAM.  (Pls.' Exs. 235, 237 and 238).

74.    VSLSAM responded to an inquiry from Lloyds Cruise International asking it to
describe what ships they currently were managing and, for each ship to describe the
services provided.  VSLSAM responded by stating that it was providing "Technical

management and hotel crewing" for both the Navigator and for the Voyager.  (Pls.' Ex. 241).

### *VSLUK Took Over Full Ship Management in June 2008*

75.     VSLUK took over full ship management duties for the Navigator on June 1, 2008, and served as the Manager of the vessel under the terms of a June 1, 2008 ship management agreement between VSLUK and the owners of the Vessels in the Regent Fleet.  (Pls.' Ex. 15).

76.     VSLUK also entered into similar ship management agreements with CPUK for the management of the Voyager and of the Mariner.  (Lindsay Trial Tr. 410:15-16).

77.     Each of those contracts contained responsibilities for VSLUK to provide the following crew management services to the Regent fleet:

> 3.1     Crew Management
>
> The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners … which includes, but is not limited to the following functions:
>
> (i)  Selecting and engaging the Vessel's Crew …
>
> (ii)  ensuring that the applicable requirements of the laws of the flag of the Vessel are satisfied in respect of manning levels, rank, qualifications and certification of the Crew …
>
> (vi) training of the Crew and supervising their efficiency …

78.     Each of these contracts also contained responsibilities for VSLUK to provide the following technical management services to the Regent fleet:

> 3.2 Technical Management
>
> The Managers shall provide technical management which includes, but is not limited to, the following functions:

(i)   provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;

(ii)   arrangement and supervision of dry dockings, repairs, alterations and the upkeep of the Vessel to the standards required by the Owners provide that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flat of the Vessel and of the places where she trades, and all requirements and recommendations of the classification society

(iii)   arrangement of the supply of necessary stores, spares and lubricating oil …

(v)   development, implementation and maintenance of a Safety management System (SMS) in accordance with the ISM Code …

***The Plaintiffs Discovered the Failure to Provide Proper
Technical Management and Maintenance to the Regent Fleet***

79.   The purpose of technical ship management is to look after a vessel in management, give it the shore side and superintendent support of the vessel, and to support the ship with supply of services, stores and spares as necessary for them to operate and to liaise with flag and class and any other bodies relevant to the ship operation. (Evenhand Trial Tr. 1379:8-18).

80.   Technical ship management is performed within the ambits of a ship's Safety Management System that is imposed upon the ship crew and shore side technical support to ensure the smooth running of the ship in accordance with standards imposed by the International Safety Management Code. (Evenhand Trial Tr. 1382:14-17).

81.   The Safety Management System is developed from the International Safety Management standards that cover areas concerning operation of ships and consists of a collection of procedures with the intent and scope is to properly manage a vessel in the safest possible way in order to protect human life at sea, the environment, and to avoid damages. (Evenhand Trial Tr. 1382:14-17; Mele Trial Tr. 507:11-19).

82.    Technical ship management also involves safety issues and implementing and working with the ship's Safety Management System. (Evenhand Trial Tr. at 1380:23-25; 1381:1-6).

83.    For a provision or guide to conducting maintenance on the ship, the crew and shore-side personnel work together to carry out the procedures set forth in a ship's Safety Management System. (Paiella Trial Tr. 897:24-25; 898:1-15).

84.    The efficacy of the Safety Management System requires a high level of senior level persons from shore-side interfacing with the ship's crew. (Mele Trial Tr. 507:25; 508:1-7).

85.    During the VSLUK contract period, the shore-side personnel were involved to ensure, for example, that training is conducted on board the ship and that the ship's crew operate and perform to certain standards. (Evenhand Trial Tr. 1381:23-25, 1382:1-5).

86.    In undertaking this task, the technical superintendents and marine superintendents, as well as the technical director, are in constant communication with the crew on the ship often interfacing with them by email on a daily basis.  (Evenhand Trial Tr. 1382:7-13).

87.    It is the responsibility of the technical managers to supervise the senior officers on board both during inspections on-board and other times in the performance of the vessel. (Evenhand Trial Tr. 1382:20-25).

88.    Likewise, the technical managers are responsible to audit the performance and the compliance with the procedures done by the crew on board the ship. (Evenhand Trial Tr. at 1383: 4-8).

89.    Technical management also involves the oversight of maintenance and repair, and includes the process of scheduling repair and maintenance, and also, making sure the

repair and maintenance happens as appropriate. (Evenhand Trial Tr. 1383:16-22; 1384:20-25; 1385:1).

90.     In the duties of crew members on-board the ship, the Chief Engineer would be the crew member responsible for the technical condition of the ship, and would report contemporaneously to the Captain and the shore-side technical managers.  (Mele Trial Tr. 509:7-14).

*RINA as the Navigator's Classification Society Provides for a Minimum Standard of Technical Sufficiency of the Navigator's Condition That Was Adopted by the Flag States of Bahamas and later Bermuda*

91.     The major classification societies including, Det Norske Veritas ("DNV"), Registro Italiano Navale ("RINA"), Lloyd's Register and Bureau Veritas ("BV") are all a part of an organization referred to as IACS or the International Association of Classification Societies. (Mele Trial Tr. 511:6-18).

92.     Each of these classification societies have a set of standards or guidelines relating to the technical sufficiency of ships.  (Mele Trial Tr. 511:19-22)

93.     While a classification society for a particular ship is chosen by the ship's owner, its primary role is to conduct technical inspections on board the ships, on behalf of certain flag state administrations, to verify that the ship complies with the rules and is seaworthy to sail. (Mele Trial Tr. 513:13-19; 514:10-25).

94.     On a yearly basis, the given class society conducts a yearly inspection to renew the ship's passenger certificate, and may conduct other periodical inspections.  (Mele Trial Tr. 513:20-25; 514:1-9).

95.     The primary objective of any of those inspections is to focus on the safety and seaworthiness of the vessel.  (Mele Trial Tr. 515:12-15).

96.     Nonetheless, class societies do not inspection and evaluate all of the technical area of a ship and thus, certain areas of a ship's technical spaces are not subject to class requirements. (Mele Trial Tr. 515:17-21).

97.     As an example, class requirements do not apply to the piping and materials in the area of a spa on a passenger vessel or its gym, including its sauna or steam bath. (Mele Trial Tr. 516:20-25, 517:1-2).

98.     Likewise, there would be no class requirements imposed upon, for example, a potable water piping or non-essential pumps that provide some type of different service other than safety or maneuverability of the ship or the air conditioning ducting itself. (Mele Trial Tr. at 517:6-21).

99.     The Flag State, also selected by the owners, and sometimes referred to as the Flag Administration of a ship, refers to the country where the ship is registered.  (Mele Trial Tr. 513:1-8).  Certain Flag Administrations, with exception to Bermuda, permit the classification societies to act on their behalf to make sure that the ship is safe and sound to sail. (Mele Trial Tr. 513:1-12).

***The Defendants breached the Navigator's Safety Management System    Requiring    Planned Maintenance and Audits***

100.    Mr. Richard Evenhand supervised the customization of the original Safety Management System for the Navigator.  (Evenhand Trial Tr. 1381:18-22).

101.    The Safety Management System for the Navigator was a structure comprised of three levels as dictated by the ISM Code. (Pl.'s Ex. 1325).    This Safety Management System developed for the Navigator remained in place, with little change, from 2000 to 2009 and only ended when V. Ship Leisure UK's contract was terminated in May 2009.  When V.Ships Leisure UK initially took over the management of the Navigator,

its SMS system was changed only to reflect its new company name, "V.Ships Leisure UK" but otherwise remained the same. (Pl.'s Ex. 135).

102.   The SMS system in place for the Navigator contained a section specifically devoted to "Planned Maintenance."  (Garbarino Dep. 137:17-25, 138:1-6).

103.   Under the "Planned Maintenance," the directions to shore side personnel and crew relating to maintenance were that "Prevention is Better than Cure."  (Pl.'s Ex. 135).

104.   "Planned Maintenance," as set out in the Safety Management System, meant that whenever possible "it's better to prevent a breakdown or failure than it is to actually correct it later where possible." (Evenhand Trial Tr. 1416:3-6).

105.   Mr. Paolo Mele, an experienced Chief Engineer, reviewed the condition of the systems and equipment complained of in this lawsuit commencing in the summer of 2008. (Mele Trial Tr. 519:16-18).  He testified that the conditions of various systems and items complained of in this lawsuit establish that the Navigator's Safety Management System was not fully followed and specifically, that VSLUK did not maintain the Navigator to the standard set forth in the SMS system during the 2008-2009 time period.  (Mele Trial Tr. 574:2-21; 575:25-576: 1-4) (Pls.' Ex. 53).

106.   Mr. Garbarino stated the following about the Navigator's condition:

> Q:      No, no, no.  I'm asking you when you got on-board the Navigator, okay, did you witness a condition such that .. the vessel suffered from ineffective maintenance and repair activities? It's a yes or no answer.
>
> A:      It did not strike admitted that in 2006 when he assumed the role as Safety and Quality Manager for the Navigator, that the "passenger areas" did not appear to be poorly maintained, but he failed to represent that conclusion for the entire vessel, inclusive of its technical spaces. (Garbarino Dep. 155:21-156: 4)

107.  David Gleaves is a superintendent hired by VSLUK to document the condition of the Regent Fleet, including the Navigator, prior to turning over the technical management to the new owners.  (Gleaves Dep. 19:23-20:6).

108.  Mr. Gleaves testified that the systems on the Navigator including the bilge piping and steam piping, bilge preservation, had all been undermaintained. (Gleaves Dep. 34:24-25, 35:1-15).

109.  He testified the crew were "reactive" to steam leaks and not devoting time to prevenative maintenance. (Gleaves Dep. 34:24-25, 35:1-15).

110.  The various conditions on board the ship had been outstanding for more than one year and many of the conditions he found were never identified by Mr. Favuzzi in his very last technical superintendent report.  (Gleaves Dep. 31:16-21; 32:1-9).

111.  Mr. Garbarino, the Safety and Quality Superintendent for the Navigator for years 2006 to 2009 testified that he conducted his annual safety audit check by sampling the equipment and systems on board. (Garbarino Dep. 173:9-16).

112.  Francesco Visimberga, a V.Ship's Deputy Technical Director, inspected the Navigator in March 2009 and reported to Mr. Malvarosa, Mr. Evenhand and Mr. Zito that the new Chief Engineer, Tonci Masle, and all staff were "working to rectify all defects highlighted" by the Chief Engineer with "good progress and proactive way."  (Pl.'s Ex. 250) He concluded his email by stating that "I found the vessel on technical side very poor, and with evidence there was previous negligence even starting from watchkeeping, daily routine maintenance routines." (Id.).

*The Defendants' failed to advise the Owners of the Navigator's Stability Problems*

113.    The stability of the vessel addresses the ship's ability to sail safely and in compliance with SOLAS requirements. (Pollard Trial Tr. 975:22-25, 976:1)

114.    Mr. Pollard opined that the Navigator suffered from a stability problem and likely had sailed, several times, without complying with the statutory requirements. (Pollard Trial Tr. 1065:5-11)

115.     While the parties agree that the Navigator experienced stability issues shortly after her launch, Mr. Lindsay testified he believed the issues were resolved. (Lindsay Trial Tr. 419:10-14).  Mr. Evenhand admitted that he never discussed the stability issues with Mr. Lindsay. (Evenhand Trial Tr. 1424:21-25, 1425:2-12).

116.    Moreover, when Mr. Murolo addressed the "technical condition" of the Navigator with Mr. Lindsay, he never advised him of the stability issue. (Lindsay Trial Tr. 424:4-6) (Pls.' Ex. 104).

117.    When the issue of stability was fully appreciated, the owners undertook efforts to plan the remediation.  The remediation included hiring a naval architect to re-design the hull, set forth planning within the dry dock and conducting the repair. (Lindsay Trial Tr. 454:23-25, 455:1-5)

118.    Mr. Pollard opined that the Plaintiffs had to effect a modification of the ship's hull in order to modify her then-existing ship stability operating characteristics. (Pollard Trial Tr. 1010:10-1011:4).

*The Defendants' Ignored their Obligations to Maintain the Navigator's Various Parts and Systems in Good Condition*

1.     The Smoke Vertical Stack

119.   The vertical stack is the housing for all of the exhaust pipes for the ship and discharges smoke or fumes through the atmosphere through the part referred to as the "stacks." (Mele Trial Tr. 520:11-23).

120.   The smokestack's condition was first documented in a February 2008 Superintendent Vessel Report, prepared by employees of VSLSAM, Antonio Favuzzi and Pantaleo Murolo. (Hislop Trial Tr. 1079:11-17) (Pls.' Ex. 93).

121.   At that time, the exhaust pipes showed signs of corrosion, but a "temporary repair" to the funnel had been undertaken and the only action noted in the report was to "keep monitoring funnel for more corrosion signs."  (Pls.' Ex. 93).

122.   Somewhat inconsistently, however, the same report notes that the exhaust pipes should be evaluated during the next dry dock to "replace the funnels" suggesting that the level of corrosion had primarily settled in at that time. (Pls.' Ex. 93).

123.   Mr. Hislop testified that, based on all of the earlier Superintendent Reports he had reviewed, there was no evidence of any mention of the condition of the funnel smokestack and that no repairs had been undertaken to the funnels before the 2008 temporary repairs and the 2009 dry dock.  (Hislop Trial Tr. 1080:2-5).

124.   Mr. Hislop testified that the overall condition of the funnel smoke stack in February of 2008 was already deteriorated by corrosion and required significant repair and replacement in the 2009 dry dock. (Hislop Trial Tr. at 1080:17-21; 1078:5-12).

125.   Mr. Mele testified that by his account the funnel smoke stack was "full of holes and corrosion" and one piece of the smokestack collapsed in the middle of the night and "luckily did not kill anyone." (Mele Trial Tr. 658:8-14).

126. The stack itself had to be "cropped" while the ship remained in service, temporary repairs were made in the form of "patches" and materials were used to reinforce the base of the stacks which were loose and corroded. (Mele Trial Tr. 658:23-25; 659:1-8).

127. These repairs were necessary to ensure the safe operation of the ship. (Mele Trial Tr. 658:23-25; 659:1-8).

128. During the 2009 dry dock itself, 7 meters of 11 stacks were replaced and all of the structures at the base of the stacks were replaced. (Mele Trial Tr. 658:23-25; 659:1-8).

129. Mr. Martin Hegarty, an Electrical Engineer, testified that the area of the funnel smoke stack presented several electrical "safety issues." (Hegarty Trial Tr. 710:14-23).

130. The safety issues he identified related to the lack of working smoke detection equipment, malfunctioning of the PA loudspeaker system and the non-working smoke obscuration system. (Hegarty Trial Tr. 710:14-23).

131. Mr. Hegarty identified photographs that revealed the melted condition of a smoke detector in the funnel smoke stack area.   (Hegarty Trial Tr. 710:14-23) (Pls.' Ex. 167K).

132. He explained that this area required a functioning smoke detector and that when it was discovered in a survey of April 1, 2009 it was addressed immediately (while the ship was in service) because it was a safety issue. (Hegarty Trial Tr. 713:5-9).  Mr. Hegarty testified that he hired a contractor to review the condition of the complete fire detection system on board the ship and discovered that 46 separate fire detectors were not functioning. (Hegarty Trial Tr. 712:3-11).  Because the condition of the fire detection system was a safety issue, Mr. Hegarty testified these issues were addressed

immediately and did not wait until the November 2009 dry dock. (Hegarty Trial Tr. 713:5-9).

133. Mr. Hegarty also testified that the public address system (PA system) which is used to notify crew working in the area of funnel of any emergencies. (Hegarty Trial Tr. 715:8-11).   However, the loud speaker itself was not working and had melted. (Hegarty Trial Tr. 715:2-7).

134. A ship's obscuration system monitors emissions from the funnel and notifies you of the smoke emissions and signifies problems with the boilers. (Hegarty Trial Tr. 715:18-25; 716:1-7). The Navigator's obscuration system, in the area of the funnel, had been disconnected because it had melted from the heat. (Hegarty Trial Tr. 715:18-25; 716:1-7).   According to conversations with the Chief Electrician on-board the Navigator, it was installed in 2007 but had not worked for the past 18 months. (Hegarty Trial Tr. 716:5-13).

   3.      The Pool and Whirlpool Equipment

135. The pool and whirlpool machinery was first commented on in the Seaworthy Systems Report of 2004 and noted that the "pool machinery room requires some immediate attention." (Hislop Trial Tr. 1081:2-6) (Pls.' Ex. 56).

136. The reports indicate that equipment had been installed to "direct water leaks away from some of the pumps/motors and the Jacuzzi equipment is severely degraded due to ongoing leaks… standing water on the deck caused active rust and deterioration of the protective coatings." (Hislop Trial Tr. 1081:2-6).

137. Mr. Hislop's opinion was that the condition of the pipework was poor and evidenced lack of maintenance over a period of time.  (Hislop Trial Tr. at 1082:1-15).  Following

the 2004 Seaworthy Systems report, there was no indication that any remedial efforts were made to arrest the condition of the pool deterioration and that the work completed in the 2009 dry dock was directly responsive to the issues raised in the 2004 report. (Hislop Trial Tr. 1082:14-25).

138. Mr. Paiella testified that the pool filtering equipment had wasted and needed to be replaced – the equipment was "incapable" of repair.  (Paiella Trial Tr. 879:11-25; 1-2) (Pls.' Ex. 167UUU).  The flooring in the area of the pool and whirlpool machinery was always filled with water and "leaks everywhere, the heating system in the pool was leaking, in several places, the heater plugs for the Jacuzzi were plastic and were buckled, the valves weren't shutting, pumps were failing constantly."  (Paiella Trial Tr. 880:3-10).  The electrical motors in the area also required replacement. (Paiella Trial Tr. 880:3-10).

### 4.  Cooling Water Connection/Sea Chests/Overboard Valves

139. The sea chest is a rectangular recess in the hull of a vessel that provides an intake reservoir from which piping systems draw raw water. The cooling water connection to the sea chests suffered from an extensive buildup of barnacles, reducing the amount of water flowing to the sea chests and reducing the efficacy of the related pump system. (Paiella Trial Tr. 832:17-25, 833:1-8) (Pls.' Ex. 167HHH).

140. The first record notation of any anomalies with the overboard valves was when Chief Engineer Tonci Masle boarded the vessel in March 2009.  (Hislop Trial Tr. 1086:10-14).  Prior to that time, there was no mention of the concerns with this particular equipment. (Hislop Trial Tr. 1086:20-23).

141.   The sea chests require maintenance at "every dry dock" to open up all of the valves, intakes, check the condition, check the wastage, do any maintenance to required which could be limited to cleaning them and putting them back. (Paiella Trial Tr. 833:16-25). If this particular item fails during sea time it could result in having an "incredible amount" of water ingress into the engine room and a difficult time to repair it. (Paiella Trial Tr. 833:16-25). The condition of this equipment evidenced that it had not been maintained for some time and the connection was "not working properly." (Paiella Trial Tr. 834:4-11). Mr. Hislop opined that the valves that came out of that location required replacement because they were "completely unserviceable" and were beyond repair. (Hislop Trial Tr. 1086:24-25; 1087:1-6).

   5.   Laundry Facilities

142.   The laundry area state of disrepair was first mentioned in 2004 and the problems with the laundry equipment became "deep rooted." (Hislop Trial Tr. 1089:23-25; 1090:1-7) (Pls.' Ex. 146, Pls.' Ex. 56).

143.   New equipment in the form of three Maytag washer/dryer machines were delivered and installed and "spares" for the laundry room were scheduled to be delivered on board by mid April 2004. (Pls.' Ex. 146 at Regent 017349). However, a somewhat inconsistent April 2004 Superintendent Report demonstrates that the crew were awaiting the arrival of "transformers" to the ship to complete commissioning of the new washers and dryers and they were scheduled to be delivered onboard on March 19, 2004 and the crew were to install the equipment before March 22, 2004. Thus, as of the March 2004 report (executed and completed in April), the transformers

apparently remained outstanding despite that they were ordered and expected by the ship's crew on or about March 19, 2004.  (Pls.' Ex. 146 at Regent 017349).

144.    The Superintendent Reports evidence that renewals of the equipment appeared ongoing, but that the actual maintenance of the new equipment was not conducted properly as evidenced by the need to replace all of the washers and dryers in November 2009. (Hislop Trial Tr. 1089:23-25; 1090:1-7).

145.    During various inspections of the Navigator before 2009 dry dock, the condition of the laundry room was observed to be a "disaster." (Paiella Trial Tr. 844:4-6).  There was water on the tank tops, the filling system was leaking, the dryers were almost "completely torn apart," there were a few machines that were not working and the soap injection machine was "leaking everywhere."  (Paiella Trial Tr. 844:11-22).  The bilge area in the laundry room was wasted and the steam valves on the ironing system were leaking steam. (Paiella Trial Tr. 844:11-22) (Pls.' Ex. 167KKK).

146.    There was no evidence the laundry room ducting had been cleaned, and if it had been done, it was done improperly. (Mele Trial Tr. 670:13-17; 671:4-25; 672:1-5).  The laundry room ducting had a vast amount of lint that was accumulating on the ducts creating a safety hazard. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5).

147.    The National Transportation Safety Board had recommended to all operators and technical managers of cruise ships around the world, especially to those carry U.S. citizens, to clean the lint ducts once per year. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5).  A search of documentation on-board the Navigator to evidence that her laundry ducts were cleaned in the one year interval was never located and the condition

of the ducts suggested the yearly cleaning was not undertaken. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5).

6.     Tank 2 Starboard and 2 Port – Pipe Penetration

148.   The heavy fuel oil storage tank holds fuel in the engine room. (Mele Trial Tr. 528:5-11).  The fuel oil tanks, both on the port and starboard sides of the ship, were corroded and leaking heavy fuel oil into the engine room bilge spaces. (Mele Trial Tr. 526:11-21).  The leak posed a safety hazard relating to fire due to the presence of fuel and combustible materials in the bilge area.  (Mele Trial Tr. 526:11-21) (Pls.' Ex. 167A).  The tank top condition was never reported prior to the April 2009 report of David Gleaves.  (Hislop Trial Tr. 1091:5-11).

149.   Mr. Gleaves was a superintendent hired by V.Ships Leisure UK to assist Tonci Masle in rectifying conditions on the Navigator.  By the time any report of the tank tops conditions were made, they were already corroded to the point of leaking.  (Hislop Trial Tr. 1091:12-17).  Mr. Paiella testified the condition of the tanks required repairs, and certain replacements, but that the cost allocation to the Defendants in certain parts 100% and in others 70% was a fair allocation, because more work in that particular area of the ship was done other than just the repair. (Mele Trial Tr. 851:8-17).

7.     Safety Valves for Steam Boilers/Hot Well

150.   The steam boilers and hot well are located in the engine room of the ship.  During Mr. Mele's initial visit to the ship, the engine room demonstrated steam and water leakages. (Mele Trial Tr. 532:5-16).

151.   The hot well is a tank in the engine room that collects and recovers hot water and condensation coming from the steam piping lines. (Mele Trial Tr. 531:18-22).

152.    The Navigator's hot well was corroded and leaking and lacked sufficient insulation to protect from steam leakages. (Mele Trial Tr. 532:22-25; 534:1-3) (Pls.' Exs. 167C, 167D).

153.    Once the old hot well was removed, the flooring below the hot well was completely corroded and wasted away due to the multiple leaks over time. (Mele Trial Tr. 537:18-25; 538:1-7). The hot well suffered from lack of maintenance and a fix as simple as additional insulation could have provided proper maintenance to the component. (Id. at 538:8-15, Pls.' Ex. 167D).

154.    The hot well had never been previously mentioned in any of the Superintendent Reports and that in Mr. Hislop's opinion, it suffered from general neglect and lack of maintenance. (Hislop Trial Tr. 1094:13-25; 1095:1-4).

155.    With maintenance given to the hot well, including maintaining the system properly, the hot well could last forever because it is "fixed steel." (Paiella Trial Tr. 918:13-19).

8.    Engine Room Store/Ventilation

156.     There were numerous problems with ventilation in the engine room.  (Hegarty Trial Tr. 797:5-17).

157.    Out of 32 separate motors in the engine room, 25 of the units required new bearings, and rebalancing of the units. (Hegarty Trial Tr. 798:5-16).

158.    The fire dampers in the air conditioning ventilation would not close posing a fire hazard. (Paiella Trial Tr. 852:4-12).

9.    Galley Exhaust and Ducting

159.    The galley exhaust and ducting was in "deplorable" condition. (Hislop Trial Tr. 1097:4-11).

160.    The Superintendent Reports reflect "some cleaning" conduced in 2006, but no additional notations indicating additional cleaning was done after that date. (Hislop Trial Tr. 1097:17-19).

161.    The pictures demonstrating the grease build up in the galley demonstrated that the galley ducting was "full of grease to the point the grease was 'raining' into the galley." (Mele Trial Tr. 671:4-25; 672:1-5).

162.    This condition was prohibited by the United States Coast Guard whose recommendation required all galley and laundry ducting cleaned once per year.  (Id.)**.**

10.    Life Boats, Rafts and Tenders including Platforms

163.    The life saving equipment had been neglected and poorly maintained since as early as year 2002 when crew were painting over valves that resultantly seized and required replacing in 2009.  (Hislop Trial Tr. 1103:5-15).

164.    Some remedial actions are noted in the Superintendent Reports as being taken to improve the condition of the life saving equipment, but Mr. Hislop's own observations lead him to doubt the accuracy of the reports based on the condition of the equipment. (Hislop Trial Tr. 1103:16-24).

165.    There were issues with the life and tender boats particularly, the engine in tender boat number 5 had been out of service for nearly 18 months. (Paiella Trial Tr. 856:4-20). Somewhat skeptical about the condition of the remaining engines, Mr. Paiella hired a contractor, before the 2009 dry dock, to inspect the life saving equipment.  (Paiella Trial Tr. 856:4-20) (Pls.' Ex. 167SSS).    Resulting from that inspection, it was discovered that the engines were in a desperate condition and 5 of the engines necessitated replacement. (Paiella Trial Tr. 856:4-20).

166.   In addition, during a load test of a life raft at the required standards, the davit (lifting device) broke apart from the decking and was unable to launch the life raft.  (Paiella 861:22-862:1).

167.   Mr. Hislop opines that in his experience, he has seen the failure of this equipment before and it results from "sheer neglect and caused by corrosion." (Hislop Trial Tr. 862:13-23).

168.   Mr. Hislop did not see any evidence in the Superintendent Reports that any of the life saving equipment were noted after the September 2006 report.   (Hislop Trial Tr. 1104:24-25. 1105:1-3).

   11.   Bow Thruster Motor

169.   The bow thruster is the device that enables the ship to maneuver in and out of port in the forward end of the vessel by moving the ship side to side. (Hegarty Trial Tr. 727:18-21).

170.   An inspection of the Navigator's bow thruster electronics during dry dock revealed it was experiencing a full "ground fault" meaning, there was no way of knowing the condition of the bow thruster until it  was no longer working. (Hegarty Trial Tr. 731:4-12).

   12.   Reduction Gears/Steering Gear/Electric Installation

171.   These component parts and systems concern the steering and navigational equipment on the ship.  The first time the steering gear was identified in the prior Superintendent Report in September 2004. (Pls.' Ex. 149).

172.  That report states that the "port steering gear hydraulic power pack LO (leaking oil). to identify and rectify."  (Pls.' Ex. 149).  The action report states "crew to carry out ASAP."

173.  Mr. Hislop testifies there were several temporary repairs of the rudders over the years but the repairs did not redress the issues that were eventually repaired in dry dock. (Hislop Trial Tr. 1113:10-21).  The repairs mainly addressed the "carrier bearings" in the system but failed to properly remediate the condition.  (Hislop Trial Tr. 1113:10-21).

174.  Mr. Mele testified that the rudder blades required replacement because they were cracking and the prior repairs, which consisted of welding the blades back together, had failed and the blades were "full of water." (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10).

175.  In addition, Mr. Mele testified to discovery problems with the hydraulic pumps for the steering gear that resulting in only one pump meeting the required pressure to operate the blade of the rudder.  (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10).  Moreover, Mr. Mele testified there was either a memoranda or condition of class imposed related to the rudder by either RINA or DNV.  (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10).

176.  Mr. Masle's report evidences that the ship had operational difficulties at full speed with this rudder, including failing to operate since only one of the pumps were in service.  (Pls.' Ex. 36 at V.Ships 0614).

177.   Mr. Hislop opined that a result of the condition of the rudder over time and its condition leading up to the dry dock that the only "permanent remedial issues" was to purchase a entirely new system. (Hislop Trial Tr. 1113:10-21).

178.   Prior to the November 2009 dry dock where the rudders were replaced, the ship was taken out of service for dry dock repairs during the years of 2000, 2001, 2003 and 2007.  (Hislop Trial Tr. 1111:20-25, 1112:1-19).  Moreover, the record evidences that in 2004 the ship was dry docked in Freeport, Bahamas for 10 days, which should have provided ample time for the repair to the rudder.

179.   More detailed history of the Navigator's dry docking history is revealed in the reports which evidence:

Dry Dock 2000 (Panama). From 19 March 2000 To 24 March 2000 (6 Days).

Dry Dock 2001 (Genova). From 21 October 2001 To 31 October 2001 (10 Days).

Dry Dock 2002 (S.Francisco). From 10 December 2002 To 15 December 2002 (5 Days).

Dry Dock 2003 (Freeport). From 28 October 2003 To 07 November 2003 (7 Days).

Wet Dock 2006 (Freeport). From 01 December 2006 To 10 December 2006 (10 Days).

Dry Dock 2007 (Freeport). From 07 December 2007 To 13 December 2007 (6 Days).

Wet Dock 2008 (Freeport). From 28 March 2008 To 03 April 2008 (5 Days).

Dry Dock 2009 (Bremerhaven). From 14 November 2009 To 14 December 2009.

13.   Emergency Switchboard/Main Switchboard

- 38 -

180.    Multiple problems existed in the emergency and main switchboards.  Mr. Hegarty

testified that the switchboard had experienced a fire in early 2008 and that it remained

covered in "soot and carbon."  (Hegarty Trial Tr. 720:16-19; 721:23-25; 722:1-8) (Pls.'

Ex. 167S).

181.    The problems associated with the condition of the switchboard were that the carbon

dust could reignite and cause heat and other problems to occur in the switchboard

itself. (Hegarty Trial Tr.  722:13-19).

182.    During his inspection, Mr. Hegarty observed that several of the switch board breakers

had stickers confirming that their last maintenance was conducted in 2005, whereas the

manufacturer requires maintenance of those parts every two years.  (Hegarty Trial Tr.

722:20-25, 723:1-7).

183.    Mr. Hegarty also identified that there were switches that were not designed to be

within the switchboard itself.  (Hegarty Trial Tr. 723:11-19).  These switches, referred

to as "hidden switches," were only revealed during the dismantling of the switchboard

for cleaning and maintenance during the dry dock.  (Hegarty Trial Tr. 723:11-19) (Pls.'

Ex. 167U).  When the switches were activated, the meter reading would give a false

reading. (Hegarty Trial Tr. 723:11-19) (Pls.' Ex. 167T).  The switches themselves were

suspect and Mr. Hegarty surmised that the only reason for such switches were to

indicate a false "good" reading on the fault meter and to mislead the authorities such as

U.S. Coast Guard, Flag State officials and Class Representatives. (Hegarty Trial Tr.

724:16-21-25; 723:1-12).  Resulting from the discovery of the "hidden switches,"  Mr.

Hegarty commissioned a contractor, R&B Marine, the manufacturers of electrical

switchboards, who offered an opinion that the only reason for such switches were to

"mask earth faults that might be on board."  (Hegarty Trial Tr. 725:132-16, 25; 726:1-4) (Pls.' Ex. 109).

184.    An earth fault is the improper leakage of electrical current. (Hegarty Trial Tr. 726:21-25; 727:1-2).

185.    The repairs to the switchboard or emergency switchboard did not from "design" because this equipment would have been tested after the ship was delivered. (Hegarty Trial Tr. 780:20-25; 781: 1-2).

186.    The history of the occurrence of "earth faults" on the ship was long standing.  In 2004, the Fleet Superintendent Report noted that crew are to "regularly monitor new earth faults and rectify as soon as possible." (Pls.' Ex. 146 at Regent 017348).  However, in the subsequent Fleet Superintendent Report in September 2004, the "earth fault" comment remains present without any indication that the issue had been resolved. (Pls.' Ex. 149 at Regent 017410). Again in the October 2005 report, the same earth fault comments are stated with instructions to for the crew to "regularly monitor new earth faults and rectify as soon as possible."  (Def's Ex. 62 at Regent 012107). Again in December 2006, the same "earth fault" comments are made without any remedial action taken. (Pls.' Ex. 155 at Regent 017550).

187.    Mr. Hegarty testified that the emergency switchboard experienced significant vibration that could have been remedied sooner by placing reinforcement brackets on the structure.  (Hegarty Trial Tr. 778:7-12).

188.    The repair conducted to the emergency switchboard occurred during trial dock and was to place reinforcement brackets on the equipment to cease the vibration originating from the ship.  (Hegarty Trial Tr. 777:24-25; 778: 1-6).

14.  Foundation for Wing Console

189.  The wing console are devices used to maneuver the vessel into port. (Hegarty Trial Tr. 781:19-25) (Pls.' Ex. 167Z). The wing console itself was corroded and resulted in holes in the actual material of the console itself. (Hegarty Trial Tr. 782:9-25; 783:1-2) (Pls.' Exs. 167AA, 167 BB).

190.  Underneath the bridge wing console area was corroded and no repairs to arrest the corrosion, such as "blanching" had been undertaken. (Hegarty Trial Tr. 783:14-784:13). The actual tray to house the cables for this particular piece of equipment was rotten in several areas. (Hegarty Trial Tr. 783:14-784:13) (Pls.' Exs. 167 CC, 167 DD). The risk imposed by the deteriorated condition was that weather, such as water and moisture would ingress into the console and cause the equipment in the console to not work properly. (Hegarty Trial Tr. 783:14-784:13).

15.  Battery Replacement

191.  The Defendants failed to change and replace the batteries relating to the uninterruptible power supplies on the ship, referred to as the UPS equipment. The batteries in this equipment are meant to function when the ship experiences a black out. (Hegarty Trial Tr. 787:5-12). The batteries in several fire detection devices were "completely dead." (Hegarty Trial Tr. 787:13-25; 788:1-25). Another concerning area is the batteries in the Voice Data Recording Equipment which records the occurrences on the bridge when an incident is occurring. (Hegarty Trial Tr. 787:13-25; 788:1-25).

192.  The last time the batteries were changed for this device was 2002 which is alarming as the requirements are that such equipment is to be surveyed every year. (Hegarty Trial Tr. 788:20-25; 789:5-11).

193.   The total costs for the replacement of batteries in this area comprised the total charges of replacing approximately 70% of the batteries through out the ship.  (Hegarty Trial Tr. 790:20-25; 791:1-2).  Mr. Hegarty testified since they replaced 70% of the batteries for routine maintenance in dry dock, the allocation of 30% was to represent the specific areas discussed herein that were glaringly the result of lack of maintenance. (Hegarty Trial Tr. 790:20-25; 791:1-2).

16.   Rotating Machinery/Diesel Generators

194.   This area of the ship concerns refers to the main generation of the ship which is intended to supply electricity to the vessel.  (Hegarty Trial Tr. 791:16-23).  The system is comprised of three diesel generators and two shaft generators. (Hegarty Trial Tr. 791:12-15).

195.   The first mention of the Mr. Hislop testified that he was on-board the Navigator, at the request of the Bahamas Maritime Authority, in 2005 to investigate a fire in the generator room. (Hislop Trial Tr. 1099:14-24).  At that time there was a lack of proper insulation in various areas of exhaust areas. (Hislop Trial Tr. 1099:14-25; 1100:1-11). Moreover, various areas of insulation in the area were flammable when tested by Mr. Hislop during his inspection. (Hislop Trial Tr. 1100:12-21).

17.   Tender Platforms

196.   A tender platform is a device that allows passengers to be transferred from the ship to the tender in order to reach shore side if the vessel is not docking on the pier or alongside. (Mele Trial Tr. 563:24-25; 564:1-3) (Pls.' Ex. 162).  The tender platform suffered from several hydraulic oil leaks and several of the valves and connections on the hardware were completely rotten and full of rust. (Mele Trial Tr. 564:14-565:9).

197.  Due to the poor condition of the hydraulic piston, the crew had difficulties opening the platform safely. (Mele Trial Tr. 564:14-565:9).  Also, the tender platform was always submerged in water. (Mele Trial Tr. 564:14-565:9) (Pls.' Ex. 565:19-566:5) (Pls.' Ex. 162 at Regent 01220, 012217, 012225).

198.  According to Mr. Masle's report, both the port and starboard tender platforms were in poor condition including, rusting hydraulic jack pistons, "very rotten" hydraulic jack fittings, pipes and control valves. (Pls.' Ex. 36 at V.Ships 0612).   Mr. Masle's report requested immediate assistance from shore service to conduct a general overhaul of the equipment. (Pls.' Ex. 36 at V.Ships 0612).   Mr. Mele testified that there had not been anything done to address the leaking condition of the hydraulic equipment.

199.  Mr. Hislop testified that "surprisingly" there were no comments in the Superintendent Reports regarding the functionality of the tender platforms. (Hislop Trial Tr. 1109:20-24)  The first report he recalls that mentioned problems with the tender platforms was Mr. Masle's 2009 report.  (Hisop Trial Tr. 1109:25, 1110:2).

   18.   Skeg Repair

200.  A ship's skeg is a sternward extension of a ship's keel and usually has a rudder mounted at the center line.   Renewal of a skeg is generally an item repaired during dry dock, but the Navigator's skeg had not been renewed in some time. (Paiella Trial Tr. 868:1-8).

201.  Nonetheless, in the 2009 dry dock the skeg required renewal because the aft section between the propellers was detaching and had to be rebuilt. (Paiella Trial Tr. 868:18-23).

202.    The first mention of any issues with the skeg is a report of outfitting it to the ship in 2000 to potentially redress the stability of the ship. (Hislop Trial Tr. 1111:20-1112:6) After that time, there is no report of any conditions with the skeg, despite that the ship went into several other dry docks that would enabled a review and repair of the skeg.

    19.    ICCP Anodes

203.    The ICCP Anode system is intended to protect the ship's underwater metal from wasting away.  (Hegarty Trial Tr. 870:2-10).

204.    The actual system was not functioning leading to the wastage of the underwater metal such as to the underwater valves, intakes and sea water intakes. (Hegarty Trial Tr. 870:2-10).

205.    The total repair cost however was not allocated to the Defendants in this action.  Only 40% of the total repair has been attributed by the Plaintiffs because most of the repairs to this system would be expected in dry dock.  (Hegarty Trial Tr. 870:19-25).

    20.    Environmental/Disposal of Oil Sludge/Incremental Sludge Costs

206.    Due to concerns over the use of the ship's oily water separator, which led to the eventual indictment of the Chief Engineer on-board the Navigator from 2008 to 2009, the Plaintiffs incurred $254,614 to off-load and process excess sludge.  (Hislop Trial Tr. 1114:5-8).

    21.    Miscellaneous Dry Dock Costs

207.    The last categories of damages sought by the Plaintiffs are related to "miscellaneous dry docking costs" relating to painting, freight, dry dock charges and some pre-dry docking invoices.  All of these amounts have been allocated to the Defendants based

on a percentage of allocation, all accepted by Plaintiffs' expert, Mr. Hislop, as reasonable and necessary.

208. With respect to all of the above-described parts of the Navigator that were identified by the Plaintiffs as needing repair or replacement in the 2009 drydock, Mr. Hislop identified these repairs as reasonable and necessary. (Hislop Trial Tr. 1077:17-25; 1078:5-12; 1083:3-9; 1084:14-19; 1086:24-25; 1087:1-6; 1088:1-8; 1089:6-10; 1090:12-17; 1091:12-17; 1092:1-4; 1093:22-25; 1094:1-3, 9-12; 1095:5-11; 1096:24-25; 1097:1-3, 20-25; 1098:13-19; 1104:1-6; 1105:4-7; 1107:22-25; 1108:1-4, 10-13; 1109:8-11; 1113:10-21; 1114:5-8; 1115:2-5).

**The Defendants' Breached Their Technical Maintenance Duty to Maintain**

**Voyager**

209. The Voyager suffered from a long standing history of vibration issues never redressed either by VSLAM or VSLUK during the 2003 to 2009 period of time. (Hislop Trial Tr. 1114:21-24).

210. Mr. Lindsay testified that the Voyager would require ongoing repairs to change out the motor mounts. Mr. Lindsay testified that the vibration problems disturbed the guests and were prevalent immediately upon their take over. (Lindsay Trial Tr. 429:25, 430: 1-5).

211. Despite the prevalence of these vibrations, these concerns were never brought to Mr. Lindsay's attention while VSLUK managed the ship. (Lindsay Trial Tr. 430:6-7). Mr. Hislop opined that in order to remediate the vibration noises the ship's engine mountings had to be changed and that the Plaintiffs' costs associated with those repairs are reasonable and necessary. (Hislop Trial Tr. 1115:2-10).

### The Defendants' failed to advise the Owners of the Navigator's Stability Problems

212.   The stability of the vessel addresses the ship's ability to sail safely and in compliance with SOLAS requirements. (Pollard Trial Tr. 975:22-25, 976:1)  Mr. Pollard opined that the Navigator suffered from a stability problem and likely had sailed, several times, without complying with the statutory requirements. (Pollard Trial Tr. 1065:5-11)  While the parties agree that the Navigator experienced stability issues shortly after her launch, Mr. Lindsay testified he believed the issues were resolved. (Lindsay Trial Tr. 419:10-14).

213.   Mr. Evenhand admitted that he never discussed the stability issues with Mr. Lindsay. (Evenhand Trial Tr. 1424:21-25, 1425:2-12).  Moreover, when Mr. Murolo addressed the "technical condition" of the Navigator with Mr. Lindsay, he never advised him of the stability issue. (Lindsay Trial Tr. 424:4-6) (Pls.' Ex. 104).

214.   When the issue of stability was fully appreciated, the owners undertook efforts to plan the remediation.  The remediation included hiring a naval architect to re-design the hull, set forth planning within the dry dock and conducting the repair. (Lindsay Trial Tr. 454:23-25, 455:1-5)  Mr. Pollard opined that the Plaintiffs had to effect a modification of the ship's hull in order to modify her then-existing ship stability operating characteristics. (Pollard Trial Tr. 1010:10-1011:4).

### The Defendants' Failed to Engage, Train and Ensure the Efficiency of a Competent Qualified Crew

215.   Under its agreement, VSLUK was obligated to provide suitably qualified Crew for the Navigator, as required by the Owners, including the obligation to select and engage the Crew, and to train the Crew and supervise their efficiency.  (Pls.' Ex. 15 at Sec. 3.1).

Richard Evenhand testified that it was the technical manager's obligation to be in daily contact with the crew, to train and supervise them, and to oversee and audit their compliance with the SMS.  (Evenhand Trial Tr. 1379:19-25).

216.    Despite these obligations, it is clear from the evidence that there were significant problems with the crew on board the Navigator during the time that VSLUK was responsible for its management.  It is equally obvious from this contemporaneous correspondence that the poor quality of the crew affected the technical management of the ships.

217.    Plaintiffs' Exhibit 254 is an email chain from September 5, 2008, three months into VSLUK's management period in which VSLUK's Technical Director instructs Lorenzo Malvarosa that "I'm receiving a lot of complains (sic.) from the Owner and from the ships about he Crew situation on the entire fleet.  We suffer constant shortages of peoples (sic.), most of them are key positions.  In addition to the poor technical knowledge of the available personnel, will not help the situation at all. Recently we had PSSC on board the navigator and this time has been a really challenging situations (sic.) on both areas Deck and Engine. …I just wont (sic.) to inform you that the Crew situation on Regent fleet is totally out of control."  (Pls.' Ex. 254 at 1, 2).  Mr. Malvarosa responded to this email by stating that "That is the situation is such we have very little change to succeed but we have also have a larger problem on the crew, to be honest most serious that what I thought."  (Pls.' Ex. 254 at 1).  Rafael Sauleau, the V.Ships Crew Operations Director responded by admitting "yes, bad situation with crewing overall."  (Pls.' Ex. 254 at 1).

218.  Plaintiffs' Exhibit 249 is another email chain from October of 2008, in the fifth month of VSLUK's management of the ships.  In this email, Richard Evenhand responds to another crewing complaint from Mr. Murolo by noting that the Owner was complaining about the quality of the crew, and that "specific reference was made with regard to the navigator (sic.) condition … as the vessel condition has not deteriorated overnight …

219.  Plaintiffs' Exhibit 251 is another email chain from January 2009, in the seventh month of VSLUK's management period.  In these emails, Mr. Murolo raises additional crew quality complaints with Mr. Seuleau, stating that "[h}appen many times that despite bad appraisal, you move those Crew from one ship to the other in the same fleet."  Later in the email series, Mr. Murolo tells Mr. Sauleau that "Don't take this personal, it is time WE solve the crew problems, after two year that I'm advicing (sic.) you, we din't (sic.) get any improvement."

220.  It is obvious from this internal correspondence among V.Ships management that there was a problem with the crew on the Regent fleet and that it was affecting the quality of the technical knowledge and performance of the crew, that the problem was of some duration and affected the condition of the vessels ("the condition of the Navigator did not deteriorate overnight").

**V.Ships Leisure UK permitted the Environmental Issues to Occur and Undertook to Conceal Them**

221.  Plaintiffs Exhibit 257 is an email string from November of 2008, in which Pantaleo Murolo, then serving as the Technical Director of the Regent fleet for VSLUK, states

that "Mr. Casillo cannot take a Chief Engineer position." (Pls.' Ex. 257 at 1). Despite this email, Mr. Casillo was hired as the Chief Engineer on the Navigator.

222. Plaintiffs' Exhibit 258 is an email chain from January of 2009, in which Mr. Malvarosa states that "We have anyway to remove Casillo and step him down, but we have also to look at the crew on board, the recent blackout was due to too much accumulation of water in the tank for lack of draining from months and months, basic stuff at that level." (Pls.' Ex. 258 at 1). Despite this email, Mr. Casillo was not removed or stepped down.

223. Instead, Mr. Casillo was permitted to stay on the Navigator where, according to the statements of three of subordinate engineers in his department, he instructed them to misstate the ship's environmental records. (Pls.' Exs. 172, 173). As was mentioned numerous times by the Defense at trial, Mr. Casillo subsequently was indicted by the United States criminal authorities for eight counts of environmental crimes while serving as the Chief Engineer on the Navigator.

224. In response to the allegations of environmental issues on the ship, the ship's owner was required to hire an environmental lawyer and an environmental consultant to investigate the claims. (Lindsay Trial Tr. 448:8-25). According to Mr. Argiz, the environmental investigation cost the Plaintiffs $188,000. (Argiz Trial Tr. 1138:23-25).

225. An additional consequence of the environmental issues brought about by Mr. Casillo's actions was that the Navigator was forced not to discharge any water overboard during the course of the investigation. As a result, the Plaintiffs suffered the extra costs of oily water and sludge removal during the period in the amount of $254,614, which Mr. Hislop deemed both reasonable and necessary. (Hislop Trial Tr. 1114:5-8).

**The Plaintiffs' Damage Claims;**

226.   The Plaintiffs claim damages in four categories.  First they claim $11.565 million for completed repairs to the Navigator and to the Voyager.  Second, they claim $525,000 for future ship repairs to the Voyager.  Third, the Plaintiffs claim damages arising from lost cruise revenue in the amount of $5.24 million.  Fourth, they claim other expenses for future cruise certificates in the amount of $909,000.  The Court will address each damage claim separately.

       1.   <u>Costs of Remediation Due to Improper Maintenance and Repairs</u>

227.   As a result of the actions and omissions described elsewhere in this opinion, various parts and systems on the Navigator and the Voyager needed to be repaired in the time period leading up to and during the dry dock in Bremerhaven, Germany.  According to the Charter Agreement for the ships, it is the responsibility of the ship owners to "keep the Vessel, or procure that the Vessel is kept, in a good and efficient state of repair" and to "maintain the Vessel in good technical condition."  (Pls.' Ex. 115, Sec. 15.1, 15.5).  Robin Lindsay testified that, although the drydock invoices were paid by the Charterer, the costs of the repairs were the ultimate responsibility of the ship-owning companies, and that the expense for these repairs were shown on the books of the shipowners.  (Lindsay Trial Tr. 460:9-19).  As a result, the Court finds that the damages resulting from the repair costs to the Navigator were suffered by its owner, CPUK Two, and that the damages suffered from the costs of repair to the Voyager were suffered by its owner, Supplystill Limited.

228.   Plaintiffs' presented Tony Argiz, a highly qualified forensic accountant who the Defendants stipulated was qualified to present his opinions, to calculate the amount of

damages arising from the repair and replacement costs.  Mr. Argiz testified that his methodology was to calculate the historical costs to cure, remedy or remediate the physical damage to the ships.

229.    In calculating these amounts, Mr. Argiz relied upon the factual determinations of the Plaintiffs' technical staff as to the percentage of each repair or replacement that was the result of neglect or improper maintenance or repair, as opposed to ordinary wear and tear or to other refurbishments.  Plaintiffs' Exhibit 1 contains the applicable percentage for each item of repair.  This exhibit originally was prepared by one of the senior members of the Plaintiffs' technical staff, and each percentage determination was affirmed at trial by other members of the Plaintiffs' technical staff with long-standing experience in ship technical management, maintenance, repair and placement, and who were present for the actual planning and execution of the repairs and maintenance on the vessels, Carlo Paiella and Martin Hegarty.

230.    Mr. Argiz testified that he reviewed the invoices for each of the repair and replacement costs, that he traced each of these amounts back to the company's books and vouched the accuracy of the invoices.  Mr. Argiz affirmed that the amounts claimed by the Plaintiffs as damages, accurately reflect the amounts actually incurred by CPUK Two and Supplystill Limited on the repairs to the Navigator and Voyager resulting from the neglect and improper maintenance and repair claimed by the Plaintiffs, and that those damages for past repairs and replacements on the Navigator is $11,531 million and on the Voyager is $34,000.

231.    Plaintiffs' technical expert, Kevin Hislop, testified as to when each of the items of repair or replacement was first recognized in the various superintendents' inspection

reports as a problem, and that, for the time thereafter, the problem remained unaddressed, resulting in the necessary repair or replacement. (Hislop Trial Tr. 1077:17-25; 1078:5-12; 1083:3-9; 1084:14-19; 1086:24-25; 1087:1-6; 1088:1-8; 1089:6-10; 1090:12-17; 1091:12-17; 1092:1-4; 1093:22-25; 1094:1-3, 9-12; 1095:5-11; 1096:24-25; 1097:1-3, 20-25; 1098:13-19; 1104:1-6; 1105:4-7; 1107:22-25; 1108:1-4, 10-13; 1109:8-11; 1113:10-21; 1114:5-8; 1115:2-5).

232.  Mr. Argiz has reviewed the third party vendor's proposals for the work, and has validated that the costs of these future repairs will be $525, 000.  These costs are the responsibility of Supplystill Limited, and the Court awards them to that entity.

Lost cruise revenue

233. As a result of the unscheduled dry dock in Bremerhaven, six previously scheduled and booked cruises on the Navigator had to be cancelled.  According to the Charter Agreement under which the Navigator was being made available for those cruises, CPUK Two was obligated to "indemnify, defend and hold Charterer harmless against any and all liability or damages incurred by Charterers or passengers arising from the cancellation or curtailment of cruises because the Vessel is unavailable … and irrespective of negligence or default unless this is due to the willful default or Gross Negligence of the Charters." (Pls.' Ex. 115, Sec. 21.7).[2]  Robin Lindsay testified that, in accordance with this provision of the Charter Agreement, the liability for the lost cruise revenue has been recognized on the books of CPUK Two as its obligation. Based on this evidence, the Court finds that it was CPUK Two that suffered the

---

[2]  Although the Charter Agreement contains a consequential damages waiver clause, the indemnification section described above is specifically excluded from that clause. (Pls.' Ex. 115, Sec. 24.1).

damages from the loss of cruise revenue because of the cancellation of the cruises resulting from the unscheduled dry dock in Bremerhaven.

234.   Mr. Argiz calculated the damages resulting from the cancelled cruises by first determining the loss period.  Mr. Argiz affirmed that the Navigator was out of service for a total of 50 days, which included the 31 days of actual drydock and an additional 19 days for repositioning the ship to the drydock and back from the drydock.  Mr. Argiz then subtracted ten days from the 50 days, in recognition that this dry dock was likely to be replacing a dry dock that would have occurred in the following year, and that typical dry docks last seven to ten days.

235.   Mr. Argiz then estimated the lost revenues from that 40-day period, and the variable/incremental costs incurred in the actual drydock and determined the actual lost profits from the unscheduled Bremerhaven dry dock to be $5.242 million.

236.   Included in the costs suffered by CPUK Two as a result of the cancelled cruises is for travel agent commissions that were not refunded when the cruises were cancelled, as is industry practice.

Future cruise certificates

237.   Mr. Lindsay testified that, in addition to a full refund for the cancelled cruise passengers, it is standard industry practice to issue these disappointed cruise passengers certificates to be used for future cruises.  Mr. Lindsay testified that such future cruise certificates were issues for the passengers whose Navigator cruises were cancelled because of the unscheduled dry dock in Bremerhaven.  Mr. Argiz testified that $909,000 of those future cruise certificates were redeemed for use on future

Regent cruises.   According to the Charter Agreement in effect at the time of the cancellations, (Pls.' Ex. 115, Sec. 21.7), CPUK Two is obligated to indemnify the Charterer for the costs of the redeemed cruise certificates, and the Court awards the costs of these certificates to CPUK Two.

Prejudgment interest

238.   Finally, the Plaintiffs are entitled to pre-judgment interest on all of the economic damages at the rate provided by Florida statutes from the date the damages were incurred.   *Tampa Port Authority*, 65 F.Supp. 2d 1279 at 1292.   The general rule is admiralty is that the court should award prejudgment interest absent peculiar circumstances. *See e.g., Pelican Marine Carriers,* I*nc. v. City of Tampa*, 791 F.Supp. 845, 857 (M.D. Fla. 1992), *aff'd,* 4 F.3d 999 (11th Cir. 1993).

## CONCLUSIONS OF LAW

I.   **THE DETERMINATION OF GOVERNING LAW**

*A.   A Contract To Provide Technical Management Services To A Vessel In Navigation Is Deemed Maritime In Nature And Governed By Federal Admiralty Law*

To determine whether a contract falls within maritime jurisdiction we look to the "subject-matter, the nature and character of the contract… *the true criterion* being the nature of the contract [and] whether it has a reference to maritime service or maritime transactions." *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)(emphasis added).   In conducting this inquiry, courts do not consider whether a ship or vessel was involved in the dispute, or the place of the contract's formation or performance, but look to the "nature and character of the contract." *Id.* The "fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.'" *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S.

603, 608, 111 S.Ct. 2071 (1991).   Thus, courts must determine whether the substance of the

contract at issue is reasonably necessary to the conduct of maritime commerce.  *Ambassador*

*Factors v. Rhein-Maas-, Und.*, 1997 AMC 1562, 1563-64 (11th Cir. 1997).

In *Venezuelan Container Line C.A. v. Navitran Corp.*, 792 F.Supp. 1291 (S.D. Fla. 1991),

Judge King held that a general agency contract directly and substantially linked to the operation

and management of ships to fall within the Court's maritime jurisdiction.   In ruling, Judge King

restated the following,

> In general a contract relating to a ship in its use as such, or to
> commerce or navigation on navigable waters, or to transportation
> by sea or to maritime employment is subject to maritime law and
> the case is one of admiralty jurisdiction, whether the contract is to
> be performed on land or water…
>
> In order to be considered maritime, *there must be a direct and
> substantial link between the contract and the operation of the ship,
> its navigation, or its management afloat, taking into account the
> needs of the shipping industry*, for the very basis of the
> constitutional grant of admiralty jurisdiction was to ensure a
> national uniformity of approach to the world of shipping.

*Id. citing* 1 *Benedict on Admiralty* §182 (7th ed. 1991).   To apply maritime law to the contract it

must have a substantial link to the operation of the ship and its management afloat. *Id.*

### B.     All of Plaintiffs' Claims Are Contractual in Nature and Arise From Agreements Made to Maintain the Condition of the Vessels

Plaintiffs invoked this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1333.

[D.E. 53]  The Second Amended Complaint asserts claims against VSLSAM and VSLUK that

are contractual in nature and arise from the agreement to provide technical maintenance and

repair to the Regent Fleet. [D.E. 53]  Count V and Count VI of the Second Amended Complaint

allege claims against VSLSAM and VSLUK for failing to provide proper technical maintenance

to the Regent Fleet.  The claim against VSLSAM is based on the time period of late 2000 until

June 1, 2008 and the claim against VSLUK is from June 1, 2008 until the termination of the

VSLUK contract in May, 2009. *Id.*   In Count VII of the Second Amended Complaint, the

Plaintiffs also assert a *quasi*-tort claim, Breach of Implied Warranty of Workmanlike Services,[3]

against VSLUK for the same reasons.  *Id.*   The Implied Warranty claim hinges on the existence

of a contract between the parties.

    Having reviewed the allegations in the Second Amended Complaint and the findings of

fact, this Court concludes all of Plaintiffs' claims are maritime in nature and warrant application

of substantive maritime law to this dispute.

## II.   CPUK, AS AGENT OF THE VESSEL OWNERS, ORALLY CONTRACTED WITH VSLSAM TO PROVIDE MAINTENANCE AND REPAIR TO THE REGENT FLEET

---

    [3] The warranty imposed on a contractor in admiralty is to effect ship repairs in a workmanlike manner. [5] *See Ryan  Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 100 L. Ed. 133, 76 S. Ct. 232 (1956); Italia Societa Per Azioni Di Navigazione v. Oregon Stevedoring Co., 376 U.S.  315, 11 L. Ed. 2d 732, 84 S. Ct. 748 (1964);* [**7] *H & H Ship Service Co. v. Weyerhaeuser Line, 382 F.2d 711 (9th Cir. 1967); American Export Lines v. Norfolk Shipbuilding & Drydock Corp., 336 F.2d 525 (4th Cir. 1964); Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310 (2d Cir. 1958); see also* 9 Williston, *Contracts* § 1012C at 38-39.  This warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task.  *See Coffman v. Hawkins & Hawkins Drilling Co., Inc., 594 F.2d 152 (5th Cir. 1979); Tebbs v. Baker-Whiteley Towing Co., 407 F.2d 1055 (4th Cir. 1969).* The warranty of workmanlike service, of course, does not make the repairer a guarantor of the results.  Where it has performed its tasks as a skillful workman should, or where its efforts have been hindered by the actions of the other contracting party, the repair firm will not be held responsible for defects attributable to faulty workmanship. *See Coffman, 594 F.2d at 155; see also Weyerhaeuser Steamship Co. v. Nacirema Oper. Co., 355 U.S. 563, 567, 2 L. Ed. 2d 491, 78 S. Ct. 438 (1958).* [**8]  However, the warranty is otherwise very broad.  It is "comparable to a manufacturer's warranty of the soundness of its manufactured product." *Ryan, 350 U.S. at 133-34.* It has been applied to find fault where repair jobs are improperly performed; *see, e.g., Booth Steamship Co., supra,* (engine repair contractor); where the misdelivery of goods has caused monetary damages to shipowners, *see, e.g., David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 299 (2d Cir. 1964);* and where efforts intended to prevent damage to a ship have been ineffective, *see, e.g., Fairmont Shipping Corp. v. Chevron International Oil Co., Inc., 511 F.2d 1252 (2d Cir. 1975).* Significantly, the warranty of workmanlike service has been recognized as a ground for liability where the equipment chosen for a specific purpose is defective or unsafe.  *Italia Societa, 376 U.S. at 321; Booth Steamship Co., 262 F.2d at 314; American President Lines Ltd. v. Marine Terminals Corp., 234 F.2d 753, 759 (9th Cir. 1956).*

Plaintiffs allege that VSLSAM entered into an oral agreement with CPUK to provide technical services to the Regent Fleet.  Courts have consistently held that maritime law regards oral contracts as valid.  *See, e.g., Kossick v. United Fruit Co*., 365 U.S. 731, 734, 81 S. Ct. 886 (1961).  To establish the contract's formation the critical issue is "whether there was a meeting of the minds as to the essential terms of the agreement."  *Tarstar Shipping Co. v. Century Shipline, Ltd.*, 451 F. Supp. 317, 322 (S.D.N.Y. 1978).  In determining the parties' intent, courts focus on what the parties expressed to "each other and to the world, not kept to themselves."  *Lasserage Tech. v. Lasserage Lab.*, 972 F.2d 799, 802 (7th Cir. 1992).  Federal maritime law supersedes the state law statute of frauds, rendering oral contracts enforceable.  *Kossick supra*.

Examples of enforceable oral contracts in admiralty arise from actions as simple as requesting a party to perform services for the benefit of a ship, the acceptance of the offer, and engaging in the services for the benefit of the ship.  *Clifford v. M/V Islander*, 565 F. Supp. 922 (D. Mass. 1983); *See also, Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible*, 1987 WL 33820 *6 (S.D. Fla. 1987).  Moreover, a court will bar a defendant from avoiding the oral agreement under the doctrine of promissory estoppel when *the plaintiff relied upon the defendant's own conduct in performance of terms of the agreement that the charter existed*.  *E.A.S.T. Inc. of Stanford, Conn. v. M/V Alaia*, 1988 AMC 1397 (E.D. La. 1987).[4]

Courts are hesitant to hold a contract void for indefiniteness and will construe that alleged indefinite term to have a meaning consistent with the apparent object of the parties in entering

---

[4]  VSLSAM cites to *Venus Lines Agency, Inc. v. CVG Int'tl Am., Inc*., 234 F.3d 1225 (11th Cir. 2000), *citing Browning v. Peyton*, 918 F.2d 1516, 1521 (11th Cir. 1990) in support of its arguments.  In *Venus Lines*, the 11th Circuit declined to find an oral contract existed to enforce an agreement to provide shipping services because evidence proved that one of the parties refused to sign written proposals to confirm the oral contract for nearly two years.  The court found that the "consistent refusal to sign Venus' proposed drafts is strong evidence that CVGIA did not intend the earlier negations to be immediately binding." *Id.* at 1230.  However unlike the *Venus* case, in the instant case, the Plaintiffs never refused to sign any written agreement.

into the contract. *Specialized Transp. Of Tampa Bay, Inc. v. Nestle Waters North*, 356 Fed.Appx. 221 (11th Cir. 2009). Therefore, if the parties provide a practicable, objective method for determining a term, the contract will not be void for indefiniteness. *Id.*

### A.     The Parties Agreed to the Oral Contract

There is significant and convincing evidence that VSLSAM entered into an enforceable oral agreement to provide technical management and operational services, including the responsibilities for the technical management and support of the necessary repairs, maintenance and upkeep of the Navigator and the Voyager, from late 2000 until May 31, 2008. This evidence includes:  1) unrebutted direct evidence of the terms, origins and formation of the oral agreement;  2) admissions by senior executives from VSLSAM of the existence, terms and payment under this agreement in contemporaneous documents;  3) evidence of sufficient consideration for the oral agreement;  4) significant evidence of actual performance of the contract's services by VSLSAM;  5) and other evidence demonstrating its existence.

### 1.     Direct evidence of the terms, origins and formation of the oral agreement

The oral contract sued upon by the Plaintiffs arises from the relationship between the parties, which was relatively casual, collegial and fully cooperative.  (Conroy Trial Tr. 65:23-66:4); Sinclair Trial Tr. 263:10-16).  Mark Conroy testified that, from the beginning of the Vlasov / Carlson joint venture, the parties had agreed that V.Ships, an affiliate of the Vlasov Group, would provide ship management services for the ships of the Regent fleet, and that, in 1998, a written ship management agreement was entered into by the parties.  (Conroy Trial Tr. 69:23-70:3; 70:16-29; 71:17-72:2).  Pursuant to that agreement, in 1998, Regent Seven Seas Cruises entered into a ship management agreement with VSLSAM for the management of the Navigator that provided for the full management of the vessel, including Maritime Operations,

including Manning, Technical and Marine Services, Hotel Operations Personnel, Procurement of Inventories, Vessel maintenance and Repair, Dry docking, Wet docking and Refurbishment, Insuring the Vessel and Claims.  (Pls.' Ex. 78 at Sec. 3).  The 1998 agreement provided that VSLSAM, as the Manager, "should provide service to the Vessel in degree and quality to luxury cruise standards as expected in the cruise ship industry from time to time and, without prejudice to the foregoing, at least the same degree and quality of services as the other comparable luxury cruise ship vessels which Owner operated as of the date hereof" and that this measure relates specifically to the technical expertise, management time, and degree of competence which manager employs."  (Pls.' Ex. 78 at Sec. 3).  VSLSAM was to be paid $450,000 per year for the services provided under the 1998 agreement, plus an additional amount for placed hotel personnel recruited.  (Pls.' Ex. 78 at Attachment A).

Mr. Conroy also testified that there came a time in 2000, when the owners of the ships desired to set up a company in the United Kingdom to serve as the formal manager of the Navigator (and later the other ships of the Regent fleet), in order to take advantage of certain beneficial UK tax leases, and for that purpose the joint venturers created Celtic Pacific (UK) Limited ("CPUK").  (Conroy Trial Tr. 72:25-73:23).  The establishment of CPUK, however, presented the parties with a number of issues.  First, CPUK did not have the technical operating expertise to actually manage the operations of the fleet technically.  (Lindsay Trial Tr. 376:13–377:1).  Second, VSLSAM raised issues because it feared losing the benefits of the 1998 ship management agreement.  (Conroy Trial Tr. 80:23-24).  In order to allay those concerns, Mr. Conroy testified that the Owners agreed that CPUK would be named as the formal Manager for the ships, but that VSLSAM would continue to provide the support for all of the services it had

provided under the 1998 agreement, and would be paid the same amount or more for those services as had been agreed in the 1998 agreement. (Conroy Trial Tr. 80:5-11; 81:20-82:2).

In order to effectuate that agreement, the parties entered into a series of written and oral agreements. Effective December 31, 2000, CPUK entered into a written management agreement with the Disponent Owner of the Navigator, Celtic Pacific (UK) Two Limited ("CPUK Two"), for CPUK to serve as the Manager of the Navigator. (Pls.' Ex. 5). That agreement provided that CPUK, as the Manager, "shall use its reasonable endeavors to provide the management services …and the Manager shall have full power and authority, in the name of the Disponent Owner and as its agent, to do all things which may seem expedient or necessary for the provision of the services or otherwise in relation to the management of the Vessel. (Pls.' Ex. 5 at Sec. 1.2). That agreement also provided that the Manager "shall be entitled, on behalf of the Disponent Owner, to: … appoint consultants and other experts to supervise or advise in relation to the maintenance, repair, operation and survey of the Vessel." (Pls.' Ex. 5 at Sec. 2.1(ii)).

In order to provide the Claims, Insuring the Vessel, Procurement of Inventories and Marine Manning responsibilities from the 1998 agreement, effective December 12, 2000, VSLSAM entered into a Manning and Ancillary Services Agreement with Radisson Seven Seas Cruises, Inc., to provide Emergency Situation Assistance, Insurance Claims Handling, Procurement and crew Manning. (Pls.' Ex. 87 at Sec. 3). VSLSAM was to be paid $80,000 a year for its services under the manning and Ancillary Services Agreement. (Pls.' Ex. 87 at Sec. 6).

In order to provide the Hotel Operations Personnel and Marine Services responsibilities from the 1998 agreement, effective December 14, 2000, VSLSAM entered into a Management Service Agreement with Radisson Seven Seas Cruises, Inc., to provide Hotel Operations

Personnel and Marine Services.  (Pls.' Ex. 86 at Sec. 3).  VSLSAM was to be paid $450,000 plus $60,000 for hotel crew recruitment services.  (Pls.' Ex. 86 at Sec. 6).

Mark Conroy also testified that, because of the UK tax leases, the parties agreed, orally, that VSLSAM would provide the rest of the technical management services previously supplied under the 1998 agreement (Technical Marine Operations, Vessel Maintenance and Repair and Dry docking, Wet docking and Refurbishment).  (Conroy Trial Tr. 81:16-19).  The parties to this oral agreement were CPUK, as an agent on behalf of CPUK Two, and VSLSAM, and the terms of the oral contract were that VSLSAM was to provide these technical management and support services as they had agreed to do in the past.  (Conroy Trial Tr. 80:5-11; 111:8-17).  Mr. Conroy testified that the standard by which VSLAM was to perform its services was consistent with the standard contained in the 1998 agreement – "Basically, it was with comparable luxury cruise vessels. ... It was vessels that competed in the same class of service.  So it was our own fleet and ships, for instance, at Silver Seas or Crystal or one of those other companies.  Since they had the most intimate knowledge of Silver Seas, I think that was their baseline."  (Conroy Trial Tr. 111:8-17).  On cross-examination, Mr. Conroy testified that the standard was that "the ship would be maintained in class and structure and the same quality as before."  (Conroy Trial Tr. 181:20 – 182:3).  Mr. Conroy also testified on cross-examination that the ship was to be kept in flag, in class "and in good condition."  (Conroy Trial Tr. 182:12-15).

Robin Lindsay also testified that, when he became engaged with the Regent fleet in 2008, he had discussions with Lorenzo Malvarosa, the CEO of VSLSAM, and Andrea Zito, COO of VSLSAM, and that, based on those discussions, "[i]t was my understanding that they had full technical management of the vessels.  They had positioned employees in the CPUK office, because CPUK had no technical expertise."  (Lindsay Trial Tr. 376:13–377:1).  Describing the

circumstances of his discussions with Messrs. Malvarosa and Zito, Mr. Lindsay further testified that "[a]t that time, they were managing the Oceania fleet, so we had many occasions that we had meetings and we were discussing a contract or continuation of the contract with the Regent fleet. So they assured me, don't worry, it's V.Ships behind it and everything will be, you know, in good order." (Lindsay Trial Tr. 377:2-9).

Based upon all of this evidence, the Court finds that there was a meeting of the minds between CPUK, on behalf of the ship owning companies, and VSLAM for VSLAM to provide technical management ands support services tot eh navigator as of December 14, 2008 and to the Voyager and the Mariner as they came on line.

2.    Admissions of the existence, terms and consideration from VSLSAM's contemporaneous documents

Further evidence of the existence of the oral agreement comes from contemporaneous documents created by VSLSAM personnel.    Plaintiffs' Exhibit 219 contains email correspondence from Mr. Malvarosa to others in the top management at V.Ships, dated September 2005, the text of which reads "Pls see attached summary of services given by V.Ships to CPUK and RSSC."   The chart attached to Plaintiffs' Exhibit 219 lists services provided to each of the ships of the Regent fleet, individually, and for the Navigator and the Voyager, lists services as being provided under three categories.   The first category is listed as Contractual Services under the Manning and Ancillary Services Agreement, and lists the services provided under that contract.   The second category is listed as Contractual Services for UK Tax Compliance under the management Service Agreement, and lists the services provided under that contract.   The final category is entitled "Services Provided in Addition" and lists the following services provided in addition:   V.Ships effective backstage management, Electronic/Electrical monitoring & management, review of operational issues, representation in international and

industry for a like ICCL, NWCA, etc., drydock management and contracts, procurement and MARCAS access, extraordinary insurance management for large and not standard claims (pods, 9/11. bowthrusters), post-newbuilding follow up (pods, claims (rr, etc.)) and newbuilding advice, support and management.  In his deposition on this contract, Mr. Malvarosa testified that "[t]he purpose of this email was at the time to specify exactly what we were doing compared to the fees …"  (Malvarosa Dep. Vol. II 8:16-22.).  When asked to describe the "Services provided in Addition" column, Mr. Malvarosa testified that they were "so there were some issue that we thought at the time were on top of, let's say, our duty of the contract.  Were still ancillary services but ancillary services on top of the ancillary service contract."  (Malvarosa Dep. Vol. II 13:1-13).

Plaintiffs' Exhibit 220 contained a revised draft of the services chart compiled by VSLSAM in October of 2005.  (Malvarosa Dep. Vol. II 17:1-11).  The revisions in Plaintiffs' Exhibit 220 include a change of the title of the column formerly titled "Services Provided in Addition" to state "Support Services (Backstage Management and Support))" and the addition of a new column on the right side entitled "Total Management Fee," listing a total fee for each ship. "Mr. Malvarosa testified that the services listed under the "Manning and Ancillary Services" column were provided under the Manning and Ancillary Services agreement, that the services listed under the "Contractual Services for UK Tax Compliance" column were the services provided under the Management Service Agreement, and that services listed in the "Support Service (Backstage Management and Support)" column were services VSLSAM was providing in addition to those two contracts.  (Malvarosa Dep. Vol. II 10:20-17:25; 18:12-26:7).  In addition, Mr. Mr. Evenhand testified that, to his knowledge, VSLSAM did not have any written contract to provide any kind of technical management services to any of the ships of the Regent

fleet during the period between 2001 and May 31, 2008.  (Evenhand Dep. 152:10-19).[5]

Plaintiffs' Exhibit 29 is a letter written by Mr. Malvarosa to Tami Thraum, the Chief Financial

Officer at Regent Seven Seas Cruises, on September 14, 2006.  In this letter, Mr. Malvarosa

writes that "[i]t was our understanding that the strategic establishment of UK lease/CPUK

structure, in which we were instrumental, and with lead to significant financial/commercial

benefits for the parent company, should not alter our direct or indirect involvement and as

consequence the level of fees.  (Pls.' Ex. 29 at 1)  Mr. Malvarosa goes on in that letter to state

that "[a]lthough CPUK is a stand alone operating company, our involvement before/after the

establishment of CPUK had not changed on the whole, due to the contract in force between us

and the parties involved."  (Pls.' Ex. 29 at 1).

     Plaintiffs' Exhibit 13 is an email written on February 21, 2008 by Mr. Malvarosa

soliciting a continuation of the existing management arrangement, and again describing the

services provided by VSLSAM to the Regent Fleet in the preceding years.  In that letter, Mr.

Malvarosa acknowledged that:

> V.Ships is providing management and consulting services covered
> by various agreements due to the fact that the management party
> was transferred to Celtic Pacific UK (CPUK) to comply with UK
> Lease requirements.  Furthermore, these agreements were made in
> the spirit that V.Ships would not be penalised by the UK Lease
> requirements which represented a benefit to the Owners and was
> facilitated by us.

---

[5]  Defendants have sought to argue that a consultancy agreement between Golden Ocean Line
Limited and VSLSAM in 2006 provided evidence of a written agreement for VSLSAM to
provide management services for the Navigator and the Voyager, but the direct testimony of Mr.
Malvarosa and Mr. Evenhand, cited above, contradict that assertion.  In addition, when asked
about any contracts with Golden Ocean Line Limited, Mr. Evenhand denied knowledge of any
such contract (Evenhand Dep., 148:14–149:7).  Mr. Malvarosa testified that the payments of
$230,000 by Golden Ocean Line Limited under this contract in 2006 and 2007 were for the costs
of managing the Mariner (Malvarosa Dep. Vol. II, 107:21–109:1).  These payments also appear
on Plaintiffs' Exhibit 271 as payments made by Golden Ocean Line for "Support on Technical
Operations" for the Mariner.

(Pls.' Ex. 13 at 1).

This additional evidence further supports the Court's conclusion that there was a meeting of the minds among the parties for VSLAM to provide the technical management and support for the Regent fleet.

3. <u>The oral agreement was supported by adequate consideration</u>

The Court finds that the oral contract was supported by adequate compensation, and that VSLSAM was compensated in a variety of separate ways for the services it provided under the oral agreement, any one of which would be sufficient to constitute consideration for this agreement.

a. **Continuing business relationship**

The Court finds that the agreement to pay VSLSAM the same amount of fees going forward for it to continue to provide the same services is adequate consideration for the oral agreement.

Mark Conroy testified that, after CPUK was established, the parties agreed that VSLSAM would continue to provide the same level of services that they had been providing for the same amount of payment. (Conroy Trial Tr. 177:14–178:5).

Similarly, as described above, Mr. Malvarosa admitted in numerous contemporaneous communications that VSLSAM was providing the same services it was providing before CPUK was established for the same fee that it was to be paid then. In Plaintiffs' Exhibit 29, Mr. Malvarosa writes that "[i]t was our understanding that the strategic establishment of UK lease/CPUK structure, in which we were instrumental, and with lead to significant financial/commercial benefits for the parent company, should not alter our direct or indirect involvement and as consequence the level of fees. (Pls.' Ex. 29 at 1) Mr. Malvarosa also admitted in that same letter that "[a]lthough CPUK is a stand alone operating company, our

involvement before/after the establishment of CPUK had not changed on the whole, due to the contract in force between us and the parties involved."  (Pls.' Ex. 29 at 1).  In Plaintiffs' Exhibit 13, Malvarosa again acknowledged that:

> V.Ships is providing management and consulting services covered by various agreements due to the fact that the management party was transferred to Celtic Pacific UK (CPUK) to comply with UK Lease requirements.  **Furthermore, these agreements were made in the spirit that V.Ships would not be penalised by the UK Lease requirements which represented a benefit to the Owners and was facilitated by us.**

Additionally, in Plaintiffs' Exhibit 220, Mr. Malvarosa lists the various services that VSLSAM was providing to the Navigator and to the Voyager all in the same horizontal column, and concludes with a column entitled "Total Management Fee" for all of the services, including those under the "Support Services (Backstage Management Support)" column.  This chart, prepared and vetted by VSLSAM's senior management, demonstrates that VSLAM agreed to provide the additional services listed in the second to last column in exchange for the total management fee listed in the last column.

###           b.     The amounts of VSLSAM's payments demonstrate sufficient consideration

The Court also finds that VSLSAM was in fact paid more for its services during the oral agreement than it had agreed to accept for these same services under the 1998 agreement, and that that additional consideration provides adequate consideration for the oral agreement.  Exhibit 273 contains a chart prepared by VSLSAM personnel describing the fees paid to VSLSAM from 200 through 2007 for each ship in the Regent fleet.  Before CPUK was established, VSLSAM contractually agreed to provide all of the ship management for the Navigator, for **$450,000** a year, plus an additional amount for placed personnel.  Starting in 2000 when CPUK was set up, however, VSLSAM began being paid more for its allegedly reduced

role in the management of the Navigator than the same parties had agreed to pay it under the 1998 full management agreement.  According to Plaintiffs' Exhibit 273, VSLSAM received **$521,051** for the services it provided to the Navigator in 2000, $**616,364** for the services it provided to the Navigator in 2001, **$545,900** for the services it provided to the Navigator in 2002, **$557,652** for the services it provided to the Navigator in 2003, **$568,834** for the services it provided to the Navigator in 2004, **$583,056** for the services it provided to the Navigator in 2005, **$600,552** for the services it provided to the Navigator in 2006, and **$710,442** for the services it provided to the Navigator in 2007.

In comparison, when VSLUK, VSLSAM's affiliate, was awarded the contract for the full management of the Navigator beginning on June 1, 2008, it was paid only **$566,600.**  In additional comparison, during the years 2002 through 2005, VSLSAM was under contract to provide the full management of the Mariner (a 50,000 ton, 700 passenger ship), and in each of those years it was paid less for the Mariner management than it received for the services it was providing to the Navigator (a 30,000 ton, 500 passenger ship).

Mark Conroy testified that he would never have agreed to pay VSLSAM the same amount of fees for what VSLSAM claims were significantly reduced management services and responsibilities after CPUK was established.  (Conroy Trial Tr. 178:2-5).

The amounts actually paid to VSLAM for the services it provided is additional evidence to the existence of the oral agreement and is additional evidence that the oral agreement was supported with sufficient consideration.

    c.       **VSLSAM also received additional consideration for its services**

There also is clear evidence that VSLSAM received payment for the services of its employees to the Regent fleet above the amounts it received as the management fees described above.  These additional fees constitute additional consideration for the oral agreement.

Exhibit 271, a document created by VSLSAM personnel in 2007, shows that, in addition to payments under the Manning and Ancillary Services Agreements and the Management Service Agreements, VSLSAM received an additional $48,000 for each ship for "Management Expenses."  Mr. Malvarosa in his deposition testified that these fees constitute VSLSAM's management expenses, and included traveling costs and other ancillary expenses.  (Malvarosa Dep. Vol. II, 17–106:19).  These payments are not provided for in any of the written agreements, and provide additional compensation for the services being provided to the Regent fleet by VSLSAM.

In addition to the management fees addressed above, CPUK also paid numerous other amounts to VSLSAM for VSLSAM personnel performing services for the Regent fleet.  These additional expenses included reimbursing VSLSAM for Vittorio Facco's salary, and paying for Mr. Facco's lodging expenses, his personal and business travel, and for his UK taxes.  (Sinclair Trial Tr. 271:21–272:19).  CPUK also paid for Pantaleo Murolo's lodging, personal and business travel and for his UK taxes.  (Sinclair Trial Tr. 281:7-13).  CPUK also paid for Antonio Favuzzi's lodging and UK taxes.  Sinclair Trial Tr. 286:1-5).

  d.  **Detrimental reliance as consideration**

There is clear evidence that CPUK relied materially upon VSLSAM to provide its technical management and support expertise to the Regent fleet.  That detrimental reliance constitutes additional consideration for the oral agreement.  Detrimenal reliance is valid

consideration for a contract.  *Pinnacle Port Community Assoc. v. Orenstein, et. al.*, 872 F.2d 1536, 1544 (11th Cir. 1989).

Richard Evenhand, the Managing Director of VSLUK, testified that the Managing Director of a ship management company is responsible for everything, the office, the staff and the contracts they manage.  (Evenhand Trial Tr. 1370:4-8).  Mr. Evenhand also testified that the specific responsibilities of a Managing Director of a ship management company include giving instructions to and supervising the company's technical staff, evaluating the technical staff, and hiring the technical staff.  (Evenhand Trial Tr. 1370:14-24).

Mark Conroy testified that when CPUK needed to find a new managing Director in 2003, it appointed Susan Sinclair to serve in that position despite her inexperience in the technical aspects of ship management.  (Conroy Trial Tr. 103:21–104:7).

Similarly, Susan Sinclair testified that, throughout the entire time between her appointment as the Managing Director of CPUK until June 1, 2008, when VSLUK became the technical managers, Ms. Sinclair relied exclusively upon the VSLSAM personnel to provide the technical expertise for the Regent fleet.  (Sinclair Trial Tr. 266:21-24).  During that time, Ms. Sinclair had nothing to do with instructing her technical staff, with supervising her technical staff, with evaluating her technical staff or even with hiring her technical staff.  (Sinclair Trial Tr. 279:12-15; 279:25–280:6; 283:12 – 284:9).  Instead, Ms. Sinclair testified that she relied upon VSLSAM to perform those functions.  (Sinclair Trial Tr. 266:21-24).

The Court finds that it is clear from the evidence that CPUK relied materially upon VSLSAM to provide the technical management and support for the Regent fleet, and that this reliance constitutes additional and sufficient consideration for the oral agreement.

        e.      **Payments by others**

Finally, it is of no consequence that some of the consideration paid to VSLAM came from Regent Seven Seas Cruises or any other Regent entity and not from the Plaintiffs. Consideration for a contract may be given by the promise or by some other person, and it is immaterial from whom the consideration is made, so long as it is made. Restatement of the Law – Contracts, Restatement (First) Contracts, Section 75(2), Definition of Consideration.

          4.      <u>VSLSAM actually performed the services under the oral agreement</u>

The Court finds the parties also demonstrated the existence of the oral agreement through their actions. Throughout the entire period at issue, VSLSAM and its personnel were materially involved in overseeing and implementing the repair and maintenance functions for the Navigator and for the Voyager. Virtually all of the individuals situated in CPUK's offices providing technical management services were V.Ships employees, employed by V.Ships, paid by V.Ships, and evaluated pursuant to V.Ships evaluation criteria.

Brian Hernaman, the "Technical Coordinator" for the Regent Fleet from 2000 until 2009, came from a V.Ships entity, and, during the entire time from 2000 through mid-2008, remained a V.Ships employee and was paid by V.Ships through he worked in the CPUK office. (Sinclair Trial Tr. 340:3-4; 360:6-8).

Kelvin McIldoon, the Purchasing Manager for the Regent Fleet, came from a V.Ships entity, and, during the entire time from 2000 through mid-2008, remained a V.Ships employee and was paid by V.Ships through he worked in the CPUK office. (Sinclair Trial Tr. 268:244-269:1).

Ron Ellison, the original Managing Director of CPUK from 2000 until 2003, came from V.Ships, and was a V.Ships employee, paid by V.Ships during his service at CPUK. (Sinclair Trial Tr. 268:6-8). Mr. Ellison consulted on an almost daily basis with Lorenzo Malvarosa

concerning technical management issues for the Regent Fleet, and reported to Mr. Malvarosa. (Sinclair Trial Tr. 268:6-8).

According to Plaintiffs' Exhibit 224, at the time that CPUK was established, the original Technical Superintendent for the Regent fleet was Paolo Gavazza, a VSLSAM employee also at that time was serving as a Fleet Superintendent for VSLSAM, and that one of the two Technical Controllers for the Regent fleet, Claudio Carracciolo, and one of the Safety and Quality Superintendents for the Regent Fleet, Richard Evenhand, were VSLSAM employees also serving in similar functions for VSLSAM.   Plaintiffs' Exhibit 224 also shows that each of the superintendents for the Regent fleet reported to the managing Director for CPUK and to Lorenzo Malvarosa, and that the Managing Director will liaise with Mr. Malvarosa.

Plaintiffs' Exhibits 140 and 141 are Superintendent's Vessel Inspection Reports for the Navigator from February, 2001 and July 2001, performed by Paolo Gavazza, a VSLSAM employee serving as the Technical Superintendent for the Regent fleet.  These reports are on a VSLSAM reporting form, with the V.Ships logo prominently displayed on the front.  (Pls.' Ex. 140 at 1; Pls.' Ex. 141 at 1).

Plaintiffs' Exhibit 33 is a report prepared by VSLSAM for a meeting at their offices in July of 2002 to discuss Potential Cost Savings on Deck and Engine Expenses and Technical Costs for the Regent fleet, including deck and engine costs, and technical expenses, including repairs and maintenance.  Mr. Conroy testified that the meeting held in the offices of VSLSAM in Monaco, and that Mr. Malvarosa and other personnel from VSLSAM was actively involved in discussions about the technical expense savings.  (Conroy Trial Tr. 98:23-99:3).

Vittorio Facco, the Technical Director of the Regent Fleet from 2003 until 2006, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time.  (Sinclair Trial Tr.

271:14-23).  Mr. Facco took direction from Lorenzo Malvarosa, VSLSAM's CEO.  (Sinclair

Trial Tr. 275:15-16).  During his tenure in the offices at CPUK, Mr. Facco was reimbursed for

his lodging and personal travel expenses to and from Italy (where his family remained) by

CPUK, and CPUK paid his UK taxes and national insurance.  (Sinclair Trial Tr. 272:5-19;

274:14-17).

In February of 2004, various persons from VSLSAM were involved in responding to a

report of the management and condition of the Navigator by a surveyor working for Seaworthy

Systems.  The response to the owners was initially drafted by Lorenzo Malvarosa.  (Pls. Ex. 56 at

36).  Mr. Facco later again solicited Mr. Malvarosa's comments on a later draft of the response

before sending it.  (Pls.' Ex. 215).

In July 2005, VSLSAM created a presentation to Radisson Seven Seas Cruises that

described the history and the "technical operations" of the Regent Fleet.  (Pls.' Ex. 10).  That

presentation includes a chart entitled "Operation Department – RSSC Fleet" that listed Mr.

Malvarosa as the Chief Executive Officer of the Operation Department of the RSSC Fleet, it

listed Richard Evenhand, the COO of VSLSAM, as the Operations Director, and it listed Vittorio

Facco, the Technical Director of the Regent Fleet, as "RSSC Fleet Functional Organization,"

with a dotted line reporting relationship to Mr. Malvarosa.  (Pls.' Ex. 10 at. 17).  That chart also

listed the responsibility of giving "support to Celtic Pacific UK" as part of the Technical

Operation department of VSLSAM.  (Pls.' Ex. 10 at. 17).  That  chart completely omitted Susan

Sinclair, the Managing Director of CPUK, from any mention in the chart (and from any

responsibility for the "Operation Department of the RSSC Fleet").  (Pls.' Ex. 10 at. 17).  Mr.

Malvarosa vetted Plaintiffs' Exhibit 10 extensively before it was presented, sending it to a

number of the senior personnel at VSLSAM for their comments at least six times in seven days. (Pls.' Ex. 223).

On September 14, 2006, Mr. Malvarosa sent a letter to the CFO for Regent Seven Seas Cruises describing the nature and extent of the relationship between VSLSAM and the Regent Fleet. (Pls.' Ex. 29). In the letter, Mr. Malvarosa stated that "The pure cost for V.Ships Leisure of the personnel involved in RSSC and CPUK support and management … amounts to US$1,244,000. This includes … myself (who I am rated in the model at 5% - but I am effectively now using more than 50% of my time for the RSSC vessels) ... our Electrical Superintendent Pantaleo Murolo (who is working 95% on RSSC vessels) has solved problems that would have cost tens of thousands of dollars in assistance from makers …." (Pls.' Ex. 29 at. 2).

Pantaleo Murolo, the Technical Director of the Regent Fleet from mid-2007 until mid-2008, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time. (Sinclair Trial Tr. 280:12-13, 16-20). On his UK Customs paperwork, Mr. Murolo acknowledged VSLSAM as his employer during his time in the UK. (Pls.' Ex. 100). Mr. Murolo was evaluated in his performance by Andrea Zito, COO of VSLSAM. (Murolo Dep. 76:6-17). During his tenure in the offices at CPUK, Mr. Murolo was reimbursed for his lodging and personal travel expenses to and from Monaco by CPUK, and CPUK paid his UK taxes. (Sinclair Trial Tr. 281:7-13).

Antonio Favuzzi, the Fleet Superintendent of the Regent Fleet from 2006 until mid-2008, came from V.Ships, and was a V.Ships employee, paid by V.Ships during that time. (Sinclair Trial Tr. 284:25-285:5). On his UK Customs paperwork, Mr. Favuzzi acknowledged VSLSAM as his employer during his time in the UK. (Pls.' Ex. 34). He was evaluated in his performance

by Mr. Murolo.  (Sinclair Trial Tr. 288:1-5).  During his tenure in the offices at CPUK, Mr.
Favuzzi was reimbursed for his lodging and travel expenses to and from the ships by CPUK, and
CPUK paid his UK taxes.  (Sinclair Trial Tr. 286:1-5).

There is significant additional evidence that Lorenzo Malvarosa, the CEO of VSLSAM,
was actively involved in the technical management of the Regent ships.  Whenever any material
issue of technical services or management arose, Lorenzo Malvarosa, was involved in the call.
(Sinclair Trial Tr. 379:15-24).  Mr. Conroy referred to Mr. Malvarosa as the "go to guy" for
serious technical issues for the Regent fleet.  (Conroy Trial Tr. 96:10-19).

Further, because VSLSAM was undertaking technical management responsibilities for
the ships of the Regent Fleet, beginning in 2000 and commencing until June of 2008, VSLSAM
was listed on the Hull and Machinery insurance policies for the Navigator as a Co-Assured with
its status listed as "Joint Managers" of the ship along with CPUK.  (Pls.' Ex. 11).  A Hull and
Machinery policy covers risk because of any problems with the mechanical aspects of the ship or
its operations, risks that VSLSAM would not face in relation to any of the obligations it
undertook under the any of the other written agreements it had in connection with the
management of the ships.  (Sinclair Trial Tr. 301:10-17).  These insurance policies were
procured for the Navigator by a V.Ships affiliate of VSLSAM.  (Sinclair Trial Tr. 303:2-5).

The parties' course of conduct also indicates that oral contracts between V.Ships entities
and CPUK were not unusual.  In the same time period, 2000 to 2008 various V. Ships entities,
including V. Ships U.K. Group HR, Marine Services MD and SEACOM, occupied desks in the
CPUK offices pursuant to an oral sub-lease agreement based roughly on a per body basis.
(Sinclair Trial Tr. 263:24-264:4; 265:6-8; Evenhand Trial Tr. 1378:2-10).

5. <u>When formal management changed, the actual management personnel and
processes did not</u>

- 74 -

The Court also finds that additional evidence of the oral contract is demonstrated by the fact that, when VSLSAM or VSLUK either went out of management or came into management, nothing about the actual management of the vessel changed.

When formal management changed from VSLSAM under the 1998 agreement to CPUK under the December 31, 2000 agreement, little about the actual management changed.  (Conroy Trial Tr. 94:14-21).  The personnel remained the same and the Regent used the same SMS and other operating policies and procedures after the change as were employed before the change. (Conroy Trial Tr. 95:3-6).

Similarly, when VSLUK came into management on June 1, 2008, nothing changed about how the ships were managed or by whom.  (Sinclair Trial Tr. 296:13-23; Evenhand Trial Tr. 1395:16-1396:4).  The same personnel remained performing the same functions under VSLUK. (Sinclair Trial Tr. 296:13-23; Evenhand Trial Tr. 1396:9-11).  VSLUK continued to use the same SMS and operating procedures.  (Conroy Trial Tr. 95:3-6; Evenhand Tr. 1395:25- 1396:4).

6. <u>When VSLUK took over management of the Regent fleet, it did not conduct a condition survey</u>

Further evidence of the existence of the oral agreement can be found in the fact that, when VSLUK took over management responsibilities for the condition of the Regent fleet on June 1, 2008, it did not conduct a survey of the condition of the ships.  (Evenhand Trial Tr. 1400:7-13).  When VSLUK assumed management of the Regent fleet, it did not even fill out the V.Ships "Vessel Takeover Data Sheet".  (Pls.' Ex, 272).

7. <u>VSLSAM promoted the technical support and deck and engine management services it was providing to the Regent fleet in promotional presentations to potential customers</u>.

Evidence of the existence of the oral argument also is demonstrated by the manner in which VSLSAM promoted the services it was providing to the Regent fleet to its potential customers.   Throughout the period between 2001 and 2008, VSLSAM sent out numerous promotional presentations describing its ship management experience to potential customers. Those presentations frequently included a slide presentation that included a description of the services it was providing to its "Current Cruise Clients" in which it described its services to the Regent fleet in the following way – "In 1998, the Group signed a joint venture agreement with Radisson for the construction of one 500-passenger and one 720-passenger ultra luxury cruise vessels, which will be managed technically by the Group and operated by Radisson Seven Seas Cruises.  Radisson Seven Seas Cruises is today one of the world's largest luxury cruise lines." (Pls.' Exs. 229 to 244).  That slide goes on to list the ships in the Regent fleet and to describe the "Services Provided" as including either "deck and engine management" or as "Technical Support Services."  *Id.*   Several of these presentations include a chart of the "Marine Business Unit: V.Ships Leisure" that showed "Technical Director Vittorio Facco, CPUK Southampton" in a direct line reporting relationship with Andrea Zito, then the COO of VSLSAM.  (Pls.' Exs. 235, 237 and 238).

Plaintiffs' Exhibit 241 is a response by VSLSAM to an inquiry from Lloyds Cruise International that asked VSLSAM to describe what ships they currently were managing and, for each ship to describe the services provided.  VSLSAM responded by stating that it was providing "Technical management and hotel crewing" for both the Navigator and for the Voyager. The Contracts with VSLUK are valid and enforceable.

**III.  THE DEFENDANT, VSLUK, DOES NOT DISPUTE THE EXISTENCE OF VALID CONTRACTS TO PROVIDE TECHNICAL MANAGEMENT TO THE REGENT FLEET.**

VSLUK took over full ship management duties for the Navigator on June 1, 2008, and served as the Manager of the vessel under the terms of a June 1, 2008 ship management agreement between VSLUK and the owners of the Vessels in the Regent Fleet.  (Pls.' Ex. 15). VSLUK also entered into similar ship management agreements with CPUK for the management of the Voyager.   (Lindsay Trial Tr. 410:15-16).   Each of those contracts contained responsibilities for VSLUK to provide the following crew management services to the Regent fleet:

> 3.1    Crew Management
>
> The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners … which includes, but is not limited to the following functions:
>
> (i)  Selecting and engaging the Vessel's Crew …
>
> (ii) ensuring that the applicable requirements of the laws of the flag of the Vessel are satisfied in respect of manning levels, rank, qualifications and certification of the Crew …
>
> (vi) training of the Crew and supervising their efficiency …

Each of these contracts also contained responsibilities for VSLUK to provide the following technical management services to the Regent fleet:

> 3.2    Technical Management
>
> The Managers shall provide technical management which includes, but is not limited to, the following functions:
>
> (i)   provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;
>
> (ii)   arrangement and supervision of dry dockings, repairs, alterations and the upkeep of the Vessel to the standards required by the Owners provide that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flat of the Vessel and of the places where she

trades, and all requirements and recommendations of the classification society

(iii)  arrangement of the supply of necessary stores, spares and lubricating oil …

(v)  development, implementation and maintenance of a Safety management System (SMS) in accordance with the ISM Code …

## IV.  THE DEFENDANTS BREACHED THEIR CONTRACTS TO PROVIDE PROPER TECHNICAL MANAGEMENT AND MAINTENANCE TO THE REGENT FLEET

### A.  The Standard for Breach In an Admiralty Contract Claim

"Federal admiralty jurisdiction is invoked by a claim that an oral contract regarding the repair of a vessel was breached. *See Hatteras of Lauderdale, Inc. v. Gemini Lady,* 853 F.2d 848, 849-50 (11th Cir.1988). To recover damages on such a claim, a plaintiff must prove "the reasonable value of the purported damages." *Sweet Pea Marine, Ltd v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11 Cir. 2005). "A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach." *Crowley American Transport, Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 781 (11th Cir. 1999) (finding that damage to cargo was not proximately caused by carrier's failure to notify of misappropriation of bank's cargo.).

### B.  The Defendants' Breached Their Duties to the Plaintiffs Despite That The Vessel Remained in Flag And Class

Although the Navigator remained in Class, and sailed within the requirements of her Flag State Bahamas, and later Bermuda, the Court finds those to be the minimal industry requirements for all ships to sail, and that they do not fully represent the Owner's standards required for the

technical condition of the Navigator.[6]  (Mele Trial Tr. 634:19-25, 635:1-3) The actual areas of the ship the Plaintiffs have indentified, and successfully proven to this Court to be in poor condition, evidence that during the time of V.Ship Leisure SAM's direction of the technical management and maintenance of the Navigator, from the period of 2000 until June 2008, and during the time of V.Ship Leisure's UK technical management contract, from June 2008 until May 2009, the Navigator's condition deteriorated to such an extent as to require comprehensive repair and replacement of the parts/systems during the period leading up to and including the November and December 2009 dry-dock. (Evenhand Trial Tr. 1379:8-18; 1382:14-17; Mele Trial Tr. 507:11-19).

This Court is not persuaded by the arguments of the Defendants that as long as the Vessel remained in "flag" and "class" she satisfied the Owner's standards.  Moreover, the record is replete with many indications of several parts/systems that would not normally be subject to class, and others, that even though subject to class requirements (the Main Switchboard and Fire Detection System) nonetheless, suffered in a state of disrepair without action from class.

The major classification societies including, Det Norske Veritas ("DNV"), Registro Italiano Navale ("RINA"), Lloyd's Register and Bureau Veritas ("BV") are all a part of an organization referred to as IACS or the International Association of Classification Societies. (Mele Trial Tr. 511:6-18).  Each of these classification societies have a set of standards or guidelines relating to the technical sufficiency of ships.  (Mele Trial Tr. 511:19-22)  While a classification society for a particular ship is chosen by the ship's owner, its primary role is to conduct technical inspections on board the ships, on behalf of certain flag state administrations,

---

[6]   In addition, there is significant evidence that, given the condition of several of the parts/systems at issue in this litigation, they also would likely have failed to meet class or flag state requirements.

to verify that the ship complies with the rules and is seaworthy to sail. (Mele Trial Tr. 513:13-19; 514:10-25).  This in itself however, does not set forth the true technical conditions of a ship. Indeed, the inspections by class occur generally on a yearly basis, review random portions of the ship, and are very much dependent on the information provided by the technical managers.

For example, on a yearly basis, the given class society conducts a yearly inspection to renew the ship's passenger certificate, and may conduct other periodical inspections.  (Mele Trial Tr. 513:20-25; 514:1-9).  The primary objective of any of those inspections is to focus on the safety and seaworthiness of the vessel.  (Mele Trial Tr. 515:12-15).  Nonetheless, class societies do not inspect and evaluate all of the technical areas of a ship and thus, certain areas of a ship's technical spaces are not subject to class requirements. (Mele Trial Tr. 515:17-21).  As an example, class requirements do not apply to the piping and materials in the area of a spa on a passenger vessel or its gym, including its sauna or steam bath. (Mele Trial Tr. 516:20-25, 517:1-2).  Likewise, there would be no class requirements imposed upon, for example, a potable water piping or non-essential pumps and air conditioning ducting itself. (Mele Trial Tr. at 517:6-21). The Flag State, also selected by the owners, and sometimes referred to as the Flag Administration of a ship, refers to the country where the ship is registered.  (Mele Trial Tr. 513:1-8).  Certain Flag Administrations, with exception of Bermuda, permit the classification societies to act on their behalf to make sure that the ship is safe and sound to sail. (Mele Trial Tr. 513:1-12).  As so they rely upon the classification society, who in turn, at least to some extent, relies on the actions of the owner.  This Court is not convinced that just because the Navigator

remained in Flag and Class that she is technically sufficient.   Indeed, the selection of flag and class are in the discretion of the owners.[7]

### C.     The Defendants' Breached Their Duty To Properly Technical Manage and Maintain the Navigator And the Technical Resources Did Not Impose Justifiable Limitations

This Court also finds that the technical budgets given and approved by the owners for the Navigator did not restrain the ability to conduct proper and good maintenance over the years. The evidence establishes that proper technical budgets were afforded to the Defendants, indeed, at times, their actual technical budgets exceeded the costs to run the ship today.  (Paiella Trial Tr. 865:17-23, Pl.'s Ex. 158, Regent 018266). Moreover, there is no evidence in the record, that the Defendants were ever denied requests for additional technical budgeting money as may be required at times for the ship. (Sinclair Trial Tr. 289:4-10). The evidence reveals that overages in the budgets were common and often funded by the Owners. (Id.).

This Court finds there is ample evidence in the record establishing that the damages complained of in this action, specifically the separate systems/parts on-board the Navigator, complained of in this action, demonstrate that the Navigator suffered from lack of routine maintenance, inattention to safety concerns, and was not maintained to the Owner's standards which, has proven to be requiring the technical spaces to remain in good condition.  The Court has grouped the various parts and systems below and addresses each in turn below.

### D.     The Defendants' Breached Their Technical Maintenance Obligations Requiring Them To Maintain The Ship In Good Condition

---

[7] Because the Navigator was the product of a joint venture from Vlasov and Carlson, the Vlasov side of the business, who at one point wholly owned the Defendant V.Ships Leisure SAM, provided the technical management and the selection of its Flag and Class.

This Court finds that both V.Ships Leisure SAM and V.Ships Leisure UK, during successive periods of time over the 2000 to 2009 time frame, supervised and managed the technical maintenance of the Navigator, and assumed responsibility for implementing the ship's Safety Management System setting for its own guise of rules on Planned Maintenance.

Regardless of the standards set forth by the Owners and V.Ships Leisure SAM and V.Ships Leisure UK in the contracts, the evidence indicates that the V.Ships' Defendants assumed responsibility to implement the Navigator's Safety Management System, a critical portion of which required Planned Maintenance and stated that "Prevention is Better than Cure" as their motto to approaching maintenance. Nonetheless, the evidence on these particular parts and systems evidences that that Defendants failed to undertake and employ those responsibilities imparted upon them by the SMS system and overall failed to properly technical manage and maintain the Navigator over many years. Through a series of oversights, mismanagement, and lack of attention to the technical maintenance and management of the ship, the technical conditions of the Navigator fell into pitiful condition, including, lacking basic needs such as air conditioning in crew cabins, and proper functioning of back up generator equipment in case of black out emergencies and safety fire detection equipment to identify a few.

This case has established that without the role of effective technical managers working cooperatively with crew on-board the ship, the efficiency of the technical conditions on certain portions of the technical spaces on a ship can be literally non-existent especially, where the crew relies upon the stores, spares, materials and equipment provided by shore side technical support to carry out their basic routine maintenance requirements. The shore side technical management and support are also instrumental in planning dry docks, wet docks and "out of service" dates for the vessels for more detailed repairs unable to be completed while the ship is in service. The

history of the Navigator's dry docking has been appropriate, literally spending more than 40 days out of service, which accords with class requirements requiring a dry dock (industry standard of 7-10 days) twice every 5 years.

According to Richard Evenhand, the purpose of technical ship management is to look after a vessel in management, give it the shore side and superintendent support of the vessel, and to support the ship with supply of services, stores and spares as necessary for them to operate and to liaise with flag and class and any other bodies relevant to the ship operation. (Evenhand Trial Tr. 1379:8-18). Technical ship management is performed within the ambits of a ship's Safety Management System that is imposed upon the ship crew and shore side technical support to ensure the smooth running of the ship in accordance with standards imposed by the International Safety Management Code. (Evenhand Trial Tr. 1382:14-17). The Safety Management System is developed from the International Safety Management standards that cover areas concerning operation of ships and consists of a collection of procedures with the intent and scope is to properly manage a vessel in the safest possible way in order to protect human life at sea, the environment, and to avoid damages. (Evenhand Trial Tr. 1382:14-17; Mele Trial Tr. 507:11-19). Technical ship management also involves safety issues and implementing and working with the ship's Safety Management System. (Evenhand Trial Tr. at 1380:23-25; 1381:1-6). For a provision or guide to conducting maintenance on the ship, the crew and shore-side personnel work together to carry out the procedures set forth in a ship's Safety Management System. (Paiella Trial Tr. 897:24-25; 898:1-15).

The efficacy of the Safety Management System requires a high level of senior level persons from shore-side interfacing with the ship's crew. (Mele Trial Tr. 507:25; 508:1-7). Those persons also are instrumental in providing stores, spares and materials to the ship to ensure

the efficacy of the technical operations.  During the VSLUK contract period, Richard Evenhand described those shore-side personnel as involved to ensure, for example, that training is conducted on board the ship and that the ship's crew operate and perform to certain standards. (Evenhand Trial Tr. 1381:23-25, 1382:1-5).  In undertaking this task, Mr. Evenhand described that the technical superintendents and marine superintendents, as well as the technical director, are in constant communication with the crew on the ship often interfacing with them by email on a daily basis.  (Evenhand Trial Tr. 1382:7-13).  It is the responsibility of the technical managers to supervise the senior officers on board both during inspections on-board and other times in the performance of the vessel. (Evenhand Trial Tr. 1382:20-25).  Likewise, the technical managers are responsible to audit the performance and the compliance with the procedures done by the crew on board the ship. (Evenhand Trial Tr. at 1383: 4-8).  Technical management also involves the oversight of maintenance and repair, and includes the process of scheduling repair and maintenance, and also, making sure the repair and maintenance happens as appropriate. (Evenhand Trial Tr. 1383:16-22; 1384:20-25; 1385:1).   In the duties of crew members on-board the ship, the Chief Engineer would be the crew member responsible for the technical condition of the ship, and would report contemporaneously to the Captain and the shore-side technical managers.  (Mele Trial Tr. 509:7-14).

> E      **The Defendants breached the Navigator's Safety Management System Requiring Planned Maintenance and Audits**

Mr. Richard Evenhand testified that he supervised the customization of the original Safety Management System for the Navigator.  (Evenhand Trial Tr. 1381:18-22).  The Safety Management System for the Navigator was a structure comprised of three levels as dictated by the ISM Code. (Pl's Ex. 135).   Under the "Planned Maintenance," the directions to shore side personnel and crew relating to maintenance were that "Prevention is Better than

Cure." (Pl.'s Ex. 135).      Mr. Evenhand testified that "Planned Maintenance," as set out in the

Safety Management System, meant that whenever possible "it's better to prevent a breakdown or

failure than it is to actually correct it later where possible." (Evenhand Trial Tr. 1416:3-6).

Nonetheless, and despite the edicts of its very own SMS system, the evidence establishes that the

Navigator was not maintained, and suffered from lack of repair, neglect and oversight for many

years.

    Mr. Paolo Mele, an experienced Chief Engineer, reviewed the condition of the systems

and equipment complained of in this lawsuit commencing in the summer of 2008. (Mele Trial

Tr. 519:16-18).  He testified that the conditions of various systems and items complained of in

this lawsuit establish that the Navigator's Safety Management System was not fully followed and

specifically, that VSLUK did not maintain the Navigator to the standard set forth in the SMS

system during the 2008-2009 time period.  (Mele Trial Tr. 574:2-21; 575:25; 576:1-4) (Pls.' Ex.

53).

    Mr. Garbarino stated the following when asked about whether the Navigator's condition

had been poorly maintained:

> Q:    No, no, no.  I'm asking you when you got on-board the Navigator, okay, did you
>        witness a condition such that .. the vessel suffered from ineffective maintenance
>        and repair activities? It's a yes or no answer.
>
> A:    It did not strike admitted that in 2006 when he assumed the role as Safety and
>        Quality Manager for the Navigator, that the "passenger areas" did not appear to be
>        poorly maintained, but he failed to represent that conclusion for the entire vessel,
>        inclusive of its technical spaces. (Garbarino Dep. 155:21-156: 4).

In addition, other employees of the Defendants such as David Gleaves, a superintendent hired by VSLUK to document the condition of the Regent Fleet in April 2009, including the Navigator testified that the systems on the navigator including the bilge piping and steam piping, bilge preservation, had all been under maintained. (Gleaves Dep. 34:24-25, 35:1-15).  He testified the crew were "reactive" to steam leaks and not devoting time to preventative maintenance. (Gleaves Dep. 34:24-25, 35:1-15).  The various conditions on board the ship had been outstanding for more than one year and many of the conditions he found were never identified by Mr. Favuzzi in his very last technical superintendent report.  (Gleaves Dep. 31:16-21; 32:1-9). Mr. Garbarino, the safety and quality superintendent for the navigator for years 2006 to 2009 testified that he conducted his annual safety audit check by sampling the equipment and systems on board. (Garbarino Dep. 173:9-16).

### D.   The Defendants' Ignored their Obligations to Maintain the Navigator's Various Parts and Systems in Good Condition

#### 1.   The Smoke Vertical Stack

The vertical stack is the housing for all of the exhaust pipes for the ship and discharges smoke or fumes through the atmosphere through the part referred to as the "stacks." (Mele Trial Tr. 520:17-23).  The smokestack's condition was first documented in a February 2008 Superintendent Vessel Report, prepared by employees of VSLSAM, Antonio Favuzzi and Pantaleo Murolo. (Hislop Trial Tr. 1079:11-17) (Pls.' Ex. 93).   At that time, the exhaust pipes showed signs of corrosion, but a "temporary repair" to the funnel had been undertaken and the only action noted in the report was to "keep monitoring funnel for more corrosion signs."  (Pls.' Ex. 93).   Somewhat inconsistently, however, the same report notes that the exhaust pipes should be evaluated during the next dry dock to "replace the funnels" suggesting that the level of corrosion had primarily settled in at that time. (Pls.' Ex. 93).   Mr. Hislop testified that, based on

all of the earlier Superintendent Reports he had reviewed, there was no evidence of any mention of the condition of the funnel smokestack and that no repairs had been undertaken to the funnels before the 2008 temporary repairs and the 2009 dry dock.  (Hislop Trial Tr. 1080:2-5).  Mr. Hislop testified that the overall condition of the funnel smoke stack in February of 2008 was already deteriorated by corrosion and required significant repair and replacement in the 2009 dry dock. (Hislop Trial Tr. at 1080:17-21; 1078:5-12).

Mr. Mele testified that by his account the funnel smoke stack was "full of holes and corrosion" and one piece of the smokestack collapsed in the middle of the night and "luckily did not kill anyone." (Mele Trial Tr. 658:8-14).  The stack itself had to be "cropped" while the ship remained in service, temporary repairs were made in the form of "patches" and materials were used to reinforce the base of the stacks which were loose and corroded. (Mele Trial Tr. 658:23-25; 659:1-8).  These repairs were necessary to ensure the safe operation of the ship. (Mele Trial Tr. 658:23-25; 659:1-8).  During the 2009 dry dock itself, 7 meters of 11 stacks were replaced and all of the structures at the base of the stacks were replaced. (Mele Trial Tr. 658:23-25; 659:1-8).

Mr. Martin Hegarty, an Electrical Engineer, testified that the area of the funnel smoke stack presented several electrical "safety issues." (Hegarty Trial Tr. 710:14-23).   The safety issues he identified related to the lack of working smoke detection equipment, malfunctioning of the PA loudspeaker system and the non-working smoke obscuration system. (Hegarty Trial Tr. 710:14-23).  Mr. Hegarty identified photographs that revealed the melted condition of a smoke detector in the funnel smoke stack area.  (Hegarty Trial Tr. 710:14-23) (Pls.' Ex. 167K).  He explained that this area required a functioning smoke detector and that when it was discovered in a survey of April 1, 2009 it was addressed immediately (while the ship was in service) because it

was a safety issue.[8] (Hegarty Trial Tr. 713:5-9).  Mr. Hegarty testified that he hired a contractor

to review the condition of the complete fire detection system on board the ship and discovered

that 46 separate fire detectors were not functioning. (Hegarty Trial Tr. 712:3-11).  Because the

condition of the fire detection system was a safety issue, Mr. Hegarty testified these issues were

addressed immediately and did not wait until the November 2009 dry dock. (Hegarty Trial Tr.

713:5-9).  Mr. Hegarty also testified that the public address system (PA system) which is used to

notify crew working in the area of funnel of any emergencies was inoperable. (Hegarty Trial Tr.

715:8-11).  However, the loud speaker itself was not working and had melted.  (Hegarty Trial Tr.

715:2-7).

Mr. Hegarty also provided testimony relating to the ship's obscuration system.  The

obscuration system monitors emissions from the funnel and notifies you of the smoke emissions

and signifies problems with the boilers. (Hegarty Trial Tr. 715:18-25; 716:1-7). The ship's

obscuration system, in the area of the funnel, had been disconnected because it had melted from

the heat. (Hegarty Trial Tr. 715:18-25; 716:1-7).  According to conversations with the Chief

Electrician on-board the Navigator, it was installed in 2007 but had not worked for the past 18

months. (Hegarty Trial Tr. 716:5-13).

2.       The Pool and Whirlpool Equipment

The pool and whirlpool machinery was first commented on in the Seaworthy

Systems Report of 2004 and noted that the "pool machinery room requires some immediate

attention." (Hislop Trial Tr. 1081:2-6) (Pls.' Ex. 56).  The reports indicate that equipment had

---

[8] Defendants' contend that photographs were taken over a period of time in 2009 leading up to
and including the dry docking period despite, that the label on the exhibit is limited to November
and December 2009.  Witnesses shown the photographs identified the conditions depicted in the
photographs to be contemporaneous with their observations made prior to, as well as, during the
dry dock. (Hegarty Trial Tr. 800:9-17).

been installed to "direct water leaks away from some of the pumps/motors and the Jacuzzi equipment is severely degraded due to ongoing leaks… standing water on the deck caused active rust and deterioration of the protective coatings." (Hislop Trial Tr. 1081:2-6). Mr. Hislop opined that the condition of the pipework was poor and evidenced lack of maintenance over a period of time. (Hislop Trial Tr. at 1082:1-15) Following the 2004 Seaworthy Systems report,[9] Mr. Hislop testified there was no indication that any remedial efforts were made to arrest the condition of the pool deterioration and that the work completed in the 2009 dry dock was directly responsive to the issues raised in the 2004 report. (Hislop Trial Tr. 1082:14-25).

Mr. Paiella testified he observed the condition of the pool machinery room. He testified that the pool filtering equipment had wasted and needed to be replaced – the equipment was "incapable" of repair. (Paiella Trial Tr. 879:11-25; 880:1-2) (Pls.' Ex. 167UUU). Mr. Paiella described the flooring in the area of the pool and whirlpool machinery was always filled with water and "leaks everywhere, the heating system in the pool was leaking, in several places, the heater plugs for the Jacuzzi were plastic and were buckled, the valves weren't shutting, pumps were failing constantly." (Paiella Trial Tr. 880:3-10). The electrical motors in the area also required replacement. (Paiella Trial Tr. 880:3-10).

3.    Cooling Water Connection/Sea Chests/Overboard Valves

---

[9]   This Court finds that, although the 2004 Seaworthy Systems report was reviewed by the Owners, a review of the report reveals that, while it in part, addresses some of the issues in this lawsuit, it does not address each of the systems and components separately identified in this action. Moreover, VSLSAM responded to that report by explaining that the "consultant (who conducted the survey) was negative to justify his fee." (Conroy Trial Tr. 116:20-25). V.Ships personnel, including Lorenzo Malvarosa, said the Navigator was in "great shape" and they addressed those areas in the report and said they were "going to make some changes in order to do it." (Conroy Trial Tr. 118:12-24). Mark Conroy testified that he and the "owners" of the Navigator accepted V.Ships' assurances that the ship would run smoothly because they had been business partners since 1999 and they relied on them. (Conroy Trial Tr. at 119:5-21).

The sea chest is a rectangular recess in the hull of a vessel that provides an intake reservoir from which piping systems draw raw water. The cooling water connection to the sea chests suffered from an extensive buildup of barnacles, reducing the amount of water flowing to the sea chests and reducing the efficacy of the related pump system. (Paiella Trial Tr. 832:17-25, 833:1-8) (Pls.' Ex. 167HHH).  Mr. Hislop testifies that the first record notation of any anomalies with the overboard valves was when Chief Engineer Tonci Masle boarded the vessel in March 2009.   (Hislop Trial Tr. 1086:10-14).   Prior to that time, and based on his review of the Superintendent Reports, there was no mention of the concerns with this particular equipment. (Hislop Trial Tr. 1086:20-23).

Mr. Paiella testified that the sea chests require maintenance at "every dry dock" to open up all of the valves, intakes, check the condition, check the wastage, do any maintenance to required which could be limited to cleaning them and putting them back. (Paiella Trial Tr. 833:16-25).  If this particular item fails during sea time it could result in having an "incredible amount" of water ingress into the engine room and a difficult time to repair it. (Paiella Trial Tr. 833:16-25).  The condition of this equipment evidenced that it had not been maintained for some time and the connection was "not working properly."  (Paiella Trial Tr. 834:4-11).  Mr. Hislop opined that the valves that came out of that location required replacement because they were "completely unserviceable" and were beyond repair. (Hislop Trial Tr. 1086:24-25; 1087:1-6).

### 4.    Laundry Facilities

Mr. Hislop testified that the laundry area state of disrepair was first mentioned in 2004 and the problems with the laundry equipment became "deep rooted."  (Hislop Trial Tr. 1089:23-25; 1090:1-7) (Pls.' Ex. 146). New equipment in the form of three Maytag washer/dryer machines were delivered and installed and "spares" for the laundry room were scheduled to be

delivered on board by mid April 2004. (Pls.' Ex. 146 at Regent 017349). However, a somewhat inconsistent April 2004 Superintendent Report demonstrates that the crew were awaiting the arrival of "transformers" to the ship to complete commissioning of the new washers and dryers and they were scheduled to be delivered onboard on March 19, 2004 and the crew were to install the equipment before March 22, 2004. Thus, as of the April 2004 report, the transformers apparently remained outstanding despite that they were ordered and expected by the ship's crew on or about March 19, 2004.

Mr. Hislop opines that the Superintendent Reports evidence that renewals of the equipment appeared ongoing, but that the actual maintenance of the new equipment was not conducted properly as evidenced by the need to replace all of the washers and dryers in November 2009. (Hislop Trial Tr. 1089:23-25; 1090:1-7). Mr. Paiella testified that during his various inspections of the Navigator before 2009 dry dock he observed the condition of the laundry room and it was a "disaster." (Paiella Trial Tr. 844:4-6). There was water on the tank tops, the filling system was leaking, the dryers were almost "completely torn apart," there were a few machines that were not working and the soap injection machine was "leaking everywhere." (Paiella Trial Tr. 844:11-22). The bilge area in the laundry room was wasted and the steam valves on the ironing system were leaking steam. (Paiella Trial Tr. 844:11-22) (Pls.' Ex. 167KKK). Mr. Mele testified that there was no evidence the laundry room ducting had been cleaned, and if it had been done, it was done improperly. (Mele Trial Tr. 670:13-17; 671:4-25; 672:1-5). The laundry room ducting had a vast amount of lint that was accumulating on the ducts creating a safety hazard. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5). Mr. Mele discussed an applicable National Transportation Safety Board recommending to all operators and technical managers of cruise ships around the world, especially to those carry U.S. citizens, to

clean the lint ducts once per year. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5).  However a search of documentation on-board the Navigator to evidence that her laundry ducts were cleaned in the one year interval was never located and the condition of the ducts suggested the yearly cleaning was not undertaken. (Mele Trial Tr. 670:13-17; 671:4-25, 672:1-5).  Based on the poor condition of the laundry room and equipment, Mr. Hislop opined that the repairs and replacements in the area were reasonable and necessary. (Hislop Trial Tr. 1090:12-17).

     5.    Tank 2 Starboard and 2 Port – Pipe Penetration

The heavy fuel oil storage tank holds fuel in the engine room. (Mele Trial Tr. 528:5-11).   The fuel oil tanks, both on the port and starboard sides of the ship, were corroded and leaking heavy fuel oil into the engine room bilge spaces. (Mele Trial Tr. 526:11-21).  The leak posed a safety hazard relating to fire due to the presence of fuel and combustible materials in the bilge area.  (Mele Trial Tr. 526:11-21) (Pls.' Ex. 167A).   Mr. Hislop opined the tank top condition was never reported prior to the April 2009 report of David Gleaves.  (Hislop Trial Tr. 1091:5-11).  Mr. Gleaves is a superintendent hired by V.Ships Leisure UK to assist Tonci Masle in rectifying conditions on the Navigator.  By the time any report of the tank tops conditions were made, they were already corroded to the point of leaking, and Mr. Hislop testified the repairs and replacement were necessary. (Hislop Trial Tr. 1091:12-17).  Mr. Paiella testified the condition of the tanks required repairs, and certain replacements, but that the cost allocation to the Defendants in certain parts 100% and in others 70% was a fair allocation, because more work in that particular area of the ship was done other than just the repair. (Mele Trial Tr. 851:8-17).

     6.    Safety Valves for Steam Boilers/Hot Well

The steam boilers and hot well are located in the engine room of the ship.  Mr. Mele testified during his initial visit to the ship, the engine room demonstrated steam and water

leakages. (Mele Trial Tr. 532:5-16). The hot well is a tank in the engine room that collects and recovers hot water and condensation coming from the steam piping lines. (Mele Trial Tr. 531:18-22). The Navigator's hot well was corroded and leaking and lacked sufficient insulation to protect from steam leakages. (Mele Trial Tr. 532:22-25; 534:1-3) (Pls.' Exs. 167C, 167D). Mr. Mele testified that once the old hot well was removed, the flooring below the hot well was completely corroded and wasted away due to the multiple leaks over time. (Mele Trial Tr. 537:18-25; 538:1-7). Mr. Mele was unequivocal that the hot well suffered from lack of maintenance and a fix as simple as additional insulation could have provided proper maintenance to the component. (Id. at 538:8-15, Pls.' Ex.. 167D)

Mr. Hislop testified that the hot well had never been previously mentioned in any of the Superintendent Reports and that in his opinion, it suffered from general neglect and lack of maintenance. (Hislop Trial Tr. 1094:13-25; 1095:1-4). Mr. Hislop opined the replacement of the hot well was necessary and the costs associated with the replacement were reasonable. (Hislop Trial Tr. 1095:5-11). Mr. Paiella testified that with maintenance given to the hot well, including maintaining the system properly, the hot well could last forever because it is "fixed steel." (Paiella Trial Tr. 918:13-19).

### 7.      Engine Room Store/Ventilation

This area addresses the ventilation into the engine room. Mr. Hegarty testified there were numerous problems with ventilation in the engine room. (Hegarty Trial Tr. 797:5-17). Out of 32 separate motors in the engine room, 25 of the units required new bearings, and rebalancing of the units. (Hegarty Trial Tr. 798:5-16). Mr. Paiella testified that the fire dampers in the air conditioning ventilation would not close posing a fire hazard. (Paiella Trial Tr. 852:4-12).

### 8.      Galley Exhaust and Ducting

Mr. Hislop described the galley exhaust and ducting as being in "deplorable" condition. (Hislop Trial Tr. 1097:4-11).  The Superintendent Reports reflect "some cleaning" conduced in 2006, but no additional notations indicating additional cleaning was done after that date. (Hislop Trial Tr. 1097:17-19).   The pictures demonstrating the grease build up in the galley were compelling. Mr. Mele described the galley ducting as being "full of grease to the point the grease was 'raining' into the galley." (Mele Trial Tr. 671:4-25; 672:1-5).  Mr. Mele testified that this condition was prohibited by the United States Coast Guard whose recommendation required all galley and laundry ducting cleaned once per year.  (Mele Trial Tr. 671:4-23).

### 9.      Life Boats, Rafts and Tenders including Platforms

Mr. Hislop's opinion is that the life saving equipment had been neglected and poorly maintained since as early as year 2002 when crew were painting over valves that resultantly seized and required replacing in 2009.  (Hislop Trial Tr. 1103:5-15).  While he admits some remedial actions taken to improve the condition of the life saving equipment is noted in the Superintendent Reports, he testified that his own observations lead him to doubt the accuracy of the reports based on the condition of the equipment. (Hislop Trial Tr. 1103:16-24).  Mr. Paiella testified there were issues with the life and tender boats particularly, the engine in tender boat number 5 had been out of service for nearly 18 months. (Paiella Trial Tr. 856:4-20).  Somewhat skeptical about the condition of the remaining engines, Mr. Paiella hired a contractor, before the 2009 dry dock, to inspect the life saving equipment.  (Paiella Trial Tr. 856:4-20) (Pls.' Ex. 167SSS).  Resulting from that inspection, it was discovered that the engines were in a desperate condition and 5 of the engines necessitated replacement. (Paiella Trial Tr. 856:4-20).   In addition, during a load test of a life raft at the required standards, the davit (lifting device) broke apart from the decking and was unable to launch the life raft.  (Paiella 861:22-862:1).  Mr.

Hislop opines that in his experience, he has seen the failure of this equipment before and it results from "sheer neglect and caused by corrosion." (Hislop Trial Tr. 862:13-23).

Mr. Hislop testified that all costs associated with repair and replacement of the life saving equipment was reasonable and necessary. (Hislop Trial Tr. 1104:1-10) He did not see any evidence in the Superintendent Reports that any of the life saving equipment were noted after the September 2006 report.  (Hislop Trial Tr. 1104:24-25. 1105:1-3).  Mr. Hislop opines the repairs were reasonable and necessary. (Hislop Trial Tr. 1105:4-7).

    10.    Bow Thruster Motor

The bow thruster is the device that enables the ship to maneuver in and out of port in the forward end of the vessel by moving the ship side to side. (Hegarty Trial Tr. 727:18-21). An inspection of the bow thruster electronics during dry dock revealed it was experiencing a full "ground fault" meaning, there was no way of knowing the condition of the bow thruster until it was no longer working. (Hegarty Trial Tr. 731:4-12).

    11.    Reduction Gears/Steering Gear/Electric Installation

These component parts and systems concern the steering and navigational equipment on the ship.  Mr. Hislop testified that the first time the steering gear was identified in the prior Superintendent Report in September 2004. (Pls.' Ex. 149).  That report states that the "port steering gear hydraulic power pack LO (leaking oil). to identify and rectify."  (Pls.' Ex. 149).  The action report states "crew to carry out ASAP."  Mr. Hislop testifies there were several temporary repairs of the rudders over the years but the repairs did not redress the issues that were eventually repaired in dry dock. (Hislop Trial Tr. 1113:10-21).  The repairs mainly addressed the "carrier bearings" in the system but failed to properly remediate the condition.  (Hislop Trial Tr. 1113:10-21).  Mr. Mele testified that the rudder blades required replacement because they were

cracking and the prior repairs, which consisted of welding the blades back together, had failed and the blades were "full of water." (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10). In addition, Mr. Mele testified to discovery problems with the hydraulic pumps for the steering gear that resulting in only one pump meeting the required pressure to operate the blade of the rudder. (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10). Moreover, Mr. Mele testified there was either a memoranda or condition of class imposed related to the rudder by either RINA or DNV. (Mele Trial Tr. 672:17-25; 673:1-19; 674:3-10). Mr. Masle's report evidences that the ship had operational difficulties at full speed with this rudder, including failing to operate since only one of the pumps were in service. (Pls.' Ex. 36 at V.Ships 0614). Mr. Hislop opined that a result of the condition of the rudder over time and its condition leading up to the dry dock that the only "permanent remedial issues" was to purchase a entirely new system. (Hislop Trial Tr. 1113:10-21). Mr. Hislop further opined that the costs of the replacement of this system were reasonable and necessary. (Id. at 111:5-9).

Also, this Court finds that the failure to do more adequate repairs to the rudder was not the result of the dry docking history of the Navigator. For example, Mr. Hislop testified that prior to the November 2009 dry dock where the rudders were replaced, the ship was taken out of service for dry dock repairs during the years of 2000, 2001, 2003 and 2007. (Hislop Trial Tr. 1111:20-25, 1112:1-19). Moreover, the record evidences that in 2004 the ship was dry docked in Freeport, Bahamas for 10 days, which should have provided ample time for the repair to the rudder. More detailed history of the Navigator's dry docking history is revealed in the reports which evidence:

> Dry Dock 2000 (Panama). From 19 March 2000 To 24 March 2000 (6 Days).

Dry Dock 2001 (Genova). From 21 October 2001 To 31 October 2001 (10 Days).

Dry Dock 2002 (S.Francisco). From 10 December 2002 To 15 December 2002 (5 Days).

Dry Dock 2003 (Freeport). From 28 October 2003 To 07 November 2003 (7 Days).

Wet Dock 2006 (Freeport). From 01 December 2006 To 10 December 2006 (10 Days).

Dry Dock 2007 (Freeport). From 07 December 2007 To 13 December 2007 (6 Days).

Wet Dock 2008 (Freeport). From 28 March 2008 To 03 April 2008 (5 Days).

Dry Dock 2009 (Bremerhaven). From 14 November 2009 To 14 December 2009.

12.    Emergency Switchboard/Main Switchboard

Multiple problems existed in the emergency and main switchboards.  Mr. Hegarty testified that the switchboard had experienced a fire in early 2008 and that it remained covered in "soot and carbon."  (Hegarty Trial Tr. 720:16-19; 721:23-25; 722:1-8) (Pls.' Ex. 167S).  The problems associated with the condition of the switchboard were that the carbon dust could reignite and cause heat and other problems to occur in the switchboard itself. (Hegarty Trial Tr. 722:13-19).    During his inspection, Mr. Hegarty observed that several of the switch board breakers had stickers confirming that their last maintenance was conducted in 2005, whereas the manufacturer requires maintenance of those parts every two years.  (Hegarty Trial Tr. 722:20-25, 723:1-7).  Mr. Hegarty also identified that there were switches that were not designed to be within the switchboard itself.  (Hegarty Trial Tr. 723:11-19).  These switches, referred to as "hidden switches," were only revealed during the dismantling of the switchboard for cleaning

and maintenance during the dry dock.  (Hegarty Trial Tr. 723:11-19) (Pls.' Ex. 167U).  When the switches were activated, the meter reading would give a false reading. (Hegarty Trial Tr. 723:11-19) (Pls.' Ex. 167T).  The switches themselves were suspect and Mr. Hegarty surmised that the only reason for such switches were to indicate a false "good" reading on the fault meter and to mislead the authorities such as U.S. Coast Guard, Flag State officials and Class Representatives. (Hegarty Trial Tr. 724:16-21-25; 723:1-12).   Resulting from the discovery of the "hidden switches,"   Mr. Hegarty commissioned a contractor, R&B Marine, the manufacturers of electrical switchboards, who offered an opinion that the only reason for such switches were to "mask earth faults that might be on board."  (Hegarty Trial Tr. 725:132-16, 25; 726:1-4) (Pls.' Ex. 109).  An earth fault is the improper leakage of electrical current. (Hegarty Trial Tr. 726:21-25; 727:1-2).   Mr. Hegarty denied that any of the repairs to the switchboard or emergency switchboard stemmed from "design" because this equipment would have been tested after the ship was delivered. (Hegarty Trial Tr. 780:20-25; 781: 1-2).

The history of the occurrence of "earth faults" on the ship was long standing.  In 2004, the Fleet Superintendent Report noted that crew are to "regularly monitor new earth faults and rectify as soon as possible." (Pls.' Ex. 146 at Regent 017348)..   However, in the subsequent Fleet Superintendent Report in September 2004, the "earth fault" comment remains present without any indication that the issue had been resolved.  (Pls.' Ex. 149 at Regent 017410). Again in the October 2005 report, the same earth fault comments are stated with instructions to for the crew to "regularly monitor new earth faults and rectify as soon as possible."  (Def's Ex. 62 at Regent 012107). Again in December 2006, the same "earth fault" comments are made without any remedial action taken. (Pls.' Ex. 155 at Regent 017550). The consistent presentation of this problem, over a series of several years, and without any remedial action evidences the lack of

maintenance by the crew and proper oversight and implementation of the SMS system by the

shore side technical management controlled by Defendant VSLSAM.

Mr. Hegarty testified that the emergency switchboard experienced significant

vibration that could have been remedied sooner by placing reinforcement brackets on the

structure.  (Hegarty Trial Tr. 778:7-12).  The repair conducted to the emergency switchboard

occurred during trial dock and was to place reinforcement brackets on the equipment to cease the

vibration originating from the ship.  (Hegarty Trial Tr. 777:24-25; 778: 1-6).

13.     Foundation for Wing Console

The wing console are devices used to maneuver the vessel into port. (Hegarty

Trial Tr. 781:19-25) (Pls.' Ex. 167Z). The wing console itself was corroded and resulted in holes

in the actual material of the console itself. (Hegarty Trial Tr. 782:9-25; 783:1-2) (Pls.' Exs.

167AA, 167 BB). Underneath the bridge wing console area was corroded and no repairs to arrest

the corrosion, such as "blanching" had been undertaken. (Hegarty Trial Tr. 783:14-784: 13).  The

actual tray to house the cables for this particular piece of equipment was rotten in several areas.

(Hegarty Trial Tr. 783:14-784:13) (Pls.' Exs. 167 CC, 167 DD). The risk imposed by the

deteriorated condition was that weather, such as water and moisture would ingress into the

console and cause the equipment in the console to not work properly.  (Hegarty Trial Tr. 783:14-

784:13).  This area should have been subject to routine maintenance and was a system never

mentioned in any of the Superintendent Reports.

14.     Battery Replacement

The Court finds that the failure of the Defendants to conduct a basic replacement

of batteries is proof of the poor maintenance and failure to comply with the Safety Management

System for the Navigator.  While the claim of batteries is not as significant as many of the other

claims brought by the Plaintiffs, it highlights the breach of duties by the Defendants over a period of time.   The most concerning problem in failing to change and replace the batteries relating to the uninterruptible power supplies on the ship, referred to as the UPS equipment. The batteries in this equipment are meant to function when the ship experiences a black out. (Hegarty Trial Tr. 787:5-12).   The batteries in several fire detection devices were "completely dead." (Hegarty Trial Tr. 787:13-25; 788:1-25).   Another concerning area is the batteries in the Voice Data Recording Equipment which records the occurrences on the bridge when an incident is occurring. (Hegarty Trial Tr. 787:13-25; 788:1-25).   The last time the batteries were changed for this device was 2002 which is alarming as the requirements are that such equipment is to be surveyed every year. (Hegarty Trial Tr. 788:20-25; 789:5-11).   The total costs for the replacement of batteries in this area comprised the total charges of replacing approximately 70% of the batteries through out the ship.   (Hegarty Trial Tr. 790:20-25; 791:1-2).   Mr. Hegarty testified since they replaced 70% of the batteries for routine maintenance in dry dock, the allocation of 30% was to represent the specific areas discussed herein that were glaringly the result of lack of maintenance.   (Hegarty Trial Tr. 790:20-25; 791:1-2).

15.   Rotating Machinery/Diesel Generators

This area of the ship concerns refers to the main generation of the ship which is intended to supply electricity to the vessel.   (Hegarty Trial Tr. 791:16-23).   The system is comprised of three diesel generators and two shaft generators. (Hegarty Trial Tr. 791:12-15). The first mention of the Mr. Hislop testified that he was on-board the Navigator, at the request of the Bahamas Maritime Authority, in 2005 to investigate a fire in the generator room. (Hislop Trial Tr. 1099:14-24).   At that time there was a lack of proper insulation in various areas of exhaust areas. (Hislop Trial Tr. 1099:14-25; 1100:1-11).   Moreover, various areas of insulation

in the area were flammable when tested by Mr. Hislop during his inspection. (Hislop Trial Tr. 1100:12-21).

16.     Tender Platforms

A tender platform is a device that allows passengers to be transferred from the ship to the tender in order to reach shore side if the vessel is not docking on the pier or alongside. (Mele Trial Tr. 563:24-25; 564:1-3) (Pls.' Ex. 162).  The tender platform suffered from several hydraulic oil leaks and several of the valves and connections on the hardware were completely rotten and full of rust. (Mele Trial Tr. 564:14-565:9)  Due to the poor condition of the hydraulic piston, the crew had difficulties opening the platform safely. (Mele Trial Tr. 564:14-565:9).  Also, the tender platform was always submerged in water. (Mele Trial Tr. 564:14-565:9) (Pls.' Ex. 565:19-566:5) (Pls.' Ex. 162 at Regent 01220, 012217, 012225).   According to Mr. Masle's report, both the port and starboard tender platforms were in poor condition including, rusting hydraulic jack pistons, "very rotten" hydraulic jack fittings, pipes and control valves. (Pls.' Ex. 36 at V.Ships 0612).   Mr. Masle's report requested immediate assistance from shore service to conduct a general overhaul of the equipment. (Pls.' Ex. 36 at V.Ships 0612).   Mr. Mele testified that there had not been anything done to address the leaking condition of the hydraulic equipment.   Mr. Hislop testified that "surprisingly" there were no comments in the Superintendent Reports regarding the functionality of the tender platforms. (Hislop Trial Tr. 1109:20-24)  The first report he recalls that mentioned problems with the tender platforms was Mr. Masle's 2009 report.  (Hisop Trial Tr. 1109:25, 1110:2).  Mr. Hislop opined that the repair costs for the tender platforms were reasonable and necessary for safety. (Hislop Trial Tr. 1110:8-12).

17.     Skeg Repair

A ship's skeg is a sternward extension of a ship's keel and usually has a rudder mounted at the center line.   Renewal of a skeg is generally an item repaired during dry dock, but the Navigator's skeg had not been renewed in some time. (Paiella Trial Tr. 868:1-8). Nonetheless, in the 2009 dry dock the skeg required renewal because the aft section between the propellers was detaching and had to be rebuilt. (Paiella Trial Tr. 868:18-23).   The first mention of any issues with the skeg is a report of outfitting it to the ship in 2000 to potentially redress the stability of the ship. (Hislop Trial Tr. 1111:20-1112:6)  After that time, there is no report of any conditions with the skeg, despite that the ship went into several other dry docks that would enabled a review and repair of the skeg.

18.     ICCP Anodes

The ICCP Anode system is intended to protect the ship's underwater metal from wasting away.  (Hegarty Trial Tr. 870:2-10)  The actual system was not functioning leading to the wastage of the underwater metal such as to the underwater valves, intakes and sea water intakes. (Hegarty Trial Tr. 870:2-10)  The total repair cost however was not allocated to the Defendants in this action.  Only 40% of the total repair has been attributed by the Plaintiffs because most of the repairs to this system would be expected in dry dock.  (Id. at 870:19-25) The additional effort to restore the system is attributed to the Defendants' failure to maintain the system.

19.     Environmental/Disposal of Oil Sludge/Incremental Sludge Costs

The Plaintiffs contend that due to concerns over the use of the ship's oily water separator, which led to the eventual indictment of the Chief Engineer on-board the Navigator from 2008 to 2009, they incurred costs to off-load and process excess sludge.   Mr. Hislop opined that the actual amounts incurred to off load the sludge were reasonable and necessary.

20.     Miscellaneous Dry Dock Costs

The last categories of damages sought by the Plaintiffs are related to "miscellaneous dry docking costs" relating to painting, freight, dry dock charges and some pre-dry docking invoices.  All of these amounts have been allocated to the Defendants based on a percentage of allocation, all accepted by Plaintiffs' expert, Mr. Hislop, as reasonable and necessary.  The Court finds that the various items within this category are fairly attributed to the Defendants as a portion of the overall costs incurred by the Plaintiffs in the dry dock *vis a vie* the amount of allocable damages to the Defendants for the items suffering from lack of maintenance and poor technical management oversight.   The value of those damages will be set forth herein below.

**F.     The Defendants' Breached Their Technical Maintenance Duty to Maintain Voyager**

The Voyager suffered from a long standing history of vibration issues never redressed either by VSLAM or VSLUK during the 2003 to 2009 period of time.   (Hislop Trial Tr. 1114:21-24).  Mr. Lindsay testified that the Voyager would require ongoing repairs to change out the motor mounts.  Mr. Lindsay testified that the vibration problems disturbed the guests and were prevalent immediately upon their take over.  (Lindsay Trial Tr. 429:25, 430: 1-5).  Despite the prevalence of these vibrations, these concerns were never brought to Mr. Lindsay's attention while VSLUK managed the ship. (Lindsay Trial Tr. 430:6-7).  Mr. Hislop opined that in order to remediate the vibration noises the ship's engine mountings had to be changed and that the Plaintiffs' costs associated with those repairs are reasonable and necessary. (Hislop Trial Tr. 1115:2-10).

**E.     The Defendants' failed to advise the Owners of the Navigator's Stability Problems**

The stability of the vessel addresses the ship's ability to sail safely and in compliance with SOLAS requirements. (Pollard Trial Tr. 975:22-25, 976:1)  Mr. Pollard opined that the Navigator suffered from a stability problem and likely had sailed, several times, without complying with the statutory requirements. (Pollard Trial Tr. 1065:5-11)  While the parties agree that the Navigator experienced stability issues shortly after her launch, Mr. Lindsay testified he believed the issues were resolved. (Lindsay Trial Tr. 419:10-14).  Mr. Evenhand admitted that he never discussed the stability issues with Mr. Lindsay. (Evenhand Trial Tr. 1424:21-25, 1425:2-12).  Moreover, when Mr. Murolo addressed the "technical condition" of the Navigator with Mr. Lindsay, he never advised him of the stability issue. (Lindsay Trial Tr. 424:4-6) (Pls.' Ex. 104).  When the issue of stability was fully appreciated, the owners undertook efforts to plan the remediation.  The remediation included hiring a naval architect to re-design the hull, set forth planning within the dry dock and conducting the repair. (Lindsay Trial Tr. 454:23-25, 455:1-5)  Mr. Pollard opined that the Plaintiffs had to effect a modification of the ship's hull in order to modify her then-existing ship stability operating characteristics. (Pollard Trial Tr. 1010:10-1011:4).

## F. The Defendants' Failed to Engage, Train and Ensure the Efficiency of a Competent Qualified Crew

Under its agreement, VSLUK was obligated to provide suitably qualified Crew for the Navigator, as required by the Owners, including the obligation to select and engage the Crew, and to train the Crew and supervise their efficiency.  (Pls.' Ex. 15 at Sec. 3.1).  Richard Evenhand testified that it was the technical manager's obligation to be in daily contact with the crew, to train and supervise them, and to oversee and audit their compliance with the SMS. (Evenhand Trial Tr. 1379:19-25).

Despite these obligations, it is clear from the evidence that there were significant problems with the crew on board the Navigator during the time that VSLUK was responsible for its management.  It is equally obvious from this contemporaneous correspondence that the poor quality of the crew affected the technical management of the ships.

Plaintiffs' Exhibit 254 is an email chain from September 5, 2008, three months into VSLUK's management period in which VSLUK's Technical Director instructs Lorenzo Malvarosa that "I'm receiving a lot of complains (sic.) from the Owner and from the ships about he Crew situation on the entire fleet.  We suffer constant shortages of peoples (sic.), most of them are key positions.  In addition t the poor technical knowledge of the available personnel, will not help the situation at all.  Recently we had PSSC on board the navigator and this time has been a really challenging situations (sic.) on both areas Deck and Engine. …I just wont (sic.) to inform you that the Crew situation on Regent fleet is totally out of control."  (Pls.' Ex. 254 at 1, 2).  Mr. Malvarosa responded to this email by stating that "That is the situation is such we have very little change to succeed but we have also have a larger problem on the crew, to be honest most serious that what I thought."  (Pls.' Ex. 254 at 1).  Rafael Sauleau, the V.Ships Crew Operations Director responded by admitting "yes, bad situation with crewing overall."  (Pls.' Ex. 254 at 1).

Plaintiffs' Exhibit 249 is another email chain from October of 2008, in the fifth month of VSLUK's management of the ships.  In this email, Richard Evenhand responds to another crewing complaint from Mr. Murolo by noting that the Owner was complaining about the quality of the crew, and that "specific reference was made with regard to the navigator (sic.) condition … as the vessel condition has not deteriorated overnight …

Plaintiffs' Exhibit 251 is another email chain from January 2009, in the seventh month of VSLUK's management period.   In these emails, Mr. Murolo raises additional crew quality complaints with Mr. Seuleau, stating that "[h}appen many times that despite bad appraisal, you move those Crew from one ship to the other in the same fleet."   Later in the email series, Mr. Murolo tells Mr. Sauleau that "Don't take this personal, it is time WE solve the crew problems, after two year that I'm advicing (sic.) you, we din't (sic.) get any improvement."

It is obvious from this internal correspondence among V.Ships management that there was a problem with the crew on the Regent fleet and that it was affecting the quality of the technical knowledge and performance of the crew, that the problem was of some duration and affected the condition of the vessels ("the condition of the Navigator did not deteriorate overnight").

Based on this correspondence and the other evidence in the case, the Court finds that VSLUK breached its crew management obligations   under its ship management contract, and that that breach was an additional cause of the condition problems on evident on the Navigator and Voyager.

### G.    V.Ships Leisure UK permitted the Environmental Issues to Occur and Undertook to Conceal Them

 Plaintiffs claim damage from certain environmental investigatory expenses and sludge removal costs that they had to incur as the result of the actions of an unqualified Chief Engineer placed on the Navigator by VSLUK.

Plaintiffs Exhibit 257 is an email string from November of 2008, in which Pantaleo Murolo, then serving as the Technical Director of the Regent fleet for VSLUK, states that "Mr. Casillo cannot take a Chief Engineer position."   (Pls.' Ex. 257 at 1).   Despite this email, Mr. Casillo was hired as the Chief Engineer on the Navigator.

Plaintiffs' Exhibit 258 is an email chain from January of 2009, in which Mr. Malvarosa states that "We have anyway to remove Casillo and step him down, but we have also to look at the crew on board, the recent blackout was due to too much accumulation of water in the tank for lack of draining from months and months, basic stuff at that level." (Pls.' Ex. 258 at 1). Despite this email, Mr. Casillo was not removed or stepped down.

Instead, Mr. Casillo was permitted to stay on the Navigator where, according to the statements of three of subordinate engineers in his department, he instructed them to misstate the ship's environmental records. (Pls.' Exs. 172, 173). As was mentioned numerous times by the Defense at trial, Mr. Casillo subsequently was indicted by the United States criminal authorities for eight counts of environmental crimes while serving as the Chief Engineer on the Navigator.

In response to the allegations of environmental issues on the ship, the ship's owner was required to hire an environmental lawyer and an environmental consultant to investigate the claims. (Lindsay Trial Tr. 448:8-25). According to Mr. Argiz, the environmental investigation cost the Plaintiffs $188,000. (Argiz Trial Tr. 1138:23-25).

An additional consequence of the environmental issues brought about by Mr. Casillo's actions was that the Navigator was forced not to discharge any water overboard during the course of the investigation. As a result, the Plaintiffs suffered the extra costs of oily water and sludge removal during the period in the amount of $254,614, which Mr. Hislop deemed both reasonable and necessary. (Hislop Trial Tr. 1114:5-8).

The Court finds that VSLUK violated its contract by hiring and failing to properly train, supervise and oversee the effectiveness of Mr. Casillo after VSLUK's own series of expressed documented misgivings about his competence and abilities.

## IV.     THE DEFENDANTS' ACTIONS AND INACTIONS CAUSED PLAINTIFFS TO SUSTAIN DAMAGES

Having established the nature of the breach, the Court next addresses damages.  The measure of damages in a breach of contract case arising under admiralty law is the amount necessary to put the injured parties in the exact position they would have been in had there been no breach.  *Eastern Shore Marine, Inc. v. PlaTrial Tr.* 2009 U.S. Dist. LEXIS 14647 (S.D. Ala. Feb. 23, 2009).  *See also, Maersk, Inc. v. Int'' Commodities Transp. Servs*., LLC, 2004 U.S. Dist, LEXIS 549 (S.D.N.Y. January 15, 2004)("In an admiralty action for breach of contract, federal maritime law governs.  The general measure of damages for a breach of contract under federal maritime law is the amount necessary to put the injured parties to the exact position they would have been in had there been no breach.").  Where two or more parties are at fault in causing property damages the liability for such damages is to be allocated proportionately to the comparative degree of their fault.  *Tampa Port Authority v. M/V Duches*s, 65 F.Supp.2d 1279 (M.D. Fla. 1997).  When it is not possible to fairly measure the comparative degree of fault, liability may be allocated equally among the parties.  *Id*. at 1293.  Betterment must be proven in order for its value to offset the incurred damages.  *Id. citing Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976)(trial court did not error in failing to include betterment reduction for deeper pipeline where record did not contain any evidence of value nor was the issue raised by the court).  Naturally, the burden of establishing "betterment" falls upon the Defendants because it is a mitigation of damages defense.  *Id*.

A.      **The Plaintiffs' Damage Claims**

The Plaintiffs claim damages in four categories.  First they claim $11.565 million for completed repairs to the Navigator and to the Voyager.  Second, they claim $525,000 for future ship repairs to the Voyager.  Third, the Plaintiffs claim damages arising from lost cruise revenue

in the amount of $5.24 million.  Fourth, they claim other expenses for future cruise certificates in the amount of $909,000.  The Court will address each damage claim separately.

1.    Costs of Remediation Due to Improper Maintenance and Repairs

As a result of the actions and omissions described elsewhere in this opinion, various parts and systems on the Navigator and the Voyager needed to be repaired in the time period leading up to and during the dry dock in Bremerhaven, Germany.  According to the Charter Agreement for the ships, it is the responsibility of the ship owners to "keep the Vessel, or procure that the Vessel is kept, in a good and efficient state of repair" and to "maintain the Vessel in good technical condition." (Pls.' Ex. 115, Sec. 15.1, 15.5).  Robin Lindsay testified that, although the drydock invoices were paid by the Charterer, the costs of the repairs were the ultimate responsibility of the ship-owning companies, and that the expense for these repairs were shown on the books of the shipowners.  (Lindsay Trial Tr. 460:9-19).  As a result, the Court finds that the damages resulting from the repair costs to the Navigator were suffered by its owner, CPUK Two, and that the damages suffered from the costs of repair to the Voyager were suffered by its owner, Supplystill Limited.

Plaintiffs' presented Tony Argiz, a highly qualified forensic accountant who the Defendants stipulated was qualified to present his opinions, to calculate the amount of damages arising from the repair and replacement costs.  Mr. Argiz testified that his methodology was to calculate the historical costs to cure, remedy or remediate the physical damage to the ships.

In calculating these amounts, Mr. Argiz relied upon the factual determinations of the Plaintiffs' technical staff as to the percentage of each repair or replacement that was the result of neglect or improper maintenance or repair, as opposed to ordinary wear and tear or to other refurbishments.  Plaintiffs' Exhibit 1 contains the applicable percentage for each item of repair.

This exhibit originally was prepared by one of the senior members of the Plaintiffs' technical staff, and each percentage determination was affirmed at trial by other members of the Plaintiffs' technical staff with long-standing experience in ship technical management, maintenance, repair and placement, and who were present for the actual planning and execution of the repairs and maintenance on the vessels, Carlo Paiella and Martin Hegarty.   The testimony of these technical witnesses on the amount of the repairs attributable to neglect and improper maintenance and repair was essentially unrebutted by the Defendants, and the Court finds that this testimony is credible and reliable.

Mr. Argiz testified that he reviewed the invoices for each of the repair and replacement costs, that he traced each of these amounts back to the company's books and vouched the accuracy of the invoices.  Mr. Argiz affirmed that the amounts claimed by the Plaintiffs as damages, accurately reflect the amounts actually incurred by CPUK Two and Supplystill Limited on the repairs to the Navigator and Voyager resulting from the neglect and improper maintenance and repair claimed by the Plaintiffs, and that those damages for past repairs and replacements on the Navigator is $11,531 million and on the Voyager is $34,000.

The Court next must allocate these damage amounts between the two defendants.  Each of these amounts results from a failure to maintain or repair a certain part or system on the Navigator or the Voyager.  Plaintiffs' technical expert, Kevin Hislop, testified as to when each of the items of repair or replacement was first recognized in the various superintendents' inspection reports as a problem, and that, for the time thereafter, the problem remained unaddressed, resulting in the necessary repair or replacement.  (Hislop Trial Tr. 1077:17-25; 1078:5-12; 1083:3-9; 1084:14-19; 1086:24-25; 1087:1-6; 1088:1-8; 1089:6-10; 1090:12-17; 1091:12-17; 1092:1-4; 1093:22-25; 1094:1-3, 9-12; 1095:5-11; 1096:24-25; 1097:1-3, 20-25; 1098:13-19;

1104:1-6; 1105:4-7; 1107:22-25; 1108:1-4, 10-13; 1109:8-11; 1113:10-21; 1114:5-8; 1115:2-5). As a result, the Court finds it appropriate to calculate the allocation of each such item in accordance with the ratable time period it went unremediated by each of the Defendants, and to allocate the damage amount based on the percentage of time after it was discovered that it was unremediated during the management period of each Defendant.

Alternatively, if this allocation method is not found to be acceptable, the Court finds that each of the Defendants had the contractual obligation to conduct the necessary maintenance and to make the necessary repairs and replacement of these parts and systems on these ships, and therefore allocates the damage amounts equally between the Defendants.

### 2.       Future repairs and maintenance on the Voyager

Mr. Robin Lindsay testified that the repairs to the vibration issues on the Voyager were not yet complete, and that the repair and replacement of the remaining engine mounts on the ship have been contracted for and will occur later this year.   Mr. Argiz has reviewed the third party vendor's proposals for the work, and has validated that the costs of these future repairs will be $525, 000.  These costs are the responsibility of Supplystill Limited, and the Court awards them to that entity.

### 3.       Lost cruise revenue

As a result of the unscheduled dry dock in Bremerhaven, six previously scheduled and booked cruises on the Navigator had to be cancelled.  According to the Charter Agreement under which the Navigator was being made available for those cruises, CPUK Two was obligated to "indemnify, defend and hold Charterer harmless against any and all liability or damages incurred by Charterers or passengers arising from the cancellation or curtailment of cruises because the Vessel is unavailable … and irrespective of negligence or default unless this is due to the willful

default or Gross Negligence of the Charters."  (Pls.' Ex. 115, Sec. 21.7).[10]  Robin Lindsay testified that, in accordance with this provision of the Charter Agreement, the liability for the lost cruise revenue has been recognized on the books of CPUK Two as its obligation.  Based on this evidence, the Court finds that it was CPUK Two that suffered the damages from the loss of cruise revenue because of the cancellation of the cruises resulting from the unscheduled dry dock in Bremerhaven.

Mr. Argiz calculated the damages resulting from the cancelled cruises by first determining the loss period.  Mr. Argiz affirmed that the Navigator was out of service for a total of 50 days, which included the 31 days of actual drydock and an additional 19 days for repositioning the ship to the drydock and back from the drydock.  Mr. Argiz then subtracted ten days from the 50 days, in recognition that this dry dock was likely to be replacing a dry dock that would have occurred in the following year, and that typical dry docks last seven to ten days.

Mr. Argiz then estimated the lost revenues from that 40-day period, and the variable/incremental costs incurred in the actual drydock and determined the actual lost profits from the unscheduled Bremerhaven dry dock to be $5.242 million.

The Court finds that the Bremerhaven dry dock was unscheduled as a result of the failure of VSLSAM to inform the ship's owner of the serious stability issues with the Navigator.  Had VSLSAM disclosed the stability problems to the Owner from the beginning, the owner would have had the opportunity to schedule the Navigator for repairs without having to cancel cruises, and CPUK Two would not have had to incur the indemnity costs described below.  Instead, the

---

[10]    Although the Charter Agreement contains a consequential damages waiver clause, the indemnification section described above is specifically excluded from that clause. (Pls.' Ex. 115, Sec. 24.1).

owner was required to perform the remediation at an unscheduled dry dock at the behest of the new classification society and the other exigencies presented at that time.

Included in the costs suffered by CPUK Two as a result of the cancelled cruises is for travel agent commissions that were not refunded when the cruises were cancelled, as is industry practice.

### 4.   Future cruise certificates

Mr. Lindsay testified that, in addition to a full refund for the cancelled cruise passengers, it is standard industry practice to issue these disappointed cruise passengers certificates to be used for future cruises.  Mr. Lindsay testified that such future cruise certificates were issues for the passengers whose Navigator cruises were cancelled because of the unscheduled dry dock in Bremerhaven.   Mr. Argiz testified that $909,000 of those future cruise certificates were redeemed for use on future Regent cruises.  According to the Charter Agreement in effect at the time of the cancellations, (Pls.' Ex. 115, Sec. 21.7), CPUK Two is obligated to indemnify the Charterer for the costs of the redeemed cruise certificates, and the Court awards the costs of these certificates to CPUK Two.

The Court finds that VSLSAM is liable for this damage to CPUK Two for the reasons stated above in connection with the lost cruise revenue.

### 5.   Prejudgment interest

Finally, the Plaintiffs are entitled to pre-judgment interest on all of the economic damages at the rate provided by Florida statutes from the date the damages were incurred.  *Tampa Port Authority*, 65 F.Supp. 2d 1279 at 1292.  The general rule is admiralty is that the court should award prejudgment interest absent peculiar circumstances. *See e.g., Pelican Marine Carriers, Inc. v. City of Tampa*, 791 F.Supp. 845, 857 (M.D. Fla. 1992), *aff'd,* 4 F.3d 999 (11th Cir. 1993).

6.   <u>Betterment</u>

The Court finds that the Defendants have neither pled nor presented any evidence of a betterment setoff.  First, the Defendants have not raised this defense in their pleadings either as an offset or otherwise.  The defense of setoff is an affirmative defense that must be pled by the Defendant.  *Davis v. Odeco, Inc.*  18 F.3d 1237, 1245 (5th Cir. 1994).  Defendants have not pled any setoff for betterment in this case, and cannot pursue this defense.

Moreover, there is no record evidence establishing the value for any betterment given the natures of the repairs and replacements.  Indeed, Plaintiffs' expert, Tony Argiz, testified that the Plaintiffs already had excluded from their damage numbers any repairs that would be deemed "upgrades" to the Navigator.  Finding no counter-evidence in the record, this Court accepts that the repair or replacement of a mitigation defense is not met, and therefore, the Plaintiffs are entitled to the full value of the repairs incurred to repair and replace the parts and systems on the Navigator and the Voyager.

**VII**   <u>**CONCLUSION**</u>

The Plaintiffs are requested to submit a Judgment in accordance with the terms of this Order.

Dated:  May 20, 2011

Respectfully submitted,

/s/ Daniel A. Casey
Daniel A. Casey, Esq.
Florida Bar No. 327972
daniel.casey@klgates.com
Robert M. Kritzman, Esq.
Florida Bar No. 0475830
robert.kritzman@klgates.com
Steven R. Weinstein, Esq.
Florida Bar No. 985848
steven.weinstein@klgates.com
Christina Paul
Florida Bar. No. 0596876
christina.paul@klgates.com
**K&L GATES** LLP
Wachovia Financial Center
200 S. Biscayne Boulevard, Suite 3900
Miami, Florida 33131
Telephone:  305.539.3300
Facsimile:  305.358.7095

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the

Court this 20th day of May, 2011 by using the CM/ECF system, which also will send a notice of

electronic filing to the counsel listed below.

Michael T. Moore, Esq.
Clay M. Naughton, Esq.
Scott A. Wagner, Esq.
Moore & Company
355 Alhambra Circle, Suite 1100
Coral Gables, FL 33134
Telephone:  786.221.0600
Facsimile:  786.221.0601
mmoore@moore-and-co.net
cnaughton@moore-and-co.net
swagner@moore-and-co.net
*Attorneys for Defendants*

/s/ Daniel A. Casey
Daniel A. Casey